1  RONALD A. PETERS, Bar No. 169895
   BENJAMIN A. EMMERT, Bar No. 212157
2  LITTLER MENDELSON
   A Professional Corporation
3  50 West San Fernando Street
   15th Floor
4  San Jose, CA 95113.2303
   Telephone:    408.998.4150
5
   Attorneys for Defendants
6  AC SQUARE, INC., AFSHIN GHANEH,
   ANDREW BAHMANYAR
7

8                  UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                   SAN FRANCISCO DIVISION

11 | DANIEL KEATING-TRAYNOR on | Case No.  CV-08-3035-MHP
   | behalf of himself and all others similarly |
12 | situated, | **DECLARATION OF BENJAMIN A.**
   | | **EMMERT IN SUPPORT OF DEFENDANT**
13 |            Plaintiffs, | **AC SQUARE, INC., AFSHIN GHANEH**
   | | **AND ANDREW BAHMANYAR'S MOTION**
14 |        v. | **FOR SANCTIONS UNDER FRCP RULE 11**
   | | **& 28 U.S.C. 1927; MEMORANDUM OF**
15 | AC SQUARE, INC.; COMCAST INC.; | **POINTS AND AUTHORITIES**
   | AFSHIN GHANEH; ANDREW |
16 | BAHMANYAR; and DOES 1 THROUGH | **FRCP, RULE 11; 28 U.S.C. § 1927**
   | 60, inclusive, |
17 | | **Date:    October 20, 2008**
   |            Defendants. | **Time:    2:00 p.m.**
18 | | **Dept:    Courtroom 15**
   | | **Honorable Marilyn Hall Patel**
19

20         I, Benjamin A. Emmert, declare:

21         1.     That I am an associate in the law firm of Littler Mendelson, a professional

22 corporation, which represents Defendants AC Square, Inc., Afshin Ghaneh and Andrew Bahmanyar,

23 with respect to the Plaintiff Daniel Keating-Traynor's Complaint in this matter.  I am duly licensed

24 to practice law in the State of California and this Court and I am one of the attorneys responsible for

25 representing Defendants in this action.  I have personal knowledge of the following facts and if

26 called and sworn in as a witness could and would competently testify thereto;

27         2.     Attached hereto as Exhibit A is a true and correct copy of Plaintiff's

28 Complaint for Damages and Demand for Jury Trial filed in the Superior Court in and for the County

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
50 West San Fernando Street
15th Floor
San Jose, CA 95113 2303
408.998.4150

(No. CV 08 3035 MHP)
Firmwide:86529400.1 047098.1008

DECLARATION IN SUPPORT OF MOTION FOR
SANCTIONS, FRCP RULE 11 & 28 U.S.C. § 1927

1    of San Mateo, Case Number CIV 456118, on July 07, 2006;

2            3.    Attached hereto as Exhibit B is a true and correct copy of Plaintiff's

3    Complaint for Restitution, Damages and Injunctive Relief filed in the Superior Court in and for the

4    County of San Mateo, Case Number CIV 464144 on June 29, 2007;

5            4.    Attached hereto as Exhibit C is a true and correct copy of Plaintiff's

6    Complaint for Restitution, Damages and Injunctive Relief filed in the Superior Court in and for the

7    County of San Mateo, Case Number CIV 473571 on June 10, 2008;

8            5.    Attached hereto as Exhibit D is a true and correct copy of Plaintiff's

9    Complaint for Violation of Fair Labor Standards Act filed in the United States District Court for the

10   Northern District of California on June 11, 2008;

11           6.    Attached hereto as Exhibit E is a true and correct copy of Plaintiff's First

12   Amended Consolidated Complaint for Damages for Violation of Fair Labor Standards Act filed in

13   the United States District Court for the Northern District of California on August 4, 2008;

14           7.    Attached hereto as Exhibit F is a true and correct copy of Plaintiff's

15   Opposition to Defendants' Motion to Dismiss Plaintiff's Complaint for Damages for Violation of the

16   Fair Labor Standards Act filed on August 4, 2008;

17           8.    Attached hereto as Exhibit G is a true and correct copy of the letter sent on

18   July 28, 2008 enclosing a copy of Defendants' draft Rule 11 motion and a request that Plaintiff

19   dismiss this action as Plaintiff's FLSA's causes of action are barred by the statute of limitations;

20           9.    Attached hereto as Exhibit H is a true and correct copy of Plaintiff's Consent

21   to be an individual plaintiff and class action plaintiff in the actions number CV-08-2908 MHP and

22   CV-08-3035 MHP;

23           10.   Attached hereto as Exhibit I is a true and correct copy of this Court's

24   Memorandum and Order granting Defendants' Motion to Dismiss Plaintiff's Complaint for failure to

25   state a claim pursuant to Federal Rule of Civil Procedure, Rule 12(b)(6);

26           11.   Attached hereto as Exhibit J is a true and correct copy of the relevant pages of

27   the Plaintiff, Daniel Keating-Traynor's deposition taken on November 21, 2006 in his action filed

28   against AC Square, Inc. on July 07, 2006, action number 456118;

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
50 West San Fernando Street
15th Floor
San Jose, CA  95113.2303
408.998.4150

(NO. CV 08 3035 MHP)
FIRMWIDE:86529400.1 047098.1008            1.            DECLARATION IN SUPPORT OF MOTION FOR
                                                          SANCTIONS, FRCP RULE 11 & 28 U.S.C. § 1927

1            12.     Attached hereto as Exhibit K is a true and correct copy of the relevant pages

2 of the Plaintiff, Daniel Keating-Traynor's deposition taken on May 23, 2008 in his action filed

3 against AC Square, Inc. on June 29, 2007, action number 464114;

4            13.     Attached hereto as Exhibit L is a true and correct copy of the document

5 prepared by Plaintiff showing Plaintiff's claimed overtime and produced during Plaintiff's

6 deposition on May 23, 2008 in his action filed against AC Square, Inc. on July 29, 2007, action

7 number 456118. Plaintiff admitted that he did not work any overtime after April 23, 2005 in this

8 document that he prepared;

9            14.     Attached hereto as Exhibit M is a true and correct copy of the letter sent to

10 Plaintiff's counsel discussing this Court's Memorandum and Order, notifying Plaintiff's counsel that

11 Defendants are the prevailing party in this action, stating that Defendants will be moving to recover

12 their attorney's fees under Federal Rule of Civil Procedure, Rule 11 and 28 U.S.C. 1927, and

13 inviting Plaintiff's counsel to contact Defendants' counsel to discuss resolving the issue of

14 Defendants' attorney's fees (See Northern California Local Rule, Rule 54-6(b)(1)). Plaintiff's

15 counsel refused to have any discussion or conference regarding Defendants' attorney's fees (See ¶

16 15);

17            15.     Attached hereto as Exhibit N is a true and correct copy of an email received

18 by Plaintiff's counsel stating, in pertinent part "there is no basis for negtiations [*sic*] on your so-

19 called fees." (See Northern California Local Rule, Rule 54-6(b)(1));

20            16.     Plaintiff dismissed his wage and hour claims in his first action, case number

21 CIV 456118, just a few days before trial, but refused or failed to dismiss his wrongful termination

22 action, despite a successful motion for summary adjudication on this issue filed by AC Square.

23 After requesting a hearing to challenge the tentative ruling in the Motion for Summary Adjudication,

24 Plaintiff failed to appear at the hearing and the motion was granted. Plaintiff then failed to appear at

25 trial, or at least inform the court that he was dismissing his wrongful termination claim. Plaintiff

26 then failed to appear at three consecutive Order To Show Cause hearings regarding the disposition of

27 his wrongful termination claim. He then also filed an utterly meritless, and very untimely Motion

28 For New Trial and then again failed to appear at the hearing to challenge the tentative ruling in

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
50 West San Fernando Street
15th Floor
San Jose, CA 95113 2303
408.998.4150

(NO. CV 08 3035 MHP)
FIRMWIDE:86529400.1 047098.1008

2.

DECLARATION IN SUPPORT OF MOTION FOR
SANCTIONS, FRCP RULE 11 & 28 U.S.C. § 1927

1  Defendant's favor. In all, Plaintiff and his counsel have failed to appear six straight times at hearings

2  in this action.

3        17.    Defendants were represented by Mr. Ronald Peters, Mr. Benjamin A. Emmert,

4  Ms. Maryam Karson, and Ms. Lilanthi Ravishankar. Mr. Peters is a shareholder in the law firm of

5  Littler Mendelson. Mr. Peters was admitted to practice in February 1994. Mr. Peters' billing rate

6  for this action is $440.00 per hour. Mr. Emmert is an associate attorney in the law firm of Littler

7  Mendelson. Mr. Emmert was admitted to practice in January 2001. Mr. Emmert's billing rate for

8  this action is $270.00 per hour. Mrs. Karson is an associate attorney in the law firm of Littler

9  Mendelson. Mrs. Karson was admitted to practice in December 2002. Mrs. Karson's billing rate for

10  this action is $270.00 per hour. Mrs. Ravishankar is an associate attorney in the law firm of Littler

11  Mendelson. Mrs. Ravishankar was admitted to practice in June 2006. Mr. Ravishankar's billing rate

12  for this action is $230.00 per hour;

13        18.    Attorney hours for this action are entered and stored on an electronic billing

14  program, "DTE." Attorney's hours are entered into the program by no later then the end of the

15  week in which the work is performed;

16        19.    Mr. Peters spent approximately 29.5 hours working on this action. Mr.

17  Emmert spent approximately 69 hours working on this action. Mrs. Karson spent approximately 17.5

18  hours working on this action. Mrs. Ravishankar spent approximately 41 hours working on this

19  action.

20        20.    The total time spent by Defense counsel in this action defending against

21  Plaintiff's Fair Labor Standards Act causes of action is approximately $45,756.13.

22        I hereby declare under penalty of perjury, under the laws of the State of California,

23  that the foregoing is true and correct, and that this Declaration was executed on September 5, 2008,

24  at San Diego, California.

25

26                      /s/
                   BENJAMIN A. EMMERT

27

28

LITTLER MENDELSON
A Professional Corporation
50 West San Fernando Street
15th Floor
San Jose, CA 95113.2303
408.998.4150

(NO. CV 08 3035 MHP)
FIRMWIDE:86529400.1 047098.1008

3.

DECLARATION IN SUPPORT OF MOTION FOR
SANCTIONS, FRCP RULE 11 & 28 U.S.C. § 1927

EXHIBIT A

BRUCE R. BERNSTEIN (SB# 104230)
LAW OFFICES OF BRUCE R. BERNSTEIN
2670 Leavenworth Street
San Francisco, CA 94133
Tel:    (415) 474-1805
Fax:    (415) 474-1806

Attorneys for Plaintiff
DANIEL JOSEPH KEATING-TRAYNOR

**ENDORSED FILED**
SAN MATEO COUNTY

JUL 0 7 2006

Clerk of the Superior Court
BY Jordan Maxwell
DEPUTY CLERK

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN MATEO

| | |
|---|---|
| DANIEL JOSEPH KEATING-TRAYNOR, | Case No.: |
| Plaintiff, | **CIV 4 5 6 1 1 8** |
| v. | **COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** |
| AC SQUARE, INC., a California corporation, Does 1-20, | |
| Defendants, | |

**PARTIES**

1.    Plaintiff is informed and believes that Defendant AC SQUARE, INC. is and at all times mentioned in this Complaint was a California corporation, with the principal place of business located in Burlingame, San Mateo County, California.

2.    Plaintiff is ignorant of the true names and capacities of Defendants Does 1 through 20, and therefore sues these Defendants in such fictitious names. Plaintiff will pray leave of this Court to amend this complaint to allege the true identities when ascertained.

3.    Plaintiff is informed and believes and alleges that each of the defendants herein was at all relevant times the agent, employee, representative, partner, sub-contractor, joint venturer of the remaining defendants and acting within the course and scope of that relationship. Plaintiff is further informed and believes that each of the Defendants herein gave consent to, ratified, and otherwise authorized the acts alleged herein to each of the remaining Defendants.

## STATEMENT OF FACTS

4.    Plaintiff DANIEL KEATING-TRAYNOR, a resident of San Francisco County, began working on or around December 1, 2004 for Defendants pursuant to an oral agreement as a trainee installation technician providing cable television and computer services to Comcast consumers throughout the Bay Area, including San Francisco, San Mateo and Santa Clara Counties. Plaintiff was not paid by AC SQUARE, INC. for two months while in this training period.

5.    Subsequent to his successful completion of the training program and having undertaken and passed an employment skills test, Plaintiff was hired as a permanent full-time employee of AC SQUARE, INC. pursuant to a written employment contract on or around January 30, 2005. Plaintiff was paid on a "piece work" basis, with varying rates for installations, disconnects, upgrades, and other similar services.

6.    However, Plaintiff was not paid at a time and one-half rate for work in excess of 8 hours per day. Plaintiff was also not paid for his travel time from one locale to another, including when he was required to commute beyond 8 hours per day.

7.    Plaintiff was required to use his own vehicle and other personal items of his, including tools, a safety belt, and non-conducive ladder (for climbing utility poles) in order to perform the essential duties of Defendant's business.

8.    Plaintiff was not reimbursed for gas, cellphone bills, parking tickets, or vehicle maintenance and damage (such as when a golf ball broke his truck's windshield).

9.    Additionally, Defendant AC SQUARE, INC. improperly deducted the cost of tools and other items from Plaintiff's wages, including an industry-specific cable crimping tool and a Nextel radio.

10.    Defendant AC SQUARE, INC. also deducted from Plaintiff's wages costs it alleged to have incurred as a result of lost equipment, including modems and cable television boxes (for as much as $360.00 per item), including for such equipment that was negligently and unintentionally mislaid while at a consumer's residence and also for equipment which had in fact been returned to the Inventory Clerk.

11.    Defendant AC SQUARE, INC. also charged back to Plaintiff's wages for jobs that were alleged by the Comcast's Quality Controllers to have not been completed or alleged to have been inadequately performed, such as disconnects that may have been reconnected by the consumer. In all cases, the chargebacks were in the sum of $50.00, a sum far larger than that payable by Defendant to Plaintiff. (For instance, a disconnect for example was paid at a $5.00 piece rate.)

12.    Plaintiff KEATING-TRAYNOR complained about these deductions and chargebacks to his wages and was retaliated against by being given the less remunerative piece work orders, such as disconnects, resulting in even lower income to him.   For example, Plaintiff complained on or about April 30, 2005 regarding a deduction of $360.00 from his wages payable for the period of April 10-23, 2005.

13.    On or about May 2, 2005, Defendant again retaliated against Plaintiff DANIEL KEATING-TRAYNOR by terminating him. Plaintiff at that time had accrued wages. Said wages have not been forthcoming despite demand therefor, and no accounting has been given.

## FIRST CAUSE OF ACTION
### [Non-Payment of Wages]

14.    Plaintiff incorporates by reference paragraphs 1-13 above, as though fully set forth herein.

15.    Pursuant to Labor Code § 201, at the time Defendant terminated Plaintiff's employment Defendant was obligated to pay Plaintiff wages earned and unpaid. In violation of Labor Code § 201 and despite demand, Defendant failed and continues to refuse to pay Plaintiff. Because Plaintiff was employed on a piece work basis and Defendant has failed and refused to provide the accounting required by law for his last two days of work, Plaintiff is only able to estimate the sum he is owed. Plaintiff estimates this to be $400.00.

16.    In addition, Defendant violated Labor Code minimum wage statutes when it failed to pay him during his training period (between December 1, 2004 and January 30, 2005).  Plaintiff estimates this to be approximately 80 hours during the month of December 2004 and January 2005.

17.    Plus, Defendant improperly charged back expenses from Plaintiff's wages and owes those now

1    as wages violating Labor Code § 222.

2    18.     Pursuant to Labor Code § 218.5, Plaintiff requests that the Court award Plaintiff reasonable

3    attorney's fees and costs incurred in this action.

4    19.     Pursuant to Labor Code § 218.6, Plaintiff requests that the Court award Plaintiff interest on

5    all due and unpaid wages, at the legal rate specified by Civil Code § 3289(b), accruing from the date

6    the wages were due and payable.

7

8    20.     The Defendant's failure to pay wages was willful in that Defendant knew that Plaintiff was

9    owed wages, thus entitling Plaintiff to penalties under Labor Code §§ 203, which provides that an

10    employee's wages shall continue as a penalty until paid or for a period of up to 30 days from the time

11    they were due, whichever period is shorter.

12        WHEREFORE, Plaintiff prays for judgment as hereinafter described.

13    **<u>SECOND CAUSE OF ACTION</u>**
        **[Failure to Pay Overtime Wages]**

14

15    21.     Plaintiff incorporates by reference paragraphs 1-20 above, as though fully set forth herein.

16    22.     During the period of from January 30, 2005 through May 2, 2005, Plaintiff never was paid

17    <u>any</u> wages for the time he worked in excess of eight hours.

18    23.     Labor Code § 1198 provides that it is unlawful to employ persons for longer than the hours

19    set by the Industrial Welfare Commission or under conditions prohibited by the applicable wage

20    order.

21    24.     At all times relevant herein, Industrial Welfare Commission Wage Order No. 9-2001 (8 Cal.

22    Code Reg. § 11090) and Labor Code § 510(a) applied to Plaintiff's employment by Defendant and

23    provide for employees employed for more than 8 hours a day or 40 hours in one week are supposed

24    to be paid at the rate of time and one-half for hours in excess of 40 in one week.

25    25.     Under the provisions of the Wage Order referred to in Paragraph 24, Plaintiff estimates that

26    he should have received time and one-half for piece work in excess of 8 hours per day on as many

27    as two days per week for the period between January 30, 2005 and May 2, 2005. Plaintiff is informed

28

1   and believes Defendant owes him a sum in an amount of at least $200.00, representing the difference

2   between the amount of wages owed pursuant to the Wage Order and the amount actually paid to

3   Plaintiff. Defendants have failed and refused and continues to fail and refuse to pay Plaintiff the

4   amount owed.

5   26.    Defendant's failure to pay Plaintiff for overtime rates on piece work jobs, as required by the

6   applicable Wage Order, violates the provision of Labor Code § 1198 and is therefore unlawful.

7   27.    Pursuant to Labor Code § 1194(a), Plaintiff requests that the court award Plaintiff reasonable

8   attorney's fees and costs incurred by him in this action.

9   28.    Pursuant to Labor Code § 558(a)(1), Plaintiff requests a civil penalty of $50 for the seven pay

10  periods Plaintiff was underpaid for a total of **$350.00**.

11  29.    The Defendant's failure to pay wages was willful in that Defendant knew the Plaintiff was

12  owed wages, thus entitling Plaintiff to penalties under Labor Code § 203, which provides that an

13  employee's wages shall continue as a penalty until paid or for a period of up to 30 days from the time

14  they were due, whichever period is shorter.

15          WHEREFORE, Plaintiff prays for judgment as hereinafter described.

16                          **THIRD CAUSE OF ACTION**
                            **[Violations of Labor Code § 2802]**
17
    30.    Plaintiff incorporates by reference paragraphs 1-29 above, as though fully set forth herein.
18
    31.    While employed in the customary business of Defendants AC SQUARE, INC. and in the
19
    direct consequence of the discharge of his duties, Plaintiff was required to expend his own monies
20
    and in addition suffered losses to his own property for which Defendants must indemnify Plaintiff,
21
    including but not limited to the purchase of a vehicle, vehicle maintenance, gas, tools, and equipment,
22
    including safety belt and non-conducive ladder in a sum greater than $3,618.23, to be proven at Trial,
23
    all necessarily for conducting Defendant's business of cable television/computer installation.
24
    Defendant has failed and refused to reimburse Plaintiff for such expenses, despite demand.
25
    32.    Pursuant to Labor Code § 2802, Plaintiff is entitled to indemnification for his necessarily
26
    incurred expenses, plus interest from the date on which the expense was occurred, plus reasonable
27

28  _____
                                          5

1  costs and attorney's fees in recovering said sums.

2      WHEREFORE, Plaintiff prays for judgment as hereinafter described.

3  

**FOURTH CAUSE OF ACTION**
**[Wrongful Termination in Violation of Public Policy]**

4

5  33.    Plaintiff incorporates by reference paragraphs 1-32 above, as though fully set forth herein.

6  34.    Defendant retaliated against Plaintiff by terminating him because he demanded wages to which

7  he is entitled from Defendant.

8  35.    Such retaliation and discharge violates public policy of California according to <u>Gould v.</u>

9  <u>Maryland Sound Indust. Inc.</u>, (1996) 31 Cal.App.4th 1137, 1150 and Labor Code § 98.6. Demandng

10  wages and reporting violations of wage law to management is a fundamental policy of this state. <u>Id.</u>

11  36.    As a result of the aforesaid acts of Defendant, Plaintiff has become mentally upset, distressed,

12  and aggravated.  Plaintiff claims general damages for such mental distress and aggravation, in an

13  amount to be determined later, and special damages to be ascertained for the cost of treatment to

14  relieve such injuries.

15  37.    Defendant's act of discharge herein was malicious, fraudulent and oppressive, with the

16  wrongful intention of injury Plaintiff, and Defendant acted with an improper and evil motive

17  amounting to malice, and in conscious disregard of Plaintiff's rights; Plaintiff requests punitive

18  damages in a sum to be ascertained.

19  38.    Plaintiff requests that the court award Plaintiff reasonable attorney's fees and costs incurred

20  by him in this action.

21

22      WHEREFORE, Plaintiff prays for judgment as hereinafter described.

23  

**FIFTH CAUSE OF ACTION**
**[Failure to Provide Personnel File, Copies and an Itemized Statement]**

24  39.    Plaintiff incorporates by reference paragraphs 1-38 above, as though fully set forth herein.

25  40.    On October 25, 2005, Plaintiff requested to see his employment file and get copies, pursuant

26  to Labor Code §§ 226(b),  432 and 1198.5.

27

28

1    41.    Defendant AC SQUARE, INC. failed and refused to provide Plaintiff access to his file, nor

2  has it responded to this request, violating Labor Code §§ 226(e), 226(f), 226.3, 433 and 1199(c).

3        WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

4        1.    For general damages in a sum to be ascertained;

5        2.    For special damages, including compensatory damages for past lost wages,
6              overtime pay, reimbursement of all improper deductions and chargebacks
              made, reimbursement for all expenses necessarily incurred by Plaintiff in the
7              discharge of his duties for employer, in a sum to be ascertained;

8        3.    For interest on the lost wages and overtime pay;

9        4.    For penalties in the amount of 30 days pay for Plaintiff, pursuant to Labor
              Code § 203;

10
11       5..   For additional civil penalties under Labor Code § 558(a)(1) totaling $350.00
              and Labor Code § 226(e), 226(f) and 226.3 in amounts to be proven at Trial;

12       6.    For attorney's fees in a sum to be ascertained pursuant to Labor Code
              §§ 218.5, 226(e), 1194 and 2802(c);

13
14       7.    For exemplary or punitive damages;

15       8.    For costs of suit herein incurred; and,

16       9.    For such other further relief as the Court may deem proper.

17                      **DEMAND FOR JURY TRIAL**

18    Plaintiff DANIEL JOSEPH KEATING-TRAYNOR hereby demands trial by jury.

19
20  DATED:    June 28, 2006

21                      LAW OFFICES OF BRUCE R. BERNSTEIN

22
23        BY:    _____

24               BRUCE R. BERNSTEIN
                 Attorneys for Plaintiff
25               DANIEL KEATING-TRAYNOR

26
27
28
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

EXHIBIT B



1  Daniel Berko - SBN 94912
   LAW OFFICE OF DANIEL BERKO
2  819 Eddy Street
   San Francisco, CA 94109
3  Telephone: 415-771-6174
   Facsimile: 415-474-3748
4  E-mail: BerkoLaw@SBCglobal.net

5
   Attorneys for Plaintiffs,
6  DANIEL KEATING-TRAYNOR on behalf of himself
   and all others similarly situated
7

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10               IN AND FOR THE COUNTY OF SAN MATEO

11                     UNLIMITED JURISDICTION

12  DANIEL KEATING-TRAYNOR on            )
    behalf of himself and all others similarly  )
13  situated,                           )   Case No.    CIV 464144
                                        )
14              Plaintiffs,             )   COMPLAINT FOR RESTITUTION,
                                        )   DAMAGES AND INJUNCTIVE
15      vs.                             )   RELIEF
                                        )
16  AC SQUARE, DOES 1 THROUGH 600,      )
    inclusive.                          )   CLASS ACTION
17                                      )
                Defendants.             )
18  ────────────────────────────────── )

19      Plaintiff DANIEL KEATING- TRAYNOR complains of Defendants and each of them as

20  follows:

21      1.      Plaintiff is informed and believes and thereupon alleges that Defendant AC

22  SQUARE, INC. and Does 1 through 600 install, disconnect, and upgrade cable television and

23  computer services to consumers who use the services and equipment of Comcast, a provider of

24  cable television and computer services to consumers throughout California.

25      2.  Plaintiff does not know the true names of Defendants DOES 1 through 600 inclusive,

26  and therefore sues them by those fictitious names.  Plaintiff is informed and believes, and on

27  the basis of that information and belief alleges, that each of those defendants was in some

28  manner legally responsible for the events, happenings, injuries and damages alleged in this

COMPLAINT FOR RESTITUTION, DAMAGES AND INJUNCTIVE RELIEF
                                    - 1 -

FILED
SAN MATEO COUNTY

JUN 2 9 2007

Clerk of the Superior Court
By _GEORGE JACKSON_
        DEPUTY CLERK

complaint.

3.  In this complaint, when reference is made to any act of AC SQUARE, INC. (hereafter "AC") such allegations shall mean that the owners, officers, directors, agents, employees or representatives, of AC authorized, ratified, approved such acts, or negligently failed and omitted to supervise its employees and agents while engaged in the management, direction, operation or control of the affairs of the business organization and did so while acting within the course and scope of its employment or agency.

4.  Plaintiff brings this action on his own behalf, and on behalf of all persons similarly situated.  The class plaintiff represents consists of all persons who were employed by AC as cable television and computer technicians and who install, upgrade, disconnect and provide similar services to consumers who use the services and equipment of Comcast.  Plaintiff KEATING worked as a technician and his job included the responsibilities to install, upgrade, disconnect and provide similar services to consumers who use the services and equipment of Comcast. Plaintiff was formerly employed by AC as a cable television and computer technician for the purpose of installing, upgrading, disconnecting and providing similar services to consumers who use the services and equipment of Comcast

5.  There are well-defined common of questions of law and fact affecting the class Plaintiffs represent.  The class members' claims against Defendants involve questions of common and general interest in that each and every class member worked as an installer of cable television and computer services to consumers who use the services and equipment of Comcast, were not paid for overtime, were paid on a piecemeal basis, did not receive rest breaks and meal breaks as required by California law, had the cost of tolls and other items deducted from their wages, were not reimbursed for gas, cellphone bills, parking tickets or vehicle maintenance or damage all of which involved or occurred while working for  AC. In addition, AC failed to pay each class member wages during all hours that they worked. Accordingly, the facts supporting the claim for each class member is identical or substantially similar for Plaintiff and each member of the class and the alleged breach and claim of liability is identical or substantially identical for each member of the class.  These questions are such that proof of a state of facts

COMPLAINT FOR RESTITUTION, DAMAGES AND INJUNCTIVE RELIEF

- 2 -

07/02/2007  09:13  6506926542                                                              PAGE  04

common to the class representatives and to members of the class will entitle each member of the class to the relief requested in this complaint.

6.    Plaintiff will fairly and adequately represent the interests of the class, because plaintiff is a member of the class and plaintiff's claims are typical of those in the class.

## FIRST CAUSE OF ACTION
### (VIOLATION OF BUSINESS AND PROFESSIONS CODE §17200)

7.    Plaintiff incorporates herein *in haec verba* all of the allegations, averments, and matters contained in paragraphs 1 through 6 above.

8.    Business and Professions Code §17200 et seq. prohibits any business from engaging in unfair competition which it defines as any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising including any act prohibited by Business and Professions Code §17500.

9.    AC'S refusal to pay class members the wages due to them, improper deductions from class members' paychecks, and its refusal to pay overtime due are each separately and collectively unfair and unlawful business practices.

10. Each class member is entitled to restitution of all money in which they have an ownership interest which constitutes either (1) the failure to pay wages due or (2) the failure to pay overtime due or (3) the failure to pay for time spent while employed by AC.

11. Plaintiff and the class are entitled to an Order or Injunction, prohibiting Defendant from continuing to engage in the conduct alleged here.

## SECOND CAUSE OF ACTION
### (VIOLATION OF LABOR CODE 2802)

12. Plaintiff incorporates by reference all of the allegations, averments and matters contained in paragraph 1 through 6 inclusive as if set forth at length herein in *haec verba*.

COMPLAINT FOR RESTITUTION, DAMAGES AND INJUNCTIVE RELIEF

- 3 -

13. While employed in the customary business of AC and in the direct consequence of their duties, class members were required to expend his or her own monies in direct consequence of the discharge of his or her duties, and in addition suffered losses to his or her own property for which Defendants must indemnify class members, including, but not limited to the purchase of a vehicle, vehicle maintenance, gas, tools, and equipment, including safety belts and other equipment.

## THIRD CAUSE OF ACTION
## (FAILURE TO PAY OVERTIME WAGES)

14. Plaintiff incorporates by reference all of the allegations, averments and matters contained in paragraph 1 through 6 inclusive as if set forth at length herein in *haec verba*.

15. AC fails ands refuses to pay class members overtime for time worked in excess of eight hours per day or forty hours per week.

16. Labor Code 1198 provides that it is unlawful to employ persons for longer than the hours set by the Industrial Welfare Commission or under conditions prohibited by the applicable wage order.

17. At all times relevant herein, the Industrial Welfare Commission Wage Order No. 9-2001 (8 Cal. Code Reg. 11090) and Labor Code 510(a) applied to the employment of class members by Defendant. Said wage order and Labor Code section provide that any employee employed for more than 8 hours a day or 40 hours per week are to be paid at the rate on 1.5 times the normal hourly rate for hours in excess of 8 per day or 40 per week, and or double time under certain conditions.

18. Pursuant to Labor Code 1194(a), Plaintiffs are entitled to reasonable attorney's fees and costs.

19. Pursuant to Labor Code 558(a)(1), each class member is entitled to a civil penalty of

COMPLAINT FOR RESTITUTION, DAMAGES AND INJUNCTIVE RELIEF

- 4 -

$50 for the initial work period that each class member was underpaid and $100 for each successive period   pay period that he or she was not paid overtime wages as required by law.

## FOURTH CAUSE OF ACTION

## (FAILURE TO FURNISH INFORMATIONREQUIRED BY LABOR CODE 226)

20. Plaintiff incorporates by reference all of the allegations, averments and matters contained in paragraph 1 through 6 inclusive as if set forth at length herein in *haec verba*.

21. Defendant has willfully refused to semimonthly or at the time of each payment of wages, furnish each of his or her employees, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately when wages are paid by personal check or cash, an accurate itemized statement in writing showing (1) gross wages earned, (2) total hours worked by the employee, (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis, and (4) all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one

22. Each class member is entitled to a) is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not exceeding an aggregate penalty of four thousand dollars ($4,000), and is entitled to an award of costs and reasonable attorney's fees.

## FIFTH CAUSE OF ACTION

## (ON BEHALF OF DANNY KEATING-TRAYNOR INDIVIDUALLY)

## (FAILURE TO PAY WAGES DUE)

23. Plaintiff incorporates herein all of the allegations, averments and matters contained in paragraphs 1- 3 above as if set forth at length in *have verba*.

24. Plaintiff worked as a trainee for approximately 80 hours for which he was not paid. He is entitled to at least minimum wage plus any overtime for those hours.

COMPLAINT FOR RESTITUTION, DAMAGES AND INJUNCTIVE RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**WHEREFORE PLAINTIFFS PRAY JUDGMENT AS FOLLOW:**

**ON ALL CAUSES OF ACTION:**

1. General damages according to proof

2. Special damages according to proof;

3. Interest on all sums awarded;

4. Costs of suit;

5. Such other, and/or further relief as is just and proper.

Dated: June 28, 2007

DANIEL BERKO
Attorney for Plaintiff DANNY TRAYNOR-
KEATING on behalf of themselves
and all those similarly situated

COMPLAINT FOR RESTITUTION, DAMAGES AND INJUNCTIVE RELIEF

- 6 -

EXHIBIT C

1  | Daniel Berko - SBN 94912
2  | LAW OFFICE OF DANIEL BERKO
   | 819 Eddy Street
3  | San Francisco, CA 94109
   | Telephone: 415-771-6174
4  | Facsimile: 415-474-3748
   | E-mail: BerkoLaw@SBCglobal.net

**FILED**
SAN MATEO COUNTY

JUN 1 0 2008

Clerk of the Superior Court
By _____
DEPUTY CLERK

*D/3/b*

Attorneys for Plaintiffs,
DANIEL KEATING-TRAYNOR on behalf of himself
and all others similarly situated

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN MATEO

UNLIMITED JURISDICTION

| | |
|---|---|
| DANIEL KEATING-TRAYNOR on behalf of himself and all others similarly situated, <br><br> Plaintiffs, <br><br> -vs- <br><br> AC SQUARE, INC.; COMCAST INC.; AFSHIN GHANEH; ANDREW BAHMANYAR; and DOES 1-60 inclusive, <br><br> Defendants. | Case No. <br> **CV 4 7 3 5 7 1** <br> COMPLAINT FOR RESTITUTION, DAMAGES AND INJUNCTIVE RELIEF <br><br> _____ <br><br> CLASS ACTION |

Plaintiff DANIEL KEATING-TRAYNOR complains of Defendants and each of them as

follows:

1.      Plaintiff is informed and believes and thereupon alleges that Defendants AC

SQUARE, INC., COMCAST INC, AFSHIN GHANEH, ANDREW BAHMANYAR and Does 1

through 60 employ cable technicians who install, disconnect, and upgrade cable television and

computer services to consumers who use the services and equipment of Comcast, a provider of

cable television and computer services to consumers throughout California.

2. Plaintiff does not know the true names of Defendants DOES 1-60 inclusive, and

therefore sues them by those fictitious names.  Plaintiff is informed and believes, and on the basis

of that information and belief alleges, that each of those defendants was in some manner legally

- 1 -

COMPLAINT FOR RESTITUTION, DAMAGES AND INJUNCTIVE RELIEF

responsible for the events, happenings, injuries and damages alleged in this complaint. Plaintiff is informed and believes and thereupon alleges that each of the Does 1-60 and all named Defendants encouraged, supported, aided, advised, agreed upon and abetted the violations that are alleged in this complaint.

3. In this complaint, when reference is made to any act of AC SQUARE, INC. (hereafter "AC") such allegations shall mean that the owners, officers, directors, agents, employees or representatives, of AC authorized, ratified, approved such acts, or negligently failed and omitted to supervise its employees and agents while engaged in the management, direction, operation or control of the affairs of the business organization and did so while acting within the course and scope of its employment or agency.

4. In this complaint, when reference is made to any act of COMCAST, INC. (hereafter "COMCAST") such allegations shall mean that the owners, officers, directors, agents, employees or representatives, of COMCAST authorized, ratified, approved such acts, or negligently failed and omitted to supervise its employees and agents while engaged in the management, direction, operation or control of the affairs of the business organization and did so while acting within the course and scope of its employment or agency.

5. Defendant AFSHIN GHANEH is responsible for the payroll and business practices of AC Square that are alleged herein. Afshin Ghaneh also owns AC Square. Defendant ANDREW BAHMANYAR is also responsible for the payroll and business practices of AC Square that are alleged herein.

6. Defendant Comcast conspired with and aided and abetted Defendants AC Square, Afshin Ghaneh and Andrew Bahmanyar and Does 1 through 60 in taking the actions alleged herein. moreover, by shifting responsibility for the installation of Comcast equipment to AC Square and knowingly allowing AC to systematically underpay its cable technicians including plaintiff and all class members, COMCAST was able to unfairly compete in the market place by reducing the true costs of installing and servicing its equipment through the use of laborers paid less than lawful wages.

7. Defendant COMCAST, Afshin Ghaneh and Andrew Bahmanyar and Does 1 through 60

- 2 -

COMPLAINT FOR RESTITUTION, DAMAGES AND INJUNCTIVE RELIEF

aided, abetted, encouraged, supported, advised and benefited from AC Square's violation of California and federal wage and hour laws as alleged herein. In addition, Afshin Ghaneh has diverted to himself funds that should have been and were available to pay Plaintiff and all AC Square employees a lawful wage.

8. Plaintiff brings this action on his own behalf, and on behalf of all persons similarly situated. The class plaintiff represents consists of all persons who were employed by AC as cable television and computer technicians and who install, upgrade, disconnect and provide similar services to consumers who use the services and equipment of Comcast. Plaintiff KEATING worked as a technician and his job included the responsibilities to install, upgrade, disconnect and provide similar services to consumers who use the services and equipment of Comcast. Plaintiff was formerly employed by AC Square as a cable television and computer technician for the purpose of installing, upgrading, disconnecting and providing similar services to consumers who use the services and equipment of Comcast

9. There are well-defined common of questions of law and fact affecting the class Plaintiffs represent. The class members' claims against Defendants involve questions of common and general interest in that each and every class member (1) worked as an installer of cable television and computer services to consumers who use the services and equipment of Comcast, (2)(a) were not paid for overtime either when he worked more than an 8 hour day, 2(b) or more than a forty hour week 2(c) worked the seventh day in a row 2(d) worked over eight hours on the seventh day, (3) were paid on a piecemeal basis, (4) did not receive rest breaks or meal breaks as required by California law, (5) were subject to improper deductions from their wages, and (6) were not reimbursed for gas, cell phone bills, parking tickets,  and vehicle expenses including, but not limited to, insurance, vehicle repairs or vehicle maintenance or damage to their vehicles which involved work done for and/ or occurred while working for AC. In addition, (7) AC failed to pay each class member wages during all hours that they worked. In addition, (8) AC intentionally failed to pay all wages due when employees left the company. (9) Class members were not paid for split shifts as required by law. (10) AC required employees and all class members do work for no pay under various circumstances such as 10(a) staff meetings, 10(b)

- 3 -

picking up work orders and equipment, and 10(c) trips to customer locations where no customer was present so as to allow an employee/class member to perform services for which he came to the customer's location (except for payment of a $1.00 fee). In addition, (11) AC failed to provide information required to be on wage stubs under California law to all class members. (12) In addition, AC and all other defendants failed to pay Plaintiffs for time spent transporting COMCAST Equipment. Accordingly, the facts supporting the claim for each class member is identical or substantially similar for Plaintiff and each member of the class and the alleged breach and claim of liability is identical or substantially identical for each member of the class. These questions are such that proof of a state of facts common to the class representatives and to members of the class will entitle each member of the class to the relief requested in this complaint.

10. Plaintiff will fairly and adequately represent the interests of the class, because plaintiff is a member of the class and plaintiff's claims are typical of those in the class.

## FIRST CAUSE OF ACTION
## (CONSPIRACY TO VIOLATE BUSINESS AND PROFESSIONS CODE §17200)

11. Plaintiff incorporates herein *in haec verba* all of the allegations, averments, and matters contained in paragraphs 1-10 above.

12. Business and Professions Code §17200 et seq. prohibits any business from engaging in unfair competition which it defines as any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising including any act prohibited by Business and Professions Code §17500.

13. AC Square's refusal to pay class members the wages due to them as alleged herein, which conduct was done in concert and pursuant to agreement with Comcast, Afshin Ghaneh and Andrew Bahmanyar, employees at Comcast, others, and Does 1 through 60, and which was aided, abetted, ordered, supported and encouraged by all defendants, and its improper deductions from class members' paychecks, are each separately and collectively unfair and unlawful

- 4 -

COMPLAINT FOR RESTITUTION, DAMAGES AND INJUNCTIVE RELIEF

business practices.

14. Each class member is entitled to restitutionary damages which constitutes (1) the failure to pay wages due or (2) the failure to pay overtime due or (3) the failure to pay for time spent while employed by AC or (4) the failure to reimburse for expenses or (5) the failure to pay a split shift or show up premium when required by law and (6) all other failures to pay money due. Moreover, to the extent that Defendants, and any of them, received greater profits from their business than they otherwise would have had AC obeyed California Labor Laws, Defendants must disgorge all such profits to the extent necessary to pay Plaintiffs the money owed to them.

15. Plaintiff and the class are entitled to an Order or Injunction, prohibiting Defendants from continuing to engage in the conduct alleged here.

## SECOND CAUSE OF ACTION
### (VIOLATION OF FAIR LABOR STANDARD ACT)
### (AGAINST ALL DEFENDANTS)

16. Plaintiff incorporates herein all of the allegations, averments and matters contained in paragraphs 1-10 and 12-15, inclusive as if set forth at length herein in *haec verba*.

17. AC Square, Comcast, Afshin Ghaneh, Andrew Bahmanyar and Does 1 through 60 fail to pay overtime to class members even though it is clear that class members are entitled to overtime for each workweek that they work over 40 hours in a week.

18. AC Square, Comcast, Afshin Ghaneh and Andrew Bahmanyar's failure to pay overtime due to class members was a willful violation of the Fair Labor Standards Act (FLSA), because it would be impossible for Defendants not to be aware that the class members were not exempt from overtime requirements and yet they failed to pay overtime and continue to fail to pay overtime through the present time.

19. Because all Defendants willfully failed to comply with the FLSA, all Plaintiffs are

- 5 -

entitled to damages consisting of the overtime wages they should have been paid and liquidated damages in an amount equal to the unpaid overtime plus interest at the legal rate and reasonable attorney's fees incurred in enforcing the rights.

### THIRD CAUSE OF ACTION
### (CONSPIRACY TO VIOLATE THE FAIR LABOR STANDARD ACT)
### (AGAINST ALL DEFENDANTS)

20. Plaintiff incorporates herein all of the allegations, averments and matters contained in paragraphs 1-10, 12 -15 and 17-19, inclusive as if set forth at length herein *in haec verba.*

21. Defendants and each of them combined together in a tacit and express agreement to knowingly and intentionally deprive Plaintiff and all class members of their rights to overtime pay as provided by the FLSA.

### FOURTH CAUSE OF ACTION
### (FAILURE TO PAY MONIES DUE AT TERMINATION OF EMPLOYMENT)

22. Plaintiff incorporates herein all of the allegations, averments and matters contained in paragraphs 1-10, 12-15, 17-19 and 21, inclusive as if set forth at length herein *in haec verba.*

23. Defendant AC Square, as to all class members who no longer work for it, willfully failed to pay all monies due at the termination of the employment relationship either immediately or within 72 hours.

24. Each class member who is no longer employed by AC Square is entitled to thirty day's wages in addition to all other relief.

### FIFTH CAUSE OF ACTION
### (CONSPIRACY TO VIOLATE LABOR CODE SECTION 558)
### (AGAINST ALL DEFENDANTS)

25. Plaintiff incorporates herein all of the allegations, averments and matters contained in paragraphs 1-10, 12-15, 17-19, 21, 23-24 inclusive as if set forth at length herein *in haec verba.*

26. Labor Code section 558 provides that any employer or other person acting on behalf of

- 6 -

the employer, who violates or causes to be violated any provision of chapter of the Labor Code regulating payment of wages or any provision regulating hours and days of work and any order of the Industrial Welfare Commission shall be liable for $50.00 penalty for the first violation of the first pay period as to any employee and $100.00 for each subsequent violation for each subsequent pay period for which the employee was underpaid in addition to an amount sufficient to recover underpaid wages. Wages recovered under section 558 are the property of the underpaid employee.

27. By engaging in the conduct and omissions alleged herein, Defendants have intentionally violated numerous provisions of IWC wage orders and statutes resulting wages including but not limited to all those referenced in this complaint.

28. Each class member and each employee is entitled to all wages due to them pursuant to Labor Code §558.

29. Because the violations of the wage orders and Labor Code provisions relating to payment of wages was intentional, and Defendants knowingly took advantage of its employees and caused them substantial economic harm, Plaintiffs are entitled to punitive damages against all Defendants.

**WHEREFORE PLAINTIFF PRAYS JUDGMENT AS FOLLOW:**

**ON ALL CAUSES OF ACTION:**

1. General damages according to proof;

2. Special damages according to proof;

3. Interest on all sums awarded;

4. Costs of suit;

5. Such other, and/or further relief as is just and proper.

**ON THE FIFTH CAUSE OF ACTION:**

- 7 -

6. Punitive Damages according to proof.

Dated: June 9, 2008

DANIEL BERKO, Attorney for Plaintiff
DANNY KEATING-TRAYNOR, on behalf of themselves
and all those similarly situated

- 8 -

COMPLAINT FOR RESTITUTION, DAMAGES AND INJUNCTIVE RELIEF

AFFIDAVIT OF PERSONAL DELIVERY

*Keating ~thayner*

**FILED**
SAN MATEO COUNTY

JUN 1 0 2008

Clerk of the Superior Court

By _____
DEPUTY CLERK

vs

*h.c. Square*

CASE # **CIV 4 7 3 5 7 1**

**DOCUMENTS**

Endorsed filed copies of the Complaint, Summons, Notice of Case Management
Conference and ADR Packet information.

I declare under penalty of perjury that I delivered back to the customer, a true copy of the
foregoing documents.  Executed on the above filed date at the Hall of Justice & Records
in Redwood City, CA  94063.

By :   G. JACKSON
       Deputy Court Clerk

**EXHIBIT D**

1 | Daniel Berko - SBN 94912
LAW OFFICE OF DANIEL BERKO
2 | 819 Eddy Street
San Francisco, CA 94109
3 | Telephone: 415-771-6174
Facsimile: 415-474-3748
4 | E-mail: BerkoLaw@SBCglobal.net



5 |
Attorneys for Plaintiffs,
6 | DANIEL KEATING-TRAYNOR on behalf of himself
and all others similarly situated

7 |

8 |
UNITED STATES DISTRICT COURT
9 |
FOR THE NORTHERN DISTRICT OF CALIFORNIA
10 |

11 | CASE NO.:
DANIEL KEATING-TRAYNOR on )
12 | behalf of himself and all others similarly ) COMPLAINT FOR DAMAGES FOR
situated, ) VIOLATION OF FAIR LABOR
13 |                    Plaintiff, ) STANDARDS ACT
        vs. )
14 |                                     )
AC SQUARE, COMCAST INC.; ) CLASS ACTION 29 USC 216(b)
15 | AFSHIN GHANEH; ANDREW )
BAHMANYAR; and    DOES 1 ) PLAINTIFF DEMANDS A JURY TRIAL
16 | THROUGH 60, inclusive, ) ON ALL ISSUES
                                        )
17 |                    Defendants. )
                                        )
18 |

19 |
20 |       Plaintiff DANIEL KEATING- TRAYNOR complains of Defendants and each of them as

21 | follows:

22 |       1.  This court has jurisdiction over this case because it is an action brought pursuant to

23 | the *Fair Labor Standards Act*, 29 USC §§ 201- 219. Plaintiff and the class members each have

24 | a right to bring an action under the FLSA pursuant to 29USC216(b).

25 |       2.  Plaintiff is informed and believes and thereupon alleges that Defendants AC SQUARE,
26 |
INC., COMCAST, INC. AFSHIN GHANEH, ANDREW BAHMANYAR and Does 1 through
27 |
60 employ technicians who install, disconnect, and upgrade cable television, computer and other
28 |

- 1 -

COMPLAINT FOR RESTITUTION, DAMAGES AND INJUNCTIVE RELIEF

electronic services to consumers who use the services and equipment of Comcast, a provider of

cable television and computer services to consumers throughout California. Does 1 through 60

knowingly direct, instigate, aid, abet, support, encourage, have agree to, and advise all the other

defendants in their violations of the FLSA and other labor laws.

3. Comcast Communications is a Delaware corporation licensed to do business and doing

business in California as Comcast. Comcast is a joint employer of Plaintiff and all class

members as alleged herein because the class members are performing essential functions of

Comcast's business, Comcast has significant power over their working conditions, the class

members are understood by the public to be representing Comcast, many of the class members

obtained their daily work assignments at Comcast warehouses, all of the equipment installed is

Comcast equipment and Plaintiff is informed and believes in the contract between AC Square

and Comcast by which AC Square agrees to have its technicians represent Comcast and install

Comcast services in customer's home dictates that AC Square is to receive insufficient funds for

its technicians to be paid in conformity with California and federal law. Moreover, COMCAST

knows, or should know, that AC SQUARE acts in violation of California Labor laws in its

agreements with all class members yet continues to pay AC Square the monies necessary to allow

AC to continue profiting by violating the law and cheating class members of their lawful rights.

AC Square acts in close concert with Comcast in supervising class members. Moreover,

Comcast aids and abets AC in its violations of the FLSA by knowing of AC's business model

and it knows, or should know, that in performing services for Comcast for which Comcast pays

AC Square, AC Square does not pay overtime to class members.

4. Afshin Ghaneh and Andrew Bahmanyar are managerial employees and/or officers and/or

directors of AC Square. Afshin Ghaneh owns 100% of the stock of AC Square and has final say

on any of its policies and practices. Afshin Ghaneh and Andrew Bahmanyar are responsible for

- 2 -

setting corporate policy, have operation control of AC's payroll and business practices, including but not limited to failing to pay overtime compensation even though it is clearly and unquestionably due to class members.

5. Plaintiff does not know the true names of Defendants DOES 1 through 60 inclusive, and therefore sues them by those fictitious names. Plaintiff is informed and believes, and on the basis of that information and belief alleges, that each of those defendants was in some manner legally responsible for the events, happenings, injuries and damages alleged in this complaint.

6. In this complaint, when reference is made to any act of AC SQUARE, INC., (hereafter "AC") such allegations shall mean that the owners, officers, directors, agents, employees or representatives, of AC authorized, ratified, approved such acts, or negligently failed and omitted to supervise its employees and agents while engaged in the management, direction, operation or control of the affairs of the business organization and did so while acting within the course and scope of its employment or agency.

7. In this complaint, when reference is made to any act of COMCAST INC. (hereafter "COMCAST") such allegations shall mean that the owners, officers, directors, agents, employees or representatives, of COMCAST authorized, ratified, approved such acts, or negligently failed and omitted to supervise its employees and agents while engaged in the management, direction, operation or control of the affairs of the business organization and did so while acting within the course and scope of its employment or agency

8. Plaintiff brings this action on his own behalf, and on behalf of all persons similarly situated. The class plaintiff represents consists of all persons who were directly employed by AC as cable television and computer technicians and who install, upgrade, disconnect and provide

- 3 -

similar services to consumers who use the services and equipment of Comcast. Plaintiff

KEATING worked as a technician and his job included the responsibilities to install, upgrade,

disconnect and provide similar services to consumers who use the services and equipment of

Comcast. Plaintiff was formerly employed by AC as a cable television and computer technician

for the purpose of installing, upgrading, disconnecting and providing similar services to

consumers who use the services and equipment of Comcast

9.   There are well-defined common of questions of law and fact affecting the class

Plaintiffs represent.  The class members' claims against Defendants involve questions of common

and general interest in that each and every class member worked as an installer of cable

television, computer and electronic services to consumers who use the services and equipment of

Comcast, were not paid for overtime, were paid on a piecemeal basis,  were not reimbursed for

gas, cellphone bills, parking tickets or vehicle maintenance or damage all of which involved or

occurred while working for  AC. In addition, AC failed to pay each class member wages during

all hours that they worked. Accordingly, the facts supporting the claim for each class member is

identical or substantially similar for Plaintiff and each member of the class and the alleged breach

and claim of liability is identical or substantially identical for each member of the class.  These

questions are such that proof of a state of facts common to the class representatives and to

members of the class will entitle each member of the class to the relief requested in this

complaint.

10. Plaintiff will fairly and adequately represent the interests of the class, because plaintiff

is a member of the class and plaintiff's claims are typical of those in the class.

## FIRST CLAIM FOR RELIEF
### (VIOLATION OF FAIR LABOR STANDARD ACT)
### (AGAINST ALL DEFENDANTS)

- 4 -

11. Plaintiff incorporates herein *in haec verba* all of the allegations, averments, and matters contained in paragraphs 1 through 10 above.

12. AC, COMCAST, AFSHIN GHANEH, ANDREW BAHMANYAR and Does 1 through 60 fail to pay overtime to class members even though it is clear that class members are entitled to overtime for each workweek that they work over 40 hours in a week.

13. AC'S, COMCAST'S, AFSHIN GHANEH'S and ANDREW BAHMANYAR'S failure to pay overtime due to class members was a willful violation of the FLSA because it would be impossible for defendants not to be aware that the class members were not exempt from overtime requirements and yet they failed to pay overtime and continue to fail to pay overtime through the present time.

14. Because all Defendants willfully failed to comply with the FLSA, all Plaintiffs are entitled to damages consisting of the overtime wages they should have been paid and liquidated damages in an amount equal to the unpaid overtime plus interest at the legal rate and reasonable attorney's fees incurred in enforcing the rights.

<u>**SECOND CLAIM FOR RELIEF**</u>

**(CONSPIRACY TO VIOLATE THE FAIR LABOR STANDARD ACT)**

**(AGAINST ALL DEFENDANTS)**

15. Plaintiff incorporates herein *in haec verba* all of the allegations, averments, and matters contained in paragraphs 1 through 14 above.

16. Defendants and each of them combined together in a tacit and express agreement to knowingly and intentionally deprive Plaintiff and all class members of their rights to overtime pay as provided by the FLSA

**WHEREFORE PLAINTIFFS PRAY JUDGMENT AS FOLLOW:**

**ON ALL CAUSES OF ACTION:**

- 5 -

1. General damages according to proof in an amount that is yet to be ascertained;

2. Special damages according to proof in an amount that is yet to be ascertained;

3. Interest on all sums awarded including prejudgment interest;

4. Costs of suit;

5. A reasonable attorney's fee;

6. Such other, and/or further relief as is just and proper.

Dated: June 9, 2008

DANIEL BERKO
Attorney for Plaintiff DANNY TRAYNOR-
KEATING on behalf of themselves
and all those similarly situated

## DEMAND FOR JURY TRIAL

Plaintiff on behalf of himself and each member of the class demands a jury trial on all issues.

Dated: June 9, 2008

DANIEL BERKO
Attorney for Plaintiff DANNY TRAYNOR-
KEATING on behalf of themselves
and all those similarly situated

- 6 -

EXHIBIT E

1  | Daniel Berko - SBN 94912
   | LAW OFFICE OF DANIEL BERKO
2  | 819 Eddy Street
   | San Francisco, CA 94109
3  | Telephone: 415-771-6174
   | Facsimile: 415-474-3748
4  | E-mail: BerkoLaw@SBCglobal.net

5  |
   | Attorneys for Plaintiffs,
6  | DANIEL KEATING-TRAYNOR on behalf of himself
   | and all others similarly situated
7  |

8  |

9  |              UNITED STATES DISTRICT COURT

10 |            NORTHERN DISTRICT OF CALIFORNIA

11 |

12 |

13 | DANIEL KEATING-TRAYNOR on        )   Case No.  08-CV-03035-MHP
   | behalf of himself and all others similarly )
   | situated,                        )
14 |              Plaintiffs,         )   AMENDED CONSOLIDATED
   |                                  )   COMPLAINT FOR RESTITUTION,
15 | -vs-                             )   DAMAGES AND INJUNCTIVE RELIEF
   | AC SQUARE, INC.; COMCAST INC.;   )
16 | AFSHIN GHANEH; ANDREW            )
   | BAHMANYAR; and DOES 1-60         )   CLASS ACTION
17 | inclusive,                       )
   |              Defendants.         )   COLLECTIVE ACTION UNDER 29 U.S.C.
18 | _____ )   216(b)

19 | DANIEL KEATING-TRAYNOR on        )
   | behalf of himself and all others similarly )
20 | situated,                        )
   |              Plaintiffs,         )
21 | -vs-                             )
   |                                  )
22 | AC SQUARE, INC. and DOES 1-60    )
   | inclusive,                       )
23 |              Defendants.         )
   | _____ )

24 |

25 |     Plaintiff DANIEL KEATING-TRAYNOR complains of Defendants and each of them as

26 | follows:

27 |     1.    Plaintiff is informed and believes and thereupon alleges that Defendants AC

28 | SQUARE, INC., COMCAST INC, AFSHIN GHANEH, ANDREW BAHMANYAR and Does 1

- 1 -

AMENDED CONSOLIDATED COMPLAINT FOR RESTITUTION, DAMAGES AND INJUNCTIVE RELIEF

through 60 employ cable technicians who install, disconnect, and upgrade cable television and computer services to consumers who use the services and equipment of Comcast, a provider of cable television and computer services to consumers throughout California.

2. Plaintiff does not know the true names of Defendants DOES 1-60 inclusive, and therefore sues them by those fictitious names. Plaintiff is informed and believes, and on the basis of that information and belief alleges, that each of those defendants was in some manner legally responsible for the events, happenings, injuries and damages alleged in this complaint. Plaintiff is informed and believes and thereupon alleges that each of the Does 1-60 and all named Defendants encouraged, supported, aided, advised, agreed upon and abetted the violations that are alleged in this complaint.

3. In this complaint, when reference is made to any act of AC SQUARE, INC. (hereafter "AC") such allegations shall mean that the owners, officers, directors, agents, employees or representatives, of AC authorized, ratified, approved such acts, or negligently failed and omitted to supervise its employees and agents while engaged in the management, direction, operation or control of the affairs of the business organization and did so while acting within the course and scope of its employment or agency.

4. In this complaint, when reference is made to any act of COMCAST, INC. (hereafter "COMCAST") such allegations shall mean that the owners, officers, directors, agents, employees or representatives, of COMCAST authorized, ratified, approved such acts, or negligently failed and omitted to supervise its employees and agents while engaged in the management, direction, operation or control of the affairs of the business organization and did so while acting within the course and scope of its employment or agency.

5. Defendant Comcast conspired with and aided and abetted Defendants AC Square, Afshin Ghaneh and Andrew Bahmanyar and Does 1 through 60 in taking the actions alleged herein. Moreover, by shifting responsibility for the installation of Comcast equipment to AC Square with actual and/or constructive knowledge that AC was systematically underpaying its cable technicians including plaintiff and all class members, COMCAST was able to unfairly compete in the marketplace by reducing the true costs of installing and servicing its equipment

- 2 -

through the use of laborers paid less than lawful wages.

6. Defendant COMCAST, Afshin Ghaneh and Andrew Bahmanyar and Does 1 through 60 aided, abetted, encouraged, supported, advised and benefited from AC Square's violation of California and federal wage and hour laws as alleged herein. In addition, Afshin Ghaneh has diverted to himself funds that should have been and were available to pay Plaintiff and all AC Square employees a lawful wage.

7. Plaintiff was employed by defendants as a cable television and computer technician from starting in early November, 2004 until May 26, 2005. Plaintiff last worked for pay on May 3, 2005 (a week in which plaintiff worked overtime hours under federal and state law) but continued to seek work by placing and receiving telephone calls to AC and its employees, and considered himself still employed by Defendant until at least on or about June 15, 2005 as a result of defendant's failure to provide him with his last paycheck, or to inform him that he was terminated, return his Nextel telephone deposit, and/or return his ladder and toolbelt such that he would be able to perform work for other companies. Plaintiff received his last paycheck from AC on October 26, 2006.

8. Plaintiff brings this action on his own behalf, and on behalf of all persons similarly situated. The class plaintiff represents consists of all persons who were employed by AC as cable television and computer technicians and who install, upgrade, disconnect and provide similar services to consumers who use the services and equipment of Comcast. Plaintiff KEATING-TRAYNOR worked as a technician and his job included the responsibilities to install, upgrade, disconnect and provide similar services to consumers who use the services and equipment of Comcast. Plaintiff was formerly employed by AC Square as a cable television and computer technician for the purpose of installing, upgrading, disconnecting and providing similar services to consumers who use the services and equipment of Comcast

9. There are well-defined common of questions of law and fact affecting the class Plaintiffs represent. The class members' claims against Defendants involve questions of common and general interest in that each and every class member (1) worked as an installer of cable television and computer services to consumers who use the services and equipment of

- 3 -

Comcast, (2)(a) were not paid for overtime regardless of whether he worked more than an 8

hour day, 2(b) more than a forty hour week 2(c) worked the seventh day in a row 2(d) worked

over eight hours on the seventh day, (3) were paid on a piece rate basis, (4) did not receive rest

breaks or meal breaks as required by California law, (5) were subject to the same company-wide

policy, or lack thereof, as regards taking rest breaks and meal breaks (6) were subject to

improper deductions from their wages, and (7) were not reimbursed for gas, cell phone bills,

parking tickets, and vehicle expenses including, but not limited to, insurance, vehicle repairs or

vehicle maintenance or damage to their vehicles which involved work done for and/ or occurred

while working for AC. In addition, (8) AC failed to pay each class member wages during all

hours that they worked. In addition, (9) AC intentionally failed to pay all wages due when

employees left the company which affects a subclass of all former employees who were once

cable technicians employed by AC and the others. (10) No class members were paid for split

shifts as required by law, even though substantially all class members were entitled to at least

one or more split shift premiums due to time off during the work day. (11) AC required

employees and all class members to work for no pay under various circumstances such as 11(a)

staff meetings, 11(b) picking up work orders and equipment, and 11(c) trips to customer

locations where no customer was present so as to allow an employee/class member to perform

services for which he came to the customer's location in which case class members were

generally paid a "zero rate" (except for irregular payments of a $1.00 fee). In addition, (12)

AC failed to provide information required to be on wage stubs under California law to all class

members. (13) In addition, AC and all other defendants failed to pay Plaintiff or class members

for time spent transporting and safeguarding COMCAST equipment even though if Plaintiff or

class members were to lose equipment, they would have the cost of the equipment as determined

by AC Square and Comcast, deducted from their wages. (14) AC had all class members, or

substantially all, sign a "Damage Responsibility Form" purporting to authorize deductions from

their paycheck for negligent or accidental damage to the property of Comcast customers that

were caused by the technician. (15) Having class members agree in writing to have deductions

from their paycheck for accidentally lost equipment. (16) AC failed to pay class members while

- 4 -

they were on call or engaged to wait. (17) Every class member has the same allegations supporting a conspiracy claim and individual liability. (18) Every class member relies on the sane facts supporting individual liability. (19) Every class member relies on the same facts in alleging Comcast was a joint employer under California law and an "employer" under federal law. (20) Class members paychecks were subject to punitive deductions, as determined by Comcast, when the job was determined to be negligently performed or the employee was not equipped to perform the work. (21) AC and the other defendants contends, that as to all class members, they had the right to charge a $15.00 deduction from class members' paychecks if the work orders are not properly filled out and to refuse to have the class member paid anything for that work.. (22) As to all class members, Defendants failed to maintain records of hours worked. Accordingly, the facts supporting the claim for each class member is identical or substantially similar for Plaintiff and each member of the class and the alleged breach and claim of liability is identical or substantially identical for each member of the class. These questions are such that proof of a state of facts common to the class representatives and to members of the class will entitle each member of the class to the relief requested in this complaint.

10. Plaintiff will fairly and adequately represent the interests of the class, because plaintiff is a member of the class and plaintiff's claims are typical of those in the class.

## FIRST CAUSE OF ACTION
### (CONSPIRACY TO VIOLATE BUSINESS AND PROFESSIONS CODE §17200) AGAINST ALL DEFDENDANTS

11. Plaintiff incorporates herein *in haec verba* all of the allegations, averments, and matters contained in paragraphs 1-10 above.

12. Business and Professions Code §17200 et seq. prohibits any business from engaging in unfair competition which it defines as any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising including any act prohibited by Business and Professions Code §17500.

13. AC Square's refusal to pay class members the wages due to them as alleged herein,

- 5 -

which conduct was done in concert and pursuant to agreement with Littler Mendelson, Comcast,

Afshin Ghaneh and Andrew Bahmanyar, employees at Comcast, and others, and Does 1 through

60, and which was aided, abetted, ordered, supported and encouraged by all defendants are each

and all, individually and collectively are unlawful acts prohibited by 17200.  Among the laws

violated and thus making the same conduct unlawful under 17200 are 29 U.S.C.201, 206, 206.5,

207, California Labor Codes 221, 222, 223, 226, 510(a), 512, 558, 1194, 1198, 2802, 2966

Industrial Welfare Commission Wage order 9-2001 (8 Cal.Code Reg. 11090; 8 Cal.Code Reg.

11010 et seq. sec. 8; 8 Cal.Code Reg. 11010 sec 9(C); San Francisco Administrative Code 12R.

14. Each class member is entitled to restitutionary damages which constitute  (1) the

failure to pay wages due or (2) the failure to pay overtime due or (3) the failure to pay for time

spent while employed by AC (4) the failure to reimburse for expenses or (5) the failure to pay a

split shift or show up premium when required by law  (6) the willful failure to pay all monies due

at the termination of employment (7) any amount of  illegal deductions including illegal

"chargebacks" from class members (6) all other failures to pay money due under statutes alleged

herein or under the work contract.  Moreover, to the extent that Defendants, and any of them,

received greater profits from their business than they otherwise would have had AC obeyed

California Labor Laws,  Defendants must disgorge all such profits at least to the extent necessary

to pay Plaintiffs the money owed to them.

15. Plaintiff and the class are entitled to an Order or Injunction, prohibiting Defendants from

continuing to engage in the conduct alleged here.

## SECOND CAUSE OF ACTION
## ( VIOLATION OF  BUSINESS AND PROFESSIONS CODE §17200)
## AGAINST ALL  DEFENDANTS

16. Plaintiff incorporates herein *in haec verba* all of the allegations, averments, and

matters contained in paragraphs 1-10, 12-15 above.

- 6 -

17. Business and Professions Code §17200 et seq. prohibits any business from engaging in unfair competition which it defines as any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising including any act prohibited by Business and Professions Code §17500.

18. Defendants and each of them violated B&P §17200 et seq by engaging in the unfair and unlawful business acts described more particularly in paragraphs 9 and 13 hereof, including AC Square's refusal to pay class members the wages due to them as alleged herein, which conduct was done in concert and pursuant to agreement with Littler Mendelson, Comcast, Afshin Ghaneh and Andrew Bahmanyar, employees at Comcast, and others, and Does 1 through 60, and which was aided, abetted, ordered, supported and encouraged by all defendants are each and all, individually and collectively are unlawful acts prohibited by 17200. Among the laws violated and thus making the same conduct unlawful under 17200 are 29 U.S.C.201, 206, 206.5, 207, California Labor Codes 221, 222, 223, 226, 510(a), 512, 558, 1194, 1198, 2802, 2966 Industrial Welfare Commission Wage order 9-2001 (8 Cal.Code Reg. 11090; 8 Cal.Code Reg. 11010 et seq. sec. 8; 8 Cal.Code Reg. 11010 sec 9(C);

19. Each class member is entitled to restitutionary damages which constitute (1) the failure to pay wages due or (2) the failure to pay overtime due or (3) the failure to pay for time spent while employed by AC (4) the failure to reimburse for expenses or (5) the failure to pay a split shift or show up premium when required by law (6) the willful failure to pay all monies due at the termination of employment (7) any amount of illegal deductions including illegal "chargebacks" from class members (6) all other failures to pay money due under statutes alleged herein or under the work contract. Moreover, to the extent that Defendants, and any of them, received greater profits from their business than they otherwise would have had AC obeyed California Labor Laws, Defendants must disgorge all such profits at least to the extent necessary

- 7 -

to pay Plaintiffs the money owed to them.

### THIRD CAUSE OF ACTION
### (FAILURE TO PAY MONIES DUE AT TERMINATION OF EMPLOYMENT)
### LABOR CODE 201-203
### AGAINST AC SQUARE, COMCAST AND GHANEH AND DOES 1 THROUGH 20

20.    Plaintiff incorporates herein all of the allegations, averments and matters contained in paragraphs 1-10, inclusive as if set forth at length herein *in haec verba*.

21.    Defendants and each of then, as to all class members who no longer work for AC, willfully failed to pay all monies due at the termination of the employment relationship either immediately or within 72 hours.

22.    Each class member who is no longer employed by AC Square is entitled to thirty day's wages in addition to all other relief.

### FOURTH CAUSE OF ACTION
### (CONSPIRACY CONSISTING OF FAILURE TO PAY MONIES DUE AT
### TERMINATION OF EMPLOYMENT)
### LABOR CODE 201-203
AGAINST AC SQUARE, COMCAST AND GHANEH AND DOES 1 THROUGH 20

23.    Plaintiff incorporates herein all of the allegations, averments and matters contained in paragraphs 1-10, and 21-22, inclusive as if set forth at length herein *in haec verba*.

### FIFTH CAUSE OF ACTION
### (VIOLATION OF LABOR CODE SECTION 558)
### (AGAINST ALL DEFENDANTS)

24.    Plaintiff incorporates herein all of the allegations, averments and matters contained in paragraphs 1-10 inclusive as if set forth at length herein *in haec verba*.

25.    Labor Code section 558 provides that any employer or other person acting on

- 8 -

behalf of the employer, who violates or causes to be violated any provision of chapter of the Labor Code regulating payment of wages or any provision regulating hours and days of work and any order of the Industrial Welfare Commission shall be liable for $50.00 penalty for the first violation of the first pay period as to any employee and $100.00 for each subsequent violation for each subsequent pay period for which the employee was underpaid in addition to an amount sufficient to recover underpaid wages.

26.    Wages recovered under section 558 are the property of the underpaid employee.

27.    By engaging in the conduct and omissions alleged herein, Defendants have intentionally violated numerous provisions of IWC wage orders and statutes resulting wages including but not limited to all those referenced in this complaint.

28.    Each class member who was employed no later than from June 29, 2006 until the present is entitled to all penalties due to them pursuant to Labor Code §558.

29.    Each class member who was employed no later than from June 29, 2007 is entitled to recover "an amount sufficient to recover his underpaid wages.

**SIXTH CAUSE OF ACTION**

**(CONSPIRACY TO VIOLATE LABOR CODE SECTION 558)**

**(AGAINST ALL DEFENDANTS)**

*30.*    Plaintiff incorporates herein all of the allegations, averments and matters contained in paragraphs 1-10 and 25-29 inclusive as if set forth at length herein *in haec verba.*

**SEVENTH CAUSE OF ACTION**

**(AGAINST AC SQUARE AND COMCAST)**

**VIOLATION OF LABOR CODE 1194**

*31.*    Plaintiff incorporates herein all of the allegations, averments and matters contained in paragraphs 1-10 inclusive as if set forth at length herein *in haec verba.*

32.    Labor Code 1194 provides that any employee who receives less than minimum

- 9 -

wage is entitled to recover in a civil action the unpaid balance of the full amount of the minimum

wage or overtime in addition to interest on said amounts and attorney's fees.

33.    Defendants and each of them violated Labor Code Section 1194 by failing to pay

minimum wage under California law to plaintiff and class members.

34.    Plaintiff and class members are entitled to ___?

## EIGHTH CAUSE OF ACTION

### (AGAINST ALL DEFENDANTS)

### CONSPIRACY TO VIOLATE LABOR CODE 1194

*35.*    Plaintiff incorporates herein all of the allegations, averments and matters

contained in paragraphs 1-10 and 32-34 inclusive as if set forth at length herein in *haec verba.*

## NINTH CAUSE OF ACTION.

### VIOLATION OF SAN FRANCISCO ADMINISTRATIVE CODE 12R

### SAN FRANCISCO MINIMUM WAGE ORDINANCE

### (AGAINST ALL DEFENDANTS

*36.*    Plaintiff incorporates herein all of the allegations, averments and matters

contained in paragraphs 1-10 inclusive as if set forth at length herein in *haec verba.*

37.    San Francisco Administrative Code Section 12R provides that the San Francisco

living wage be paid as a minimum wage to all employees who are employed in San Francisco

City and County to perform more than two hours work.

38.    Defendants and each of them failed to pay plaintiff and the class members wages

in accordance with the San Francisco minimum wage ordinance.

39.    Plaintiff and the class members are entitled to unpaid wages and penalties for the

willful violation.

- 10 -

## TENTH CAUSE OF ACTION.

## CONSPIRACY TO VIOLATE SAN FRANCISCO ADMINISTRATIVE CODE 12R

## SAN FRANCISCO MINIMUM WAGE ORDINANCE

## (AGAINST ALL DEFENDANTS

40.    Plaintiff incorporates herein all of the allegations, averments and matters contained in paragraphs 1-10 and 37-39 inclusive as if set forth at length herein *in haec verba.*

41.    Plaintiff and the class members are entitled to unpaid wages and ??

## ELEVENTH CAUSE OF ACTION.

## (VIOLATION OF FAIR LABOR STANDARD ACT)
## (AGAINST ALL DEFENDANTS

42.    Plaintiff incorporates herein all of the allegations, averments and matters contained in paragraphs 1-10 inclusive as if set forth at length herein *in haec verba.*

43.    .AC Square, Comcast, Afshin Ghaneh, Andrew Bahmanyar and Does 1 through 60 failed and still fail to pay overtime to class members even though it is clear that class members are entitled to overtime for each workweek that they work over 40 hours in a week. Plaintiff is informed and believes and thereupon alleges that all, or virtually all, class members worked one or more workweeks where they worked over forty hours in the week but were not pay overtime.

44.    AC Square, Comcast, Afshin Ghaneh and Andrew Bahmanyar's failure to pay overtime due to class members was a willful violation of the Fair Labor Standards Act (FLSA), because it would be impossible for Defendants not to be aware that the class members were not exempt from overtime requirements and yet they failed to pay overtime and continue to fail to

- 11 -

pay overtime through the present time.

45.    Because all Defendants willfully failed to comply with the FLSA, all Plaintiffs are entitled to damages consisting of the overtime wages they should have been paid and liquidated damages in an amount equal to the unpaid overtime plus interest at the legal rate and reasonable attorney's fees incurred in enforcing the rights.

## TWELFTH CAUSE OF ACTION
### (CONSPIRACY TO VIOLATE THE FAIR LABOR STANDARD ACT)
### (AGAINST ALL DEFENDANTS)

46.    Plaintiff incorporates herein all of the allegations, averments and matters contained in paragraphs 1-10, and 43-45 inclusive as if set forth at length herein *in haec verba.*

*47.*    All defendants are employers pursuant to 29 USC 203(d) and liable for damages caused by a violation of the FLSA.

## REQUEST FOR INJUNCTIVE RELIEF

49.    Plaintiff incorporates herein all of the allegations, averments and matters contained in paragraphs 1-47 inclusive as if set forth at length herein *in haec verba.*

50.    Plaintiff, on behalf of class members who are current employees of Defendants requests this Court issue an injunction prohibiting defendants and each of them from failing to pay overtime, from paying artificial piece rates, from paying wages below the applicable minimum wage requirements.

**WHEREFORE PLAINTIFF PRAYS JUDGMENT AS FOLLOW:**

**ON ALL CAUSES OF ACTION:**

1. General damages according to proof;

- 12 -

AMENDED CONSOLIDATED COMPLAINT FOR RESTITUTION, DAMAGES AND INJUNCTIVE RELIEF

2. Special damages according to proof;

3. Interest on all sums awarded;

4. Costs of suit;

5. Injunctive Relief

6. Such other, and/or further relief as is just and proper.

7. Punitive Damages according to proof.

**DEMAND FOR JURY TRIAL**

Plaintiff on behalf of himself and class members hereby demands trial by jury on each and every cause of action.

Dated: August 11, 2008

_____

DANIEL BERKO, Attorney for Plaintiff
DANNY KEATING-TRAYNOR, on behalf of himself
and all those similarly situated

- 13 -

EXHIBIT F

1  Daniel Berko - SBN 94912
   **LAW OFFICE OF DANIEL BERKO**
2  **819 Eddy Street**
   **San Francisco, CA 94109**
3  Telephone: 415-771-6174
   Facsimile: 415-474-3748
4  E-mail: BerkoLaw@SBCglobal.net

5
   **Attorneys for Plaintiffs,**
6  **DANIEL KEATING-TRAYNOR on behalf of himself**
   **and all others similarly situated**
7

8

9              **UNITED STATES DISTRICT COURT**

10             **NORTHERN DISTRICT OF CALIFORNIA**

11

12 DANIEL KEATING-TRAYNOR on          )
   behalf of himself and all others similarly   )   Case No.  3:08-CV-03035
   situated,                          )
13            **Plaintiffs,**           )   **PLAINTIFF DANIEL KEATING-**
   -vs-                               )   **TRAYNOR'S OPPOSITION TO**
14                                    )   **DEFENDANT AC SQUARE'S  MOTION**
   AC SQUARE, INC.; COMCAST INC.;     )   **TO DISMISS**
15 AFSHIN GHANEH; ANDREW              )
   BAHMANYAR; and DOES 1-60           )
16 inclusive,                         )   **DATE: September 8, 2008**
              **Defendants.**          )   **TIME: 2:00 p.m.**
17 _____  )   **HONORABLE MARILYN HALL**
                                          **PATEL**
18
                                          **CLASS ACTION**
19

20

21                    **INTRODUCTION**

22     Plaintiff is a former employee of AC Square who worked as a cable technician.  Because

23 he believed he was underpaid and wrongfully fired he filed with the Department of Labor

24 Standards Enforcement. However,  he found that department woefully under staffed and

25 inattentive to his claims.  He then hired an attorney and filed Case One – San Mateo Superior

26
   Court Case No.  456 188  on July 6, 2008.  AC Square has referred to Plaintiff's claims with
27
   such disparaging labels such as "various and sundry" and "small potatoes".  In any event,
28

**PLAINTIFF DANIEL KEATING-TRAYNOR'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiff's attorney dropped the "small potatoes" case and that left Plaintiff without an attorney facing a trial and a summary adjudication motion. Plaintiff lost the summary adjudication motion (all of his evidence was ordered stricken due to a defective verification of his declaration) and was forced to dismiss without prejudice on June 19, 2008- 6 days before the trial date then set - all causes of action for compensation or penalties due without prejudice.

With present counsel, Plaintiff filed Case No. 2 (Case No, 464 144) as a class action under California Law for compensation on behalf of all cable technicians on June 29, 2007. The only named Defendant was AC Square.

With present counsel, Plaintiff filed a new and expanded complaint in state court on June 10, 2008, Case No. 473 571. Notably, new named defendants are added (COMCAST, BAHMANYAR, and GHANEH), and an FLSA claim and conspiracy to violate the FLSA was added.

The next day, June 11, 2008, Plaintiff filed an FLSA claim (two counts one a violation of the FLSA and a conspiracy to violate the FLSA).

On June 18 , 2008 the San Mateo Superior Court ordered Case 2 and case 3, the June 2007 and June 2008 state court complaints, consolidated for all purposes. Under California law, the entire actions are deemed merged and one action under those circumstances. Thus, the 2nd and 3rd complaints are regarded as merged, one set of findings is made, and one judgment is rendered. [See *Hamilton v. Asbestos Corp., Ltd.* (2000) 22 C4th 1127, 1147–1148 ]

Plaintiff has tried to obtain agreement of the parties to the filing of an Amended Consolidated Complaint in the Removed Actions and then any and all defendants would move to dismiss any and all claims that they wish and the court would have one hearing on Plaintiff's best attempt to state a claim. (Plaintiff would, as any Plaintiff, still want to be able to seek leave to amend if warranted, but allowing a hearing on the Consolidated Complaint it would avoid the

PLAINTIFF DANIEL KEATING-TRAYNOR'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

piecemeal attacks on the basic claims alleged). Plaintiff has been unable to secure such an agreement.

Plaintiff believes that there is no question that the filing of the Amended Consolidated Federal Complaint makes moot all motions to dismiss the superseded pleading. However, to date, AC Square takes the position that even the filing of an amended complaint in the direct federal action did not moot out the motion to dismiss the complaint in that action. So, in an abundance of caution, Plaintiff will file this opposition to the Motion to Dismiss filed by Comcast, even though he respectfully requests the court take the motion off calendar and have Comcast and all defendants file a motion to dismiss the Amended Consolidated complaint.

### THE CONSPIRACY ALLEGATIONS DEMONSTRATE THAT THE STATUTE OF LIMITATIONS HAS NOT EVEN BEGUN TO RUN AND THUS THE COMPLAINT IS TIMELY

Defendants claim that the statute of limitations for conspiracy is the same as the statute of Limitations for the underlying cause of action. Plaintiff agrees with defendants.[1] The key difference that defendants ignore is that the statute of limitations does not start to run until the last overt act of the conspiracy has occurred. Plaintiff will argue that the conspiracy continues to run until this day and thus the statute of limitations has not even begun. He also notes that he was not paid for his final work week until shortly after October 26, 2006. Thus if a valid conspiracy is pled, there is no question Plaintiff's individual claim under the FLSA is timely.

Defendants argue that no valid conspiracy is alleged relying largely on the corporate shield doctrine.[2] The most important response is that the FLSA has a broad definition of employer that, for example, unquestionably includes Mr. Ghaneh. *Chao v. Hotel Oasis, Inc.* (1st Cir. 2007),

---

1 Equitable tolling and relation back are separate issues.

**PLAINTIFF DANIEL KEATING-TRAYNOR'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

493 F3d 26, 34. For purposes of any motion to dismiss, "employer" includes Comcast and Mr.

Bahmanyar as well.  "[W]e must be mindful of the directive [of Congress] that [the FLSA} is to

be liberally construed to apply to the furthest reaches consistent with Congressional Intent.

*Biggs v. Wilson* (9th Cir. 1993) 1 F.3d 1537Thus the general common law doctrine of the

corporate shield must yield to the statutory imperative of the specific FLSA.  Moreover, a vital

distinction between this case and those applying the corporate shield to shield off liability for the

agent/employee, is that here, because of 29 USC203(d) the individuals and Comcast are legally

capable of committing the acts alleged.

Defendant cites California case law for holding that in a "simple overtime claim" the

action is founded on a contract claim and no conspiracy to violate a contract exists in California.

But, the California Supreme Court has never retreated from its holding in holding in *Wyatt v.*

*Union Mortgage Co.* (1979) 24 Cal.3d 773, 785 that "[d]irectors and officers of a corporation

are not rendered personally liable for its torts merely because of their official positions, but may

become liable if they directly ordered, authorized or participated in the tortious conduct. (*United*

*States Liab. Ins. Co. v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 595) Personal liability, if

otherwise justified, may rest upon a "conspiracy" among the officers and directors to injure third

parties through the corporation."    Such persons may be held liable, as conspirators or

otherwise, for violation of their own duties towards persons injured by the corporate tort. (See

*Wyatt v. Union Mortgage supra,*  And though it does seem to be the law, at least in California,

that one cannot be liable for conspiracy to commit a wrongful act unless one was personally

bound by the duty violated by the wrongdoing, here the crucial point is that under the FLSA, and

under California Labor Code 558 and 2966, every single named defendant is capable of

---

2 Comcast does not actually argue this, but since its co-defendant does, we will address the issue.

- 4 -

personally violating the FLSA and Labor Code sections.3 Because Mr. Ghaneh and Bahmayer

personally participated and ordered and directed the violation of the FLSA and California labor

laws and because they are capable of violating the laws cited, they can conspire to violate them

as well. See *Doctors' Co. v. Superior Court* (1989) 49 Cal.3d 39, 44 where the California

Supreme Court stated that "we anticipate that the impact of our holding, barring liability of

employees or agents for conspiracy to cause their principal to violate a duty that is binding on

the principal alone, will be relatively narrow where the violated duty is other than contractual."

Reynolds v. Bemont (2005) 36 Cal.4th 1075, the case cited by defendants, is decided

under California law.   Although it is not at all clear that there can't be a conspiracy to violate a

contract even in California, whatever the rule in California, it is not authority for the conspiracy

rule under the FLSA. Any more than Missouri law which holds that one can have a conspiracy to

violate a contract. *Rosen v. Alside, Inc.* (Mo. 1952) 248 S.W. 638.   In any event, it is interesting

to note that in *Reynolds* the court stated that a "**simple failure** to comply with statutory

requirements…does not qualify." (Emp. Added)  It is not clear what the court meant by a

"simple failure", but in this case we have an alleged knowing, intentional failure to pay overtime,

to take unlawful deductions, to charge unlawful expenses, to fail to make full payment at

termination of employment, to take unlawful deductions, to fail to give rest and meal breaks, and

to fail to pay for many hours pay under California minimum wage law (which requires minimum

wage for every hour worked as distinct from the FLSA which allows an employer to average the

wages over the work week for minimum (but not overtime) wages.  And, under *Reynolds,*

"[d]irector status therefore neither immunizes a person from individual liability nor subjects him

or her to vicarious liability." *Reynolds* at p. 1090.

---

3 In *Jones v. Gregory* (2006) the Court of Appeal noted that  Labor Code section 558 provides for penalties and
wages to be paid to the affected employee by "*[a]ny* employer *or other person acting on behalf of an employer,*" a
much stronger indication it applies to corporate officers and agents. (See § 558, subd. (a), italics in court opinion.)
Similarly, the FLSA claims apply to corporate officers and agents and others if warranted by the facts, as here.

While the Reynolds court did conclude that "corporate agents acting within the scope of their agency are not personally liable for the corporate employer's failure to pay its employees' wages," the court also noted that its holding did not preclude employees ... from recovering penalties and wages due against corporate agents. *Reynolds, supra*, 36 Cal.4th at 1087 and 1089. Specifically, the court stated that "pursuant to section 558, subdivision (a), any 'person acting on behalf of an employer who violates, or causes to be violated' a statute or wage order relating to working hours is subject to a civil penalty, payable to the affected employee, equal to the amount of any underpaid wages." Id. at 1189. The court further stated that "the Legislature has provided that aggrieved employees may under certain circumstances maintain civil actions to recover such penalties." Id. (*Reynolds* did not involve labor Code 558, because the facts involved predated the passage of that section.)   In his concurring opinion, Justice Moreno stated, "it would make sense for the Legislature to extend the reach of section 1194 to include individuals who are directly responsible for the nonpayment of overtime wages but who hide behind the corporate form....

**Taking a leaf from federal law, the Legislature could similarly authorize section 1194 actions against such individuals.** (Emp. Added.)

In addition, the Consolidated Amended Complaint alleges that Ghaneh misappropriated to himself money belonging to the class and Plaintiff. *Reynolds* notes that is an example of an exception to its ruling that a corporate officer is not liable for failure to pay overtime wages.

The general rule is that conspiracy liability is sufficiently established by proof showing concerted action or other facts and circumstances from which the natural inference arises that the unlawful, overt acts were committed in furtherance of a common design, intention, or purpose of the alleged conspirators. *Meineke v. Discount Muffler v. Jaynes* 999 F.2d 120 (5th Cir 1993) (stating Texas law). Furthermore, the requisite concurrence and knowledge " ' "may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged

**PLAINTIFF DANIEL KEATING-TRAYNOR'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

conspirators, and other circumstances. (Chicago Title Ins. Co. v. Great Western Financial Corp.

(1968) 69 Cal.2d 305, 316,  Tacit consent as well as express approval will suffice to hold a

person liable as a coconspirator. (Holder v. Home Sav. & Loan Assn. (1968) 267 Cal.App.2d 91,

108. Wyatt, supra, at p. 785.


## DEFENDANTS FAILURE TO PAY OVERTIME TO PLAINTIFF WHEN THEY PAID HIM ON OR AFTER OCTOBER 26, 2006 STARTED THE STATUTE OF LIMITATIONS FOR THAT PAYMENT

When Defendants paid Plaintiff with a check dated October 26, 2006 which did not include

payment for overtime even though Plaintiff worked for more than 40 hours during the period

covered by that check, the statute of limitations runs from that DATE. "Each paycheck received

by plaintiffs constituted a new cause of action.for the alleged violation of the FLSA [and]

plaintiffs are entitled to recover for any violations which occurred in the two years preceding

[the date of their claim.]" *Mitchell v. Lancaster Milk Co.* 185 F.Supp. 66, 70 (M.D. Pa. 1960)

cited with approval in *Biggs v. Wilson* 1 F3d 1537 (Ninth Cir. 1993).  Thus, even putting aside

the conspiracy claim, relation back and equitable tolling, the complaint is clearly timely as to the

October 26, 2006 failure to pay overtime wages.


## EQUITABLE TOLLING APPLIES TO TOLL THE STATUTE OF LIMITATIONS FOR PLAINTIFFS' CLAIMS

Defendants have been aware of Plaintiff's claims for overtime since June 29, 2007 when

the complaint in this action was filed in state court.  This allows the court to apply the doctrine of

equitable tolling to toll the statute fo limitations for his claim as of that date.   For the same

reason, the complaint filed in this action clearly put defendants on notice of the overtime claims

-7-

asserted by Defendants.

## CONCLUSION

The court should take the motion to dismiss off calendar because of the filing of the Amended Consolidated complaint. The Amended Consolidated Complaint (and the original complaint as well) is timely because a conspiracy is alleged, because the last payment alleged to violate the law was with a check dated October 26, 2006 and received after that date, because the complains relate back to June 29, 2007, at least, and because of the doctrine of equitable tolling.

Dated: August 11, 2008

_____
DANIEL BERKO Attorney for Plaintiff,
DANIEL KEATING-TRAYNOR, on behalf of
himself and all others similarly situated

- 8 -

1 | Daniel Berko - SBN 94912
  | **LAW OFFICE OF DANIEL BERKO**
2 | 819 Eddy Street
  | San Francisco, CA 94109
3 | Telephone: 415-771-6174
  | Facsimile: 415-474-3748
4 | E-mail: BerkoLaw@SBCglobal.net

5

6 | Attorneys for Plaintiffs,
  | **DANIEL KEATING-TRAYNOR on behalf of himself**
  | **and all others similarly situated**

7

8

9 | **UNITED STATES DISTRICT COURT**

10 | **NORTHERN DISTRICT OF CALIFORNIA**

11

12 | DANIEL KEATING-TRAYNOR on )           Case No.  3:08-CV-03035
   | behalf of himself and all others similarly )
13 | situated,                          )
   |                         Plaintiffs, )           **PLAINTIFF DANIEL KEATING-**
   |                                    )           **TRAYNOR'S OPPOSITION TO**
14 | -vs-                               )           **DEFENDANT ANDREW A.**
   |                                    )           **BAHMANIAR MOTION TO DISMISS**
15 | AC SQUARE, INC.; COMCAST INC.; )
   | AFSHIN GHANEH; ANDREW           )
16 | BAHMANYAR; and DOES 1-60        )           **DATE: September 8, 2008**
   | inclusive,                         )           **TIME: 2:00 p.m.**
17 |                         Defendants. )           **HONORABLE MARILYN HALL**
   | _____ )           **PATEL**

18 |                                                **CLASS ACTION**

19

20

21 |                          **INTRODUCTION**

22 |        Plaintiff is a former employee of AC Square who worked as a cable technician.  Because

23 | he believed he was underpaid and wrongfully fired he filed with the Department of Labor

24 | Standards Enforcement.  However,  he found that department woefully under staffed and

25 | inattentive to his claims.  He then hired an attorney and filed Case One – San Mateo Superior

26 | Court Case No.  456188  on July 6, 2008.  AC Square has referred to Plaintiff's claims with

27 | such disparaging labels such as "various and sundry" and "small potatoes".  In any event,

28

- 1 -

Plaintiff's attorney dropped the "small potatoes" case and that left Plaintiff without an attorney

facing a trial and a summary adjudication motion.  Plaintiff lost the summary adjudication

motion (all of his evidence was ordered stricken due to a defective verification of his

declaration) and  was forced to dismiss without prejudice on June 19, 2008- 6 days before the

trial date then set - all causes of action for compensation or penalties due without prejudice.

With present counsel, Plaintiff filed Case No. 2 (Case No, 464 144)  as a class action under

California Law for compensation on behalf of all cable technicians on June 29, 2007.  The only

named Defendant was AC Square.

With present counsel, Plaintiff filed a new and expanded complaint in state court on June

10, 2008, Case No. 473 571.  Notably, new named defendants are added (COMCAST,

BAHMANYAR, and GHANEH), and an FLSA claim and conspiracy to violate the FLSA was

added.

The next day, June 11, 2008, Plaintiff filed an FLSA claim (two counts one a violation of

the FLSA and a conspiracy to violate the FLSA).

On June 18 , 2008  the San Mateo Superior Court ordered Case 2 and case 3, the June 2007

and June 2008 state court complaints, consolidated for all purposes.  Under California law, the

entire actions are deemed merged and one action under those circumstances.  Thus, the 2nd and

3rd complaints are regarded as merged, one set of findings is made, and one judgment is

rendered.   [See *Hamilton v. Asbestos Corp., Ltd.* (2000) 22 C4th 1127, 1147–1148 ]

Plaintiff has tried to obtain agreement of the parties to the filing of an Amended

Consolidated Complaint in the Removed Actions and then any and all defendants would move to

dismiss any and all claims that they wish and the court would have one hearing on Plaintiff's

best attempt to state a claim. (Plaintiff would, as any Plaintiff, still want to be able to seek leave

to amend if warranted, but allowing a hearing on the Consolidated Complaint it would avoid the

- 2 -

piecemeal attacks on the basic claims alleged). Plaintiff has been unable to secure such an agreement.

Plaintiff believes that there is no question that the filing of the Amended Consolidated Federal Complaint makes moot all motions to dismiss the superseded pleading. However, to date, AC Square takes the position that even the filing of an amended complaint in the direct federal action did not moot out the motion to dismiss the complaint in that action. So, in an abundance of caution, Plaintiff will file this opposition to the Motion to Dismiss filed by Comcast, even though he respectfully requests the court take the motion off calendar and have Comcast and all defendants file a motion to dismiss the Amended Consolidated complaint.

## THE CONSPIRACY ALLEGATIONS DEMONSTRATE THAT THE STATUTE OF LIMITATIONS HAS NOT EVEN BEGUN TO RUN AND THUS THE COMPLAINT IS TIMELY

Defendants claim that the statute of limitations for conspiracy is the same as the statute of Limitations for the underlying cause of action. Plaintiff agrees with defendants.[1] The key difference that defendants ignore is that the statute of limitations does not start to run until the last overt act of the conspiracy has occurred. Plaintiff will argue that the conspiracy continues to run until this day and thus the statute of limitations has not even begun. He also notes that he was not paid for his final work week until shortly after October 26, 2006. Thus if a valid conspiracy is pled, there is no question Plaintiff's individual claim under the FLSA is timely.

Defendants argue that no valid conspiracy is alleged relying largely on the corporate shield doctrine.[2] The most important response is that the FLSA has a broad definition of employer that, for example, unquestionably includes Mr. Ghaneh. *Chao v. Hotel Oasis, Inc.* (1st Cir. 2007),

---

[1] Equitable tolling and relation back are separate issues.

- 3 -

493 F3d 26, 34.  For purposes of any motion to dismiss, "employer" includes Comcast and Mr.

Bahmanyar as well.   "[W]e must be mindful of the directive [of Congress] that [the FLSA} is to

be liberally construed to apply to the furthest reaches consistent with Congressional Intent.

*Biggs v. Wilson* (9th Cir. 1993) 1 F.3d 1537Thus the general common law doctrine of the

corporate shield must yield to the statutory imperative of the specific FLSA.  Moreover, a vital

distinction between this case and those applying the corporate shield to shield off liability for the

agent/employee, is that here, because of 29 USC203(d) the individuals and Comcast are legally

capable of committing the acts alleged.

   Defendant cites California case law for holding that in a "simple overtime claim" the

action is founded on a contract claim and no conspiracy to violate a contract exists in California.

But, the California Supreme Court has never retreated from its holding in holding in *Wyatt v.*

*Union Mortgage Co.* (1979) 24 Cal.3d 773, 785 that  "[d]irectors and officers of a corporation

are not rendered personally liable for its torts merely because of their official positions, but may

become liable if they directly ordered, authorized or participated in the tortious conduct. (*United*

*States Liab. Ins. Co. v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 595) Personal liability, if

otherwise justified, may rest upon a "conspiracy" among the officers and directors to injure third

parties through the corporation."    Such persons may be held liable, as conspirators or

otherwise, for violation of their own duties towards persons injured by the corporate tort. (See

*Wyatt v. Union Mortgage supra,*  And though it does seem to be the law, at least in California,

that one cannot be liable for conspiracy to commit a wrongful act unless one was personally

bound by the duty violated by the wrongdoing, here the crucial point is that under the FLSA, and

under California Labor Code 558 and 2966, every single named defendant is capable of

---

2 Comcast does not actually argue this, but since its co-defendant does, we will address the issue.

- 4 -

personally violating the FLSA and Labor Code sections.3 Because Mr. Ghaneh and Bahmayer

personally participated and ordered and directed the violation of the FLSA and California labor

laws and because they are capable of violating the laws cited, they can conspire to violate them

as well. See *Doctors' Co. v. Superior Court* (1989) 49 Cal.3d 39, 44 where the California

Supreme Court stated that "we anticipate that the impact of our holding, barring liability of

employees or agents for conspiracy to cause their principal to violate a duty that is binding on

the principal alone, will be relatively narrow where the violated duty is other than contractual."

*Reynolds v. Bemont* (2005) 36 Cal.4[th] 1075, the case cited by defendants, is decided

under California law.  Although it is not at all clear that there can't be a conspiracy to violate a

contract even in California, whatever the rule in California, it is not authority for the conspiracy

rule under the FLSA. Any more than Missouri law which holds that one can have a conspiracy to

violate a contract. *Rosen v. Alside, Inc.* (Mo. 1952) 248 S.W. 638.  In any event, it is interesting

to note that in *Reynolds* the court stated that a "**simple failure** to comply with statutory

requirements...does not qualify." (Emp. Added)  It is not clear what the court meant by a

"simple failure", but in this case we have an alleged knowing, intentional failure to pay overtime,

to take unlawful deductions, to charge unlawful expenses, to fail to make full payment at

termination of employment, to take unlawful deductions, to fail to give rest and meal breaks, and

to fail to pay for many hours pay under California minimum wage law (which requires minimum

wage for every hour worked as distinct from the FLSA which allows an employer to average the

wages over the work week for minimum (but not overtime) wages.  And, under *Reynolds,*

"[d]irector status therefore neither immunizes a person from individual liability nor subjects him

or her to vicarious liability." *Reynolds* at p. 1090.

---

3 In *Jones v. Gregory* (2006) the Court of Appeal noted that  Labor Code section 558 provides for penalties and
wages to be paid to the affected employee  by *"[a]ny* employer or *other person acting on behalf of an employer,"* a
much stronger indication it applies to corporate officers and agents. (See § 558, subd. (a), italics in court opinion.)
Similarly, the FLSA claims apply to corporate officers and agents and others if warranted by the facts, as here.

While the Reynolds court did conclude that "corporate agents acting within the scope of their agency are not personally liable for the corporate employer's failure to pay its employees' wages," the court also noted that its holding did not preclude employees ... from recovering penalties and wages due against corporate agents. *Reynolds, supra,* 36 Cal.4th at 1087 and 1089.

Specifically, the court stated that "pursuant to section 558, subdivision (a), any 'person acting on behalf of an employer who violates, or causes to be violated' a statute or wage order relating to working hours is subject to a civil penalty, payable to the affected employee, equal to the amount of any underpaid wages." Id. at 1189. The court further stated that "the Legislature has provided that aggrieved employees may under certain circumstances maintain civil actions to recover such penalties." Id. (*Reynolds* did not involve labor Code 558, because the facts involved predated the passage of that section.)   In his concurring opinion, Justice Moreno stated, "it would make sense for the Legislature to extend the reach of section 1194 to include individuals who are directly responsible for the nonpayment of overtime wages but who hide behind the corporate form.... **Taking a leaf from federal law, the Legislature could similarly authorize section 1194 actions against such individuals.** (Emp. Added.)

In addition, the Consolidated Amended Complaint alleges that Ghaneh misappropriated to himself money belonging to the class and Plaintiff. *Reynolds* notes that is an example of an exception to its ruling that a corporate officer is not liable for failure to pay overtime wages.

The general rule is that conspiracy liability is sufficiently established by proof showing concerted action or other facts and circumstances from which the natural inference arises that the unlawful, overt acts were committed in furtherance of a common design, intention, or purpose of the alleged conspirators. *Meineke v. Discount Muffler v. Jaynes* 999 F.2d 120 (5th Cir 1993) (stating Texas law). Furthermore, the requisite concurrence and knowledge " ' "may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged

- 6 -

conspirators, and other circumstances. (Chicago Title Ins. Co. v. Great Western Financial Corp.

(1968) 69 Cal.2d 305, 316,  Tacit consent as well as express approval will suffice to hold a

person liable as a coconspirator. (Holder v. Home Sav. & Loan Assn. (1968) 267 Cal.App.2d 91,

108. Wyatt, supra, at p. 785.


### DEFENDANTS FAILURE TO PAY OVERTIME TO PLAINTIFF WHEN THEY PAID HIM ON OR AFTER OCTOBER 26, 2006 STARTED THE STATUTE OF LIMITATIONS FOR THAT PAYMENT

When Defendants paid Plaintiff with a check dated October 26, 2006 which did not include

payment for overtime even though Plaintiff worked for more than 40 hours during the period

covered by that check, the statute of limitations runs from that DATE. "Each paycheck received

by plaintiffs constituted a new cause of action for the alleged violation of the FLSA [and]

plaintiffs are entitled to recover for any violations which occurred in the two years preceding

[the date of their claim.]" *Mitchell v. Lancaster Milk Co.* 185 F.Supp. 66, 70 (M.D. Pa. 1960)

cited with approval in *Biggs v. Wilson* 1 F3d 1537 (Ninth Cir. 1993).  Thus, even putting aside

the conspiracy claim, relation back and equitable tolling, the complaint is clearly timely as to the

October 26, 2006 failure to pay overtime wages.


### EQUITABLE TOLLING APPLIES TO TOLL THE STATUTE OF LIMITATIONS FOR PLAINTIFFS' CLAIMS

Defendants have been aware of Plaintiff's claims for overtime since June 29, 2007 when

the complaint in this action was filed in state court.  This allows the court to apply the doctrine of

equitable tolling to toll the statute fo limitations for his claim as of that date.   For the same

reason, the complaint filed in this action clearly put defendants on notice of the overtime claims

- 7 -

asserted by Defendants.

# CONCLUSION

The court should take the motion to dismiss off calendar because of the filing of the Amended Consolidated complaint. The Amended Consolidated Complaint (and the original complaint as well) is timely because a conspiracy is alleged, because the last payment alleged to violate the law was with a check dated October 26, 2006 and received after that date, because the complains relate back to June 29, 2007, at least, and because of the doctrine of equitable tolling.


Dated: August 11, 2008


_____
DANIEL BERKO Attorney for Plaintiff,
DANIEL KEATING-TRAYNOR, on behalf of
himself and all others similarly situated

PLAINTIFF DANIEL KEATING-TRAYNOR'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1   Daniel Berko - SBN 94912
    LAW OFFICE OF DANIEL BERKO
2   819 Eddy Street
    San Francisco, CA 94109
3   Telephone: 415-771-6174
    Facsimile: 415-474-3748
4   E-mail: BerkoLaw@SBCglobal.net

5
    Attorneys for Plaintiffs,
6   DANIEL KEATING-TRAYNOR on behalf of himself
    and all others similarly situated
7

8

9                 UNITED STATES DISTRICT COURT

10               NORTHERN DISTRICT OF CALIFORNIA

11
    DANIEL KEATING-TRAYNOR on          )
12  behalf of himself and all others similarly )   Case No.  3:08-CV-03035
    situated,                          )
13              Plaintiffs,            )   PLAINTIFF DANIEL KEATING-
    -vs-                               )   TRAYNOR'S OPPOSITION TO
14                                     )   DEFENDANT AFSHIN GAHNEH
    AC SQUARE, INC.; COMCAST INC.;     )   MOTION TO DISMISS
15  AFSHIN GHANEH; ANDREW              )
    BAHMANYAR; and DOES 1-60           )   DATE: September 8, 2008
16  inclusive,                         )   TIME: 2:00 p.m.
                Defendants.            )   HONORABLE MARILYN HALL
17  _____)   PATEL
18
                                           CLASS ACTION
19

20

21                       INTRODUCTION

22      Plaintiff is a former employee of AC Square who worked as a cable technician.  Because

23  he believed he was underpaid and wrongfully fired he filed with the Department of Labor

24  Standards Enforcement.  However,  he found that department woefully under staffed and

25  inattentive to his claims.  He then hired an attorney and filed Case One – San Mateo Superior

26
    Court Case No.  456188  on July 6, 2008.  AC Square has referred to Plaintiff's claims with
27
    such disparaging labels such as "various and sundry" and "small potatoes".  In any event,
28

                                    - 1 -

Plaintiff's attorney dropped the "small potatoes" case and that left Plaintiff without an attorney

facing a trial and a summary adjudication motion.  Plaintiff lost the summary adjudication

motion (all of his evidence was ordered stricken due to a defective verification of his

declaration) and  was forced to dismiss without prejudice on June 19, 2008- 6 days before the

trial date then set - all causes of action for compensation or penalties due without prejudice.

With present counsel, Plaintiff filed Case No. 2 (Case No, 464 144)  as a class action under

California Law for compensation on behalf of all cable technicians on June 29, 2007.  The only

named Defendant was AC Square.

With present counsel, Plaintiff filed a new and expanded complaint in state court on June

10, 2008, Case No. 473 571.  Notably, new named defendants are added (COMCAST,

BAHMANYAR, and GHANEH), and an FLSA claim and conspiracy to violate the FLSA was

added.

The next day, June 11, 2008, Plaintiff filed an FLSA claim (two counts one a violation of

the FLSA and a conspiracy to violate the FLSA).

On June 18 , 2008  the San Mateo Superior Court ordered Case 2 and case 3, the June 2007

and June 2008 state court complaints, consolidated for all purposes.  Under California law, the

entire actions are deemed merged and one action under those circumstances.  Thus, the 2nd and

3rd complaints are regarded as merged, one set of findings is made, and one judgment is

rendered.   [See _Hamilton v. Asbestos Corp., Ltd._ (2000) 22 C4th 1127, 1147–1148 ]

Plaintiff has tried to obtain agreement of the parties to the filing of an Amended

Consolidated Complaint in the Removed Actions and then any and all defendants would move to

dismiss any and all claims that they wish and the court would have one hearing on Plaintiff's

best attempt to state a claim. (Plaintiff would, as any Plaintiff, still want to be able to seek leave

to amend if warranted, but allowing a hearing on the Consolidated Complaint it would avoid the

- 2 -

piecemeal attacks on the basic claims alleged). Plaintiff has been unable to secure such an agreement.

Plaintiff believes that there is no question that the filing of the Amended Consolidated Federal Complaint makes moot all motions to dismiss the superseded pleading. However, to date, AC Square takes the position that even the filing of an amended complaint in the direct federal action did not moot out the motion to dismiss the complaint in that action. So, in an abundance of caution, Plaintiff will file this opposition to the Motion to Dismiss filed by Comcast, even though he respectfully requests the court take the motion off calendar and have Comcast and all defendants file a motion to dismiss the Amended Consolidated complaint.


### THE CONSPIRACY ALLEGATIONS DEMONSTRATE THAT THE STATUTE OF LIMITATIONS HAS NOT EVEN BEGUN TO RUN AND THUS THE COMPLAINT IS TIMELY

Defendants claim that the statute of limitations for conspiracy is the same as the statute of Limitations for the underlying cause of action. Plaintiff agrees with defendants.[1] The key difference that defendants ignore is that the statute of limitations does not start to run until the last overt act of the conspiracy has occurred. Plaintiff will argue that the conspiracy continues to run until this day and thus the statute of limitations has not even begun. He also notes that he was not paid for his final work week until shortly after October 26, 2006. Thus if a valid conspiracy is pled, there is no question Plaintiff's individual claim under the FLSA is timely.

Defendants argue that no valid conspiracy is alleged relying largely on the corporate shield doctrine.[2] The most important response is that the FLSA has a broad definition of employer that, for example, unquestionably includes Mr. Ghaneh. *Chao v. Hotel Oasis, Inc.* (1st Cir. 2007),

---

[1] Equitable tolling and relation back are separate issues.

- 3 -

493 F3d 26, 34.  For purposes of any motion to dismiss, "employer" includes Comcast and Mr.

Bahmanyar as well.  "[W]e must be mindful of the directive [of Congress] that [the FLSA} is to

be liberally construed to apply to the furthest reaches consistent with Congressional Intent.

*Biggs v. Wilson* (9th Cir. 1993) 1 F.3d 1537Thus the general common law doctrine of the

corporate shield must yield to the statutory imperative of the specific FLSA.  Moreover, a vital

distinction between this case and those applying the corporate shield to shield off liability for the

agent/employee, is that here, because of 29 USC203(d) the individuals and Comcast are legally

capable of committing the acts alleged.

Defendant cites California case law for holding that in a "simple overtime claim" the

action is founded on a contract claim and no conspiracy to violate a contract exists in California.

But, the California Supreme Court has never retreated from its holding in holding in *Wyatt v.*

*Union Mortgage Co.* (1979) 24 Cal.3d 773, 785 that "[d]irectors and officers of a corporation

are not rendered personally liable for its torts merely because of their official positions, but may

become liable if they directly ordered, authorized or participated in the tortious conduct. (*United*

*States Liab. Ins. Co. v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 595) Personal liability, if

otherwise justified, may rest upon a "conspiracy" among the officers and directors to injure third

parties through the corporation."    Such persons may be held liable, as conspirators or

otherwise, for violation of their own duties towards persons injured by the corporate tort. (See

*Wyatt v. Union Mortgage supra,*  And though it does seem to be the law, at least in California,

that one cannot be liable for conspiracy to commit a wrongful act unless one was personally

bound by the duty violated by the wrongdoing, here the crucial point is that under the FLSA, and

under California Labor Code 558 and 2966, every single named defendant is capable of

---

2 Comcast does not actually argue this, but since its co-defendant does, we will address the issue.

- 4 -

PLAINTIFF DANIEL KEATING-TRAYNOR'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

personally violating the FLSA and Labor Code sections.3 Because Mr. Ghaneh and Bahmayer

personally participated and ordered and directed the violation of the FLSA and California labor

laws and because they are capable of violating the laws cited, they can conspire to violate them

as well. See *Doctors' Co. v. Superior Court* (1989) 49 Cal.3d 39, 44 where the California

Supreme Court stated that "we anticipate that the impact of our holding, barring liability of

employees or agents for conspiracy to cause their principal to violate a duty that is binding on

the principal alone, will be relatively narrow where the violated duty is other than contractual."

Reynolds v. Bemont (2005) 36 Cal.4th 1075, the case cited by defendants, is decided

under California law. Although it is not at all clear that there can't be a conspiracy to violate a

contract even in California, whatever the rule in California, it is not authority for the conspiracy

rule under the FLSA. Any more than Missouri law which holds that one can have a conspiracy to

violate a contract. *Rosen v. Alside, Inc.* (Mo. 1952) 248 S.W. 638. In any event, it is interesting

to note that in *Reynolds* the court stated that a "**simple failure** to comply with statutory

requirements...does not qualify." (Emp. Added) It is not clear what the court meant by a

"simple failure", but in this case we have an alleged knowing, intentional failure to pay overtime,

to take unlawful deductions, to charge unlawful expenses, to fail to make full payment at

termination of employment, to take unlawful deductions, to fail to give rest and meal breaks, and

to fail to pay for many hours pay under California minimum wage law (which requires minimum

wage for every hour worked as distinct from the FLSA which allows an employer to average the

wages over the work week for minimum (but not overtime) wages. And, under *Reynolds,*

"[d]irector status therefore neither immunizes a person from individual liability nor subjects him

or her to vicarious liability." *Reynolds* at p. 1090.

---

3 In *Jones v. Gregory* (2006) the Court of Appeal noted that Labor Code section 558 provides for penalties and
wages to be paid to the affected employee by "*[a]ny* employer or *other person acting on behalf of an employer,*" a
much stronger indication it applies to corporate officers and agents. (See § 558, subd. (a), italics in court opinion.)
Similarly, the FLSA claims apply to corporate officers and agents and others if warranted by the facts, as here.

- 5 -

While the Reynolds court did conclude that "corporate agents acting within the scope of

their agency are not personally liable for the corporate employer's failure to pay its employees'

wages," the court also noted that its holding did not preclude employees ... from recovering

penalties and wages due against corporate agents. *Reynolds, supra*, 36 Cal.4th at 1087 and 1089.

Specifically, the court stated that "pursuant to section 558, subdivision (a), any 'person acting on

behalf of an employer who violates, or causes to be violated' a statute or wage order relating to

working hours is subject to a civil penalty, payable to the affected employee, equal to the amount

of any underpaid wages." Id. at 1189. The court further stated that "the Legislature has provided

that aggrieved employees may under certain circumstances maintain civil actions to recover such

penalties." Id. (*Reynolds* did not involve labor Code 558, because the facts involved predated the

passage of that section.)   In his concurring opinion, Justice Moreno stated, "it would make sense

for the Legislature to extend the reach of section 1194 to include individuals who are directly

responsible for the nonpayment of overtime wages but who hide behind the corporate form....

**Taking a leaf from federal law, the Legislature could similarly authorize section 1194**

**actions against such individuals.** (Emp. Added.)

In addition, the Consolidated Amended Complaint alleges that Ghaneh misappropriated to

himself money belonging to the class and Plaintiff. *Reynolds* notes that is an example of an

exception to its ruling that a corporate officer is not liable for failure to pay overtime wages.

The general rule is that conspiracy liability is sufficiently established by proof showing

concerted action or other facts and circumstances from which the natural inference arises that the

unlawful, overt acts were committed in furtherance of a common design, intention, or purpose of

the alleged conspirators. *Meineke v. Discount Muffler v. Jaynes* 999 F.2d 120 (5th Cir 1993)

(stating Texas law). Furthermore, the requisite concurrence and knowledge " ' "may be inferred

from the nature of the acts done, the relation of the parties, the interests of the alleged

- 6 -

conspirators, and other circumstances. (Chicago Title Ins. Co. v. Great Western Financial Corp.

(1968) 69 Cal.2d 305, 316,  Tacit consent as well as express approval will suffice to hold a

person liable as a coconspirator. (Holder v. Home Sav. & Loan Assn. (1968) 267 Cal.App.2d 91,

108. Wyatt, supra, at p. 785.


### DEFENDANTS FAILURE TO PAY OVERTIME TO PLAINTIFF WHEN THEY PAID HIM ON OR AFTER OCTOBER 26, 2006 STARTED THE STATUTE OF LIMITATIONS FOR THAT PAYMENT

When Defendants paid Plaintiff with a check dated October 26, 2006 which did not include

payment for overtime even though Plaintiff worked for more than 40 hours during the period

covered by that check, the statute of limitations runs from that DATE. "Each paycheck received

by plaintiffs constituted a new cause of action for the alleged violation of the FLSA [and]

plaintiffs are entitled to recover for any violations which occurred in the two years preceding

[the date of their claim.]" *Mitchell v. Lancaster Milk Co.* 185 F.Supp. 66, 70 (M.D. Pa. 1960)

cited with approval in *Biggs v. Wilson* 1 F3d 1537 (Ninth Cir. 1993).  Thus, even putting aside

the conspiracy claim, relation back and equitable tolling, the complaint is clearly timely as to the

October 26, 2006 failure to pay overtime wages.


### EQUITABLE TOLLING APPLIES TO TOLL THE STATUTE OF LIMITATIONS FOR PLAINTIFFS' CLAIMS

Defendants have been aware of Plaintiff's claims for overtime since June 29, 2007 when

the complaint in this action was filed in state court.  This allows the court to apply the doctrine of

equitable tolling to toll the statute fo limitations for his claim as of that date.   For the same

reason, the complaint filed in this action clearly put defendants on notice of the overtime claims

- 7 -

asserted by Defendants.

## CONCLUSION

The court should take the motion to dismiss off calendar because of the filing of the Amended Consolidated complaint. The Amended Consolidated Complaint (and the original complaint as well) is timely because a conspiracy is alleged, because the last payment alleged to violate the law was with a check dated October 26, 2006 and received after that date, because the complains relate back to June 29, 2007, at least, and because of the doctrine of equitable tolling.

Dated: August 11, 2008

_____
DANIEL BERKO Attorney for Plaintiff,
DANIEL KEATING-TRAYNOR, on behalf of
himself and all others similarly situated

- 8 -



LITTLER MENDELSON ®

July 28, 2008

Ronald A. Peters
Direct: 408.795.3433
Direct Fax: 408.288.5686
rpeters@littler.com

Daniel Berko, Esq.
Law Office of Daniel Berko
819 Eddy Street
San Francisco, CA 94109

Re:   *Keating-Traynor v. AC Square, Inc.*; Case Nos.  CIV 473571; CV-08-2907-MHP;
      Notice Of Intent To File Motion For Sanctions Pursuant To FRCP Rule 11 And
      CCP §128.7

Dear Mr. Berko:

As you are aware, our law firm represents AC Square, Inc., Afshin Ghaneh and Andrew
Bahmanyar ("Defendants") in the above-referenced matters.

I am writing to request that your client, Daniel Keating-Traynor, immediately dismiss his
recently filed complaints, the first filed on June 10, 2008 in San Mateo Superior Court, Case
No. CIV 473571 and the second, Federal Court action filed on June 11, 2008, Case No. CV-
08-2907-MHP.  Enclosed with this letter are two motions requesting sanctions, including the
recovery of costs and attorneys fees that Defendants intend to file in the event your client
refuses to dismiss these complaints.

As you can see from the attached motions, the request for dismissal of the foregoing actions
is based on our conviction that Plaintiff's pleadings have been filed in violation of Rule 11 of
the Federal Rules of Civil Procedure ("FRCP") as well as section 128.7 of the California
Code of Civil Procedure ("CCP").

Your client's complaints referenced above were filed in the pursuit of a clearly improper
purpose. Your conduct in the prosecution of this matter leads to the inescapable conclusion
that the sole reason for the filing of the complaints was to circumvent the possibility of the
dismissal of the original complaint in light of your own failure to obtain the necessary
discovery relevant to class certification.

Even a cursory glance at the applicable laws would have disclosed that Plaintiff's second,
third, fourth, and fifth causes of action, including FLSA claims, asserted in his second state
court complaint, as well as both of the identical FLSA claims which make up the entirety of
Plaintiff's federal court complaint, are barred by the applicable statutes of limitations.
Likewise, the law is clear that claims against individual defendants are not permitted in this

ALABAMA

ARIZONA

ARKANSAS

CALIFORNIA

COLORADO

CONNECTICUT

DISTRICT OF
COLUMBIA

FLORIDA

GEORGIA

ILLINOIS

INDIANA

MASSACHUSETTS

MINNESOTA

MISSOURI

NEVADA

NEW JERSEY

NEW YORK

NORTH CAROLINA

OHIO

OREGON

PENNSYLVANIA

RHODE ISLAND

SOUTH CAROLINA

TEXAS

VIRGINIA

WASHINGTON

Daniel Berko, Esq.
July 28, 2008
Page 2

context.  Suing Mr. Ghaneh and Mr. Bahmanyar is a purely bad faith tactic designed to cause them personal, emotional and financial harm without justification.

You and your client's bad faith is further evidenced by the fact that you filed **identical** FLSA actions in both State and Federal Court apparently hoping to tax Defendants' resources, not to mention their peace of mind, by forcing them to litigate the exact same causes of action in different fora at the same time.

Finally, you failed to investigate the viability of the claims asserted in both complaints against Comcast, Inc..  It's clear that you merely named Comcast, Inc. as "a shot in the dark" tactic, without any justification.  In fact, the discovery conducted in your original state court action clearly established that Comcast could not be an employer or conspirator as to any alleged state or federal statutory violation.  Therefore, the only information you had in your possession at the time of the filing was evidence that established the opposite proposition. This is borne out by the fact that you do not allege in the state court action that Comcast was a joint employer, but do claim it is in the Federal Court complaint filed at the same time. While Comcast and their attorneys can speak for themselves, and will do so shortly, these actions were clearly designed, in bad faith, to cause direct economic harm to my clients by improperly dragging into this action one of their  most important customers.

Accordingly, Defendants respectfully request that Plaintiff immediately dismiss the two recently filed complaints.  In the event Plaintiff fails to do so, within ten days of your receipt of this correspondence, Defendants will proceed with the filing of the enclosed FRCP Rule 11 and CCP § 128.7 motions.

Please feel free to contact me should you have any questions with respect to the matters discussed in this correspondence.

Very truly yours,

Ronald A. Peters

RAP/prl

Enclosures

1   RONALD A. PETERS, Bar No. 169895
    BENJAMIN A. EMMERT, Bar No. 212157
2   LILANTHI RAVISHANKAR, Bar No. 243487
    MARYAM S. KARSON, Bar No. 221184
3   LITTLER MENDELSON
    A Professional Corporation
4   50 West San Fernando Street
    15th Floor
5   San Jose, CA  95113.2303
    Telephone:    408.998.4150
6
    Attorneys for Defendants
7   AC SQUARE, INC., AFSHIN GHANEH,
    ANDREW BAHMANYAR
8

9                  UNITED STATES DISTRICT COURT

10               NORTHERN DISTRICT OF CALIFORNIA

11                  SAN FRANCISCO DIVISION

12  DANIEL KEATING-TRAYNOR on            Case No.  CV-08-2907-MHP
    behalf of himself and all others similarly
13  situated,                           DEFENDANT AC SQUARE, INC.'S
                                        NOTICE OF MOTION AND MOTION
14              Plaintiffs,             FOR SANCTIONS UNDER FRCP RULE
                                        11; MEMORANDUM OF POINTS AND
15      v.                              AUTHORITIES

16  AC SQUARE, INC.; COMCAST INC.;      FRCP, RULE 11
    AFSHIN GHANEH; ANDREW
17  BAHMANYAR; and DOES 1 THROUGH       Date:
    60, inclusive,                      Time:
18                                      Dept:    Courtroom 15
                Defendants.             Honorable Marilyn Hall Patel
19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
50 West San Fernando Street
15th Floor
San Jose, CA  95113 2303
408 998 4150

(No. CV 08 2907 MHP)                    DEFENDANT'S MOTION FOR SANCTIONS
                                        UNDER FRCP RULE 11

**TABLE OF CONTENTS**

PAGE

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 3

II.     STATEMENT OF THE CASE ................................................................................ 3

III.    LEGAL ANALYSIS ............................................................................................... 5

        A.      Applicable Legal Standards for Sanctions Under Rule 11 Of The Federal
                Rules Of Civil Procedure ........................................................................... 5

        B.      Plaintiff And His Attorney Have Engaged In Sanctionable Conduct ........................ 6

                1.      The Imposition Of Sanctions Is Appropriate, Because Plaintiff Has
                        Filed His Successive Complaints For Improper Purposes ............................. 7

                2.      The Imposition Of Sanctions Is Appropriate, Because A Reasonable
                        Investigation Would Have Revealed That The Claims Pleaded In
                        Plaintiff's  Third Complaint Are Time-Barred ............................................ 8

                        a.      Plaintiff's First Cause of Action For The Violation Of The Fair
                                Labor Standard Act ("FLSA") Is Barred By The Applicable
                                Statutes Of Limitations ................................................................ 8

                        b.      Plaintiff's Second Cause Of Action For Conspiracy To Violate
                                The FLSA Is Barred By The Applicable Statutes Of
                                Limitations .................................................................................. 9

                3.      The Imposition Of Sanctions Is Appropriate, Because A Reasonable
                        Investigation Would Have Revealed That The Majority Of The Claims
                        Pleaded In Plaintiff's Second Filed Complaint Are Time-Barred ................. 9

                        a.      Plaintiff's Fourth Cause Of Action For The Violation Of
                                California Labor Code 203 Is Barred  By The Applicable
                                Statute Of Limitations ................................................................. 9

                        b.      Plaintiff's Fifth Cause Of Action For Conspiracy To Violate
                                California Labor Code 558 Is Barred  By The Applicable
                                Statute Of Limitations ............................................................... 11

                4.      The Imposition Of Sanctions Is Appropriate, Since On The Face Of
                        Plaintiff's Second And Third Pleadings, It Is Apparent That Counsel
                        Failed To Conduct A Reasonable Investigation To Ascertain That
                        Plaintiff's Factual Contentions Contain Evidentiary Support ...................... 12

        C.      Sanctions Are Warranted For Counsel's Misconduct ................................................. 13

                1.      Rule 11 Sanctions Are Appropriate ................................................................. 13

                        a.      Monetary Sanctions Should Be Imposed ............................................ 13

                2.      Terminating Sanctions Are Appropriate ........................................................ 14

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
50 West San Fernando Street
15th Floor
San Jose, CA  95113 2303
408 998 4150

(No. CV 08 2907 MHP)

DEFENDANT'S MOTION FOR SANCTIONS
UNDER FRCP RULE 11

i

# TABLE OF AUTHORITIES

PAGE

## CASES

*In re Keegan Management Co., Securities Litigation*, 78 F.3d 431, 434 (9th Cir. 1996) ............................................................................................................................... 6

*Buster v. Greisen*, 104 F.3d 1186, 1190 (9th Cir. 1997) ........................................................ 5

*Carman v. Treat*, 7 F.3d 1379, 1382 (8th. Cir. 1993) ........................................................... 15

*Combs v. Rockwell International Corp.*, 927 F.2d 486, 488 (9th Cir. 1991) ....................... 15

*Cooter & Gell v. Hartman Corp.*, 496 U.S. 384, 393 (1990) ............................ 5, 6, 13, 14

*Estate of Gianna Blue v. County of Los Angeles*, 120 F.3d 982, 985 (9th Cir. 1997) .............. 5, 6

*Garr v. U.S. Healthcare*, 22 F.3d 1274, 1279 (3d Cir. Pa. 1994) .................................... 6, 12

*Huettig & Schromm, Inc. v. Landscape Contractors Council of Northern Calif.*, 790 F.2d 1421, 1427 (9th Cir. 1986) ..................................................................................... 6, 8

*Johnson v. A. W. Chesterton Co.*, 18 F.3d 1362, 1366 (7th Cir. Wis. 1994) ................... 12, 13

*Meyer v. California Int'l Chem. Co.*, 1998 U.S. App. LEXIS 31606 (9th Cir. 1998) ............... 5, 7, 8

*Mir v. Little Company of Mary Hospital* (9th Cir. 1988) 844 F.2d 646, 653 ........................ 6

*Plante v. Fleet National Bank*, 978 F. Supp. 59, 69 (D.R.I. 1997) ................................... 6, 13

*Rhinehart v. Stauffer*, 638 F.2d 1169, 1171 (9th Cir. 1979) ......................................... 14, 15

*Salivary v. City of Los Angeles*, 780 F.2d 823, 831 (9th Cir. 1986) .................................... 6

*Smith v. Ricks,* 31 F.3d 1478; 1488 (9th Cir. 1994) ............................................................. 6

*Truesdell v. Southern California Permanent Medical Group*, 293 F.3d 1146, 1153 (9th Cir. 2002) ........................................................................................................................ 13

*Walker v. Norwest Corp.*, 108 F.3d 158, 162 (8th Cir. 1997) ............................................ 13

## STATUTES

Business and Professions Code §17200 ................................................................................ 4

Cal. Code Civ. Proc. § 473 ..................................................................................................... 7

Fed. R. Civ. P. 11(c)(2) ......................................................................................................... 13

U.S.C.S. Fed Rules Civ. Proc. R. 11(a) ........................................................................... 5, 14

U.S.C.S. Fed Rules Civ. Proc. R. 11(b)(1) ...................................................................... 5, 7, 8

U.S.C.S. Fed Rules Civ. Proc. R. 11(b)(2),(3) ...................................................................... 5

U.S.C.S. Fed Rules Civ. Proc. R. 11(b)(3) .......................................................................... 12

U.S.C.S. Fed Rules Civ. Proc. R. 11(b),(c) ........................................................................... 5

U.S.C.S. Fed Rules Civ. Proc. R. 11(c)(4) ............................................................................ 6

## OTHER AUTHORITIES

17 Schwarzer, et. al.; *Practice Guide: Federal Civil Procedure Before Trial, National Edition;* § 17:61 (TRG 2007) ............................................................................................... 5

Fed. R. Civ. P. 11, Advisory Committee Notes to 1993 amendment ................................ 14

LITTLER MENDELSON
A Professional Corporation
50 West San Fernando Street
15th Floor
San Jose, CA 95113 2303
408 998 4150

# TABLE OF AUTHORITIES
### (CONTINUED)

Firmwide:85811432.1 047098.1008

LITTLER MENDELSON
A Professional Corporation
50 West San Fernando Street
15th Floor
San Jose, CA 95113 2303
408 998 4150

(NO. )                                    iv.

TABLE OF CONTENTS
(CONTINUED)

PAGE

IV.     CONCLUSION.................................................................................................. 15

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
50 West San Fernando Street
15th Floor
San Jose, CA 95113 2303
408 998 4150

(No. CV 08 2907 MHP)                                      DEFENDANT'S MOTION FOR SANCTIONS
                                                          UNDER FRCP RULE 11
                              ii

1    **TO PLAINTIFF DANIEL KEATING-TRAYNOR AND TO HIS ATTORNEY OF RECORD:**

2          **YOU ARE HEREBY NOTIFIED** that on _____, 2008 at _____ a.m., in

3    Courtroom 15 of this Court, located at 450 Golden Gate Avenue, San Francisco, CA 94102,

4    Defendant AC SQUARE, INC., will, and hereby does, move the Court, pursuant to Rule 11 of the

5    Federal Rules of Civil Procedure, for an Order granting monetary sanctions in the amount of

6    $_____ against Plaintiff Daniel Keating-Traynor and Plaintiff's counsel of record, Daniel Berko

7    and the Law Office of Daniel Berko, and terminating sanctions in Defendant's favor.

8          This motion is made on the grounds that Plaintiff and his counsel filed the instant

9    action, case number CV-08-2907-MHP for the improper purpose to harass Defendant AC Square,

10   Inc., cause unnecessary delay and to needlessly increase the cost of the litigation.  This motion is

11   based on the fact that the causes of action in Plaintiff's Complaint are barred by the statute of

12   limitations and Plaintiff and his counsel have continued to prosecute this matter despite knowledge

13   of this fact.

14         Defendant's motion is based on this Notice of Motion and Motion, the Memorandum

15   of Points and Authorities, the Declaration of Ronald A. Peters filed herewith, the complete files and

16   records of this matter, and on any such evidence and argument that the Court deems necessary at the

17   hearing on this motion.

18                  **MEMORANDUM OF POINTS AND AUTHORITIES**

19   **I.     INTRODUCTION AND SUMMARY OF ARGUMENT**

20         Plaintiff's putative class action against Defendant AC Square, Inc. (hereinafter

21   referred to as "Defendant") by Plaintiff Daniel Keating-Traynor (hereinafter referred to as

22   "Plaintiff"), on behalf of himself and all persons similarly situated, is inappropriate, legally

23   unsupportable, and/or without factual foundation.  As fully described below, and in Defendant's

24   Motion to Dismiss under Federal Rules of Civil Procedure, Rule 12(b)(6), Plaintiff's suit asserts

25   legal theories that are without factual support and are clearly time-barred by the applicable statute of

26   limitations.  Additionally, Plaintiff's current Complaint, action number CV-08-2907-MHP, is the

27   fourth of four Complaints filed by Plaintiff against AC Square, Inc. for the same alleged wrong.

28   Plaintiff filed an original Complaint in San Mateo County Superior Court on July 7, 2006, case

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
50 West San Fernando Street
15th Floor
San Jose, CA 95113 2303
408 998 4150

(NO. CV 08 2907 MHP)          2.      DEFENDANT'S MOTION FOR SANCTIONS
UNDER FRCP RULE 11

1    number CIV 456118, a second Complaint in the San Mateo County Superior Court on June 29,

2    2007, case number CIV 464144, a third Complaint in the same court on June 10, 2008, case number

3    CIV 473571 (removed case number CV-08-3035-EDL), and the instant Complaint in this Court,

4    case number CV-08-2907-MHP, on June 11, 2008.  Each of these Complaints sought, or are

5    currently seeking redress for the same alleged wrong.  Moreover, Plaintiff's second Complaint is still

6    on-going and therefore his filing of the third and this fourth action can only have been done for an

7    improper purpose to cause unnecessary delay, needlessly increase litigation costs and otherwise

8    harass Defendant.

9           On _____, 2008, counsel for Defendant requested Plaintiff dismiss this

10    inappropriate action and provided Plaintiff's counsel authority supporting the request.  However,

11    Plaintiff's counsel has failed to voluntarily dismiss the action, despite being presented with

12    incontrovertible evidence that it is barred by the statute of limitations.  As a consequence, Plaintiff

13    and his counsel should be sanctioned under Rule 11 of the Federal Rules of Civil Procedure for

14    filing and refusing to dismiss this action.

15    **II.    STATEMENT OF THE CASE**

16           Plaintiff's Complaint that is the subject of this motion, case number CV-08-2907-

17    MHP is the fourth of four Complaints Plaintiff has filed against Defendant for the same alleged wage

18    and hour violations.  A summary of the procedural history and the pertinent statement of facts in this

19    action follows.

20           **A.    PROCEDURAL HISTORY**

21                  **1.    Plaintiff's First Complaint**

22           Plaintiff filed his first Complaint against Defendant in the San Mateo County

23    Superior Court on July 7, 2006, action number CIV 456118 (hereinafter referred to as the "Original

24    Complaint") (See Declaration of Ronald A. Peters filed in Support of Defendant AC Square, Inc.'s

25    Motion for Sanctions Under FRCP Rule 11 (hereinafter referred to as "Peters Decl."), Exh. A.).  The

26    Original Complaint contained five causes of action for: (1) nonpayment of wages in violation of

27    California Labor Code section 201; (2) failure to pay overtime wages in violation of California

28    Labor Code sections 510 and 1198; (3) violation of California Labor Code section 2802; (4)

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
50 West San Fernando Street
15th Floor
San Jose, CA  95113 2303
408 998 4150

(NO. CV 08 2907 MHP)                     3.          DEFENDANT'S MOTION FOR SANCTIONS
                                                     UNDER FRCP RULE 11

1  wrongful termination; and, (5) failure to provide personnel file/failure to provide itemized wage

2  statements in violation of California Labor Code sections 226, 432 and 1198.5. *Id.* Plaintiff claimed

3  that he worked for Defendant from approximately January 30, 2005 to May 2, 2005. (Peters Decl.,

4  Exh. A, ¶ 5). In fact, Plaintiff alleged that Defendant terminated his employment on May 2, 2005.

5  *Id.* As pertinent to this motion, the Original Complaint alleged Defendant failed to pay Plaintiff

6  compensation for all hours that he worked. *Id.*

7          Plaintiff dismissed his first, second, third and fifth causes of action without prejudice

8  on June 25, 2007. (Peters Decl., Exh. B). Plaintiff's fourth cause of action for wrongful termination

9  was dismissed following a grant of summary adjudication in favor of Defendant. (Peters Decl., Exh.

10  C). Judgment was entered on the Original Complaint on June 28, 2007. (Peters Decl., Exh. D).

11          **2.    Plaintiff's Second Complaint**

12          After dismissing the Original Complaint, Plaintiff filed a second Complaint against

13  Defendant in the San Mateo County Superior Court on June 29, 2007, action number 464144

14  (hereinafter referred to as the "Second Complaint") (Peters Decl., Exh. E). Plaintiff's Second

15  Complaint contains five causes of action for: (1) violation of California Business and Professions

16  Code section 17200; (2) violation of California Labor Code section 2802; (3) failure to pay overtime

17  wages pursuant to California Labor Code section 510 and 1194; (4) failure to furnish itemized wage

18  statements pursuant to California Labor Code section 226; and, (5) failure to pay wages due. *Id.* This

19  Complaint, like the Original Complaint, alleges Defendant failed to pay Plaintiff compensation for

20  all hours worked. The first through fourth causes of action are brought on behalf of Plaintiff and all

21  other similarly situated individuals. *Id.* The fifth cause of action was brought by Plaintiff on his own

22  behalf. *Id.* Interestingly, unlike the Original Complaint, Plaintiff's Second Complaint omits any

23  allegations as to when he worked for Defendant.

24          At the initial Case Management Conference in this second action, the parties agreed

25  to set March 31, 2008 as the discovery cut-off date on class certification issues. (Peters Decl., Exh.

26  F, ¶ 5.). Thereafter, the parties stipulated to continue this cut-off date to June 30, 2008. *Id.*

27  However, as late as June 5, 2008, Plaintiff had not completed his class-related discovery, even

28  though in a declaration submitted to the Court in support of an ex-parte application to further

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
50 West San Fernando Street
15th Floor
San Jose, CA 95113 2303
408 998 4150

(NO. CV 08 2907 MHP)                    4.          DEFENDANT'S MOTION FOR SANCTIONS
                                                    UNDER FRCP RULE 11

1    continue the discovery cut-off date, Plaintiff acknowledges that the Court had provided him with

2    ample time to conduct such discovery. (Peters Decl., Exh. F, ¶ 6.).

3               **3.     Plaintiff's Third Complaint**

4               As the June 30, 3008 discovery deadline approached, on June 10, 2008 Plaintiff filed

5    a new Complaint in the San Mateo County Superior Court, action number 473571, removed action

6    number CV-08-3035-EDL (hereinafter referred to as the "Third Complaint") (Peters Decl., Exh. G).

7    It, like the Second Complaint, is styled as a class action on behalf of Plaintiff and all other similarly

8    situated individuals. *Id.*  The Third Complaint names as defendants AC Square, Inc. and adds as

9    defendants, Comcast, Inc., and individual defendants, Afshin Ghaneh and Andrew Bahmanyar.  It

10   contains five causes of action for: (1) conspiracy to violate California Business and Professions Code

11   section 17200; (2) violation of the FLSA; (3) conspiracy to violate the FLSA; (4) failure to pay

12   monies at termination of employment; and, (5) conspiracy to violate California Labor Code section

13   558. *Id.*  This Complaint, like the Original Complaint and the Second Complaint alleges the same

14   wrongful conduct on the part of the defendants, including AC Square, Inc.   The significant

15   differences between Original and Second Complaint is the Third Complaint alleges different causes

16   of action and names the additional defendants Comcast, Inc., Afshin Ghaneh, and Andrew

17   Bahmanyar.  However, the underlying allegations are identical, including his failure to allege the

18   time period he worked for Defendant.

19               On June 19, 2008 AC Square, Inc. moved to consolidate Plaintiff's Second and Third

20   Complaints. (Request for Judicial Notice, Exh. H).  The San Mateo Superior Court granted AC

21   Square, Inc.'s consolidation request and ordered the Second and Third Complaints consolidated

22   under action number 464144. *Id.* (The Second and Third Complaints will hereinafter be collectively

23   referred to as the "Consolidated Action").   On June 20, 2008 AC Square, Inc. removed the

24   Consolidated Action to this Court. (Request for Judicial Notice, Exh. I).

25               **4.     Plaintiff's Fourth Complaint**

26               The day after filing his Third Complaint, on June 11, 2008, Plaintiff filed another new

27   Complaint in the Northern District of California, action number CV-08-2907-MHP (hereinafter

28   referred to as the "Fourth Complaint"). The Fourth Complaint, like the Third Complaint names as

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
50 West San Fernando Street
15th Floor
San Jose, CA 95113 2303
408 998 4150

(NO. CV 08 2907 MHP)                    5.        DEFENDANT'S MOTION FOR SANCTIONS
UNDER FRCP RULE 11



1  defendants AC Square, Inc., Comcast, Inc. Afshin Ghaneh, and Andrew Bahmanyar. (Peters Decl.,

2  Exh. J). The Fourth Complaint contains two causes of action for: (1) violation of the FLSA; and, (2)

3  conspiracy to violate the FLSA. *Id.* The Fourth Complaint is essentially the same as the Third

4  Complaint, but only alleges causes of action for alleged violations of the FLSA. Also, like the

5  Second and the Third Complaint, the Fourth Complaint fails to allege the dates Plaintiff claims to

6  have worked for Defendant.

7  **B.  STATEMENT OF ALLEGATIONS/FACTS**

8  **1.  Statement of Allegations in Plaintiff's Fourth Complaint**

9  Plaintiff's Fourth Complaint alleges that he "worked as a technician" for AC Square,

10  Inc. and was "formerly employed by AC [Square, Inc.] as a cable television and computer technician

11  for the purpose of installing, upgrading, disconnecting and providing similar services to consumers

12  who use the services and equipment of Comcast [Inc.]." (Peters Decl., Exh. J, p. 4:1-6). Plaintiff

13  further alleges that he was "not paid for overtime" and "AC [Square, Inc.] failed to pay each class

14  member wages during all hours that they worked." (Peters Decl., Exh. J, p. 4:14-15). His first

15  cause of action for violation of the FLSA alleges defendants failed "to pay overtime" and his second

16  cause of action for conspiracy to violate the FLSA alleges defendants "combined together in a tacit

17  and express agreement to knowingly and intentionally deprive Plaintiff and all class members of

18  their rights to overtime pay as provided by the FLSA." (Peters Decl., Exh. J, p. 4:3, 21-24).

19  **2.  Statement of Facts**

20  The critical operative facts for this motion are the dates Plaintiff claims to have

21  worked for AC Square, Inc. Obviously, if Plaintiff worked for AC Square, Inc. outside the statute of

22  limitations, his claims for overtime compensation under the FLSA would be barred.

23  Plaintiff's deposition was taken in the original action on November 21, 2006 and in

24  the second action on May 23, 2008. (See Peters Decl., Exhs. K and L). While the Second, Third

25  and Fourth Complaints omit any allegations as to when Plaintiff worked for AC Square, Inc., he

26  specifically testified in his deposition he last worked for AC Square, Inc. outside the period of the

27  statute of limitations.

28  Plaintiff testified that he worked for AC Square, Inc. from about February 8, 2005 to

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
50 West San Fernando Street
15th Floor
San Jose, CA 95113-2303
408.998.4150

(NO. CV 08 2907 MHP)                    6.                    DEFENDANT'S MOTION FOR SANCTIONS
                                                              UNDER FRCP RULE 11

1    May 2005. (See Peters Decl., Exh., K, pp. 17:1-2; 24:24-25; 25:1-2; 175:11-25; 176:5-8, 20-25;

2    177:1-4. Exh. L, pp. 18:12-25; 19:1-22; 20:19-25).  While Plaintiff does not recall the exact date he

3    stopped working for AC Square, Inc., he specifically recalls that he did not work for AC Square, Inc.

4    past the end of May 2005.  Specifically, Plaintiff testified:

5    Q.    And just before we move on to the next document, the next,
          the last page of Exhibit 19 indicates work on Sunday,
6          Monday and Tuesday, May 1st, 2nd and 3rd.  Does that
          comport with your understanding of when the last day you
7          worked at AC Square was?

8    A.    No. I believe I worked more days in May.  I believe I
          worked later in May.

9    Q.    And when you say later in May, what days in later May?
     A.    In the last two weeks of May.

10        .....
     Q.    You've indicated that you believe you worked after May
          3rd.

11   A.    There was a day I worked with Max.

12        ....
     Q.    So do you recall more than one day working with Max after
          May 3rd, or do you just remember one?

13   A.    I remember one day.
     Q.    Just the one day.  And you think it was sometime after the

14        3rd.  Can you give me any estimate of how long after, week
          after, two weeks after?

15   A.    No, I don't know.
     Q.    So it could have been the fourth?

16   A.    Could have been the fourth, could have been the 20th, could
          have been the 25th.

17

18   (Peters Decl., Exh. K, pp. 24:24-25; 25:1-2; 175:11-25;
     176:5-8, 20-25; 177:1-4).

19   Q.    When was the last time you worked?
20   A.    At AC Square.
     Q.    So May – last time you actually did any work –
21   A.    The end of May.

22        ....
     Q.    So your recollection and your testimony is that you worked,
          actually worked at AC Square doing cable installation and
23        things at the end of May.  Is that right?

     A.    Yes.
24   Q.    Are you sure about that?
     A.    My – my answer to your question is that I worked,
25        physically worked after May 3rd.

     Q.    Okay.
     A.    In the month of May.
26

27   (Peters Decl., Exh. L pp. 18:12-25; 19:1-22).

28   AC Square, Inc.'s employees, such as Plaintiff, are paid every two weeks in the first

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
50 West San Fernando Street
15th Floor
San Jose, CA  95113 2303
408 998 4150

1    and third week of the month. (Peters Decl., Exh. L, p. 24:12-22). In fact, Plaintiff testified he

2    received his paycheck every other Saturday. (Peters Decl., Exh. L, p. 24:12-22). Plaintiff also

3    testified that he believed each paycheck he received from AC Square, Inc. did not accurately account

4    for all the hours he had worked. (Peters Decl., Exh. K, pp. 91:20-25; 92:1-25; 93:1-25; 94:1). In

5    fact, Plaintiff testified he complained to AC Square, Inc. about his perceived deficiencies in his

6    paychecks each time he received one. (Peters Decl., Exh. K, pp. 91:20-25; 92:1-25; 93:1-25; 94:1).

7         In addition to admitting that he did not work for Defendant after the end of May

8    2005, Plaintiff also expressly admitted that he did not work any alleged overtime after April 23,

9    2005. During his first deposition taken in the Original Action, Plaintiff testified he prepared a

10   document estimating the number of overtime hours he claims to have worked. (Peters Decl., Exh. K,

11   pp. 197:18-25; 198:1-4; 199:19-25; 200:1-14). Plaintiff authenticated this document during his

12   second deposition and testified that it accurately represented the days he claimed to have worked

13   overtime for AC Square, Inc. (Peters Decl., Exh. L, pp. 78:10-12, 21-24; 79:13-22; 80:7-8, 25; 81:1-

14   6; 95:14-21; 97:20-21; Exh. M). Plaintiff testified to this document in his second deposition as

15   follows:

16        Q.    Do you recall preparing an estimate of your overtime in
                your previous action?
17        A.    Yes.
                ....
18        Q.    Defendants' Number 1 is a one-page document, contains a
                chart with three columns, and I'll represent to you that was
19              produced by your former counsel at your previous
                deposition.
20
          Q.    So my first question about this document is: Do you
21              recognize it?
          A.    Yeah.
22        Q.    You've seen this document before?
          A.    Uh-huh.
23        Q.    Is that a yes?
          A.    Yes.
24        Q.    And what is this document, if you know?
          A.    Um, it's my start – it's the days I worked, the time of my
25              last job and how much overtime.
                ....
26        Q.    [D]id you prepare this document?
          A.    Correct.
27              ....
          Q.    Okay. So do you believe this is accurate?
28        A.    Um –

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
50 West San Fernando Street
15th Floor
San Jose, CA 95113 2303
408 998 4150

(NO. CV 08 2907 MHP)                    8.        DEFENDANT'S MOTION FOR SANCTIONS
                                                  UNDER FRCP RULE 11

1    Q.    You prepared – this document you prepared?
     A.    Yeah.
2    Q.    So it's an accurate reflection of the hours you worked and
           the overtime you worked on those days?
3    A.    To the best of my knowledge at the time.

4    (Peters Decl., Exh. L pp. 78:10-12, 21-24; 79:13-22; 80:7-8, 25;
     81:1-6).

5

6          Plaintiff's counsel, Mr. Daniel Berko personally attended Plaintiff's deposition taken

7    in the Second Action during which Plaintiff testified to both his tenure at AC Square, Inc. and his

8    claimed overtime. (Peters Decl., Exh. L, p. 2:10-12).   Thus, Mr. Berko would be expected to know

9    when Plaintiff worked for AC Square, Inc.

10   **III.    LEGAL ANALYSIS**

11         **A.    Applicable Legal Standards for Sanctions Under Rule 11 Of The Federal Rules
                   Of Civil Procedure.**

12

13         Federal Rules of Civil Procedure, Rule 11, has been designed "to deter dilatory or

14   abusive pretrial tactics and to streamline litigation by excluding baseless filings." 17 Schwarzer, et.

15   al.; *Practice Guide: Federal Civil Procedure Before Trial, National Edition*; § 17:61 (TRG 2007),

16   citing *Cooter & Gell v. Hartman Corp.*, 496 U.S. 384, 393 (1990).   To accomplish this objective,

17   Rule 11 requires that each filed pleading be signed by an attorney or unrepresented party.[1] U.S.C.S.

18   Fed Rules Civ. Proc. R. 11(a).   Every signature on a pleading is a certification of the merits of the

19   filed document. U.S.C.S. Fed Rules Civ. Proc. R. 11(b),(c). Rule 11 imposes sanctions upon parties

20   or their representatives who file a pleading for "*any* improper purpose." U.S.C.S. Fed Rules Civ.

21   Proc. R. 11(b)(1). (Emphasis added.) An improper purpose includes harassing a party, causing

22   unnecessary delay, or needlessly increasing the cost of litigation. U.S.C.S. Fed Rules Civ. Proc. R.

23   11(b)(1).   Such purpose also includes engaging in "procedural maneuvering" in an endeavor to

24   obtain a "tactical advantage." *Meyer v. California Int'l. Chem. Co.*, 1998 U.S. App. LEXIS 31606

25   (9th Cir. 1998).

26

27   [1] In this regard, Rule 11 makes it incumbent upon a court to "strike an unsigned paper unless the
     omission is promptly corrected after being called to the attorney's or party's attention." U.S.C.S.
28   Fed. Rules Civ. Proc. R. 11(a).

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
50 West San Fernando Street
15th Floor
San Jose, CA 95113-2303
408 998 4150

(NO. CV 08 2907 MHP)          9.          DEFENDANT'S MOTION FOR SANCTIONS
                                          UNDER FRCP RULE 11

1     Rule 11 makes it incumbent upon counsel to, prior to filing a pleading with the court,

2     conduct an "inquiry reasonable under the circumstances" so as to ensure the filed pleading is not

3     frivolous and contains factual contentions that have evidentiary support, and allegations warranted

4     by the law.  U.S.C.S. Fed Rules Civ. Proc. R. 11(b)(2),(3). See, also, *Estate of Gianna Blue v.*

5     *County of Los Angeles*, 120 F.3d 982, 985 (9th Cir. 1997). The Ninth Circuit has defined frivolous

6     filings as "those that are both baseless and made without a reasonable and competent inquiry."

7     *Estate of Gianna Blue v. County of Los Angeles*, 120 F.3d 982, 985 (9th Cir. 1997), quoting *Buster v.*

8     *Greisen*, 104 F.3d 1186, 1190 (9th Cir. 1997).  For instance, while by happenstance, a factual

9     allegation in a pleading that is based on hearsay might ultimately prove to be accurate, absent actual

10    investigation, such arbitrary reliance on hearsay would not insulate a plaintiff or its counsel from

11    sanctions. *Garr v. U.S. Healthcare*, 22 F.3d 1274, 1279 (3d Cir. Pa. 1994). ["'A shot in the dark is a

12    sanctionable event, even if it somehow hits the mark.'"].

13     In addition, where a reasonable investigation would have revealed a claim lacks merit

14    in light of existing law, a court may impose sanctions as a penalty for bringing and continuing such a

15    claim. *Id*. The filing of a claim time-barred by the applicable statute of limitations is considered

16    ***wholly*** improper for the purpose of Rule 11. *Estate of Gianna Blue, supra*. (Court affirmed the

17    award of sanctions against plaintiff because reasonable investigation would have revealed claim

18    time-barred by statute of limitations.)  See, also, *Mir v. Little Company of Mary Hospital,* (9th Cir.

19    1988) 844 F.2d 646, 653.

20     Rule 11 authorizes the imposition of monetary or non-monetary sanctions. U.S.C.S.

21    Fed Rules Civ. Proc. R. 11(c)(4). The standard for determining whether sanctions are to be issued

22    under Rule 11 is objective.  *Salivary v. City of Los Angeles*, 780 F.2d 823, 831 (9th Cir. 1986),

23    overruled on other grounds by *Cooter, supra*, 496 U.S. 384 (1990).  Sanctionable conduct under

24    Rule 11 does not require a showing of bad faith. *Ibid*.; see, also, *Plante v. Fleet National Bank*, 978

25    F. Supp. 59, 69 (D.R.I. 1997); and *Smith v. Ricks*, 31 F.3d 1478, 1488 (9th Cir. 1994).  A party or its

26    counsel's good faith belief that the party's claims are non-frivolous or were not filed for an improper

27    purpose is not a defense where objectively, the pleaded claims are legally barred or the purpose of

28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
50 West San Fernando Street
15th Floor
San Jose, CA 95113 2303
408 998 4150

(NO. CV 08 2907 MHP)          10.       DEFENDANT'S MOTION FOR SANCTIONS
UNDER FRCP RULE 11

1  the filing is improper. See *ibid.* See, also, *In re Keegan Management Co., Securities Litigation*, 78

2  F.3d 431, 434 (9th Cir. 1996).

3         Finally, where an improper purpose is advocated or a meritless claim is filed by an

4  experienced lawyer, there arises a compelling inference that the action was filed with counsel's

5  knowledge of the claim's inappropriateness or lack of merit. See, e.g., *Huettig & Schromm, Inc. v.*

6  *Landscape Contractors Council of Northern Calif.*, 790 F.2d 1421, 1427 (9th Cir. 1986).

7  **B.    Plaintiff And His Attorney Have Engaged In Sanctionable Conduct.**

8         In this case, Plaintiff and his counsel have engaged in sanctionable conduct by

9  disregarding the plain fact that this action is barred by the statute of limitations.  This fact is

10  specifically admitted by Plaintiff himself.  However, despite such knowledge, Plaintiff and his

11  counsel chose to file and continued to prosecute the unsupported Fourth Complaint.  The only

12  reasonable conclusion that can be drawn from this fact is that the Fourth Complaint was filed for

13  sole purpose to harass and prejudice AC Square, Inc.  Therefore, Plaintiff and his counsel should be

14  sanctioned for their wholly improper Fourth Complaint.

15         **1.    The Imposition Of Sanctions Is Appropriate, Because A Reasonable**
              **Investigation Would Have Revealed That The Claims Pleaded In**
16              **Plaintiff's Fourth Complaint Are Time-Barred**

17              **a.    Plaintiff's First Cause of Action For The Violation Of The Fair**
                    **Labor Standard Act ("FLSA") Is Barred By The Applicable**
18                  **Statutes Of Limitations**

19         Plaintiff, through his Fourth Complaint, seeks to recover unpaid overtime

20  compensation allegedly due and owing from the defendants pursuant to the provisions of the FLSA.

21  In general, the statute of limitations for an alleged violation of the FLSA is two years. See 29 U.S.C.

22  § 255(a).  However, where an employer's violation is willful, the limitations period is extended to

23  three years.  *Id.*  The running of the statute under the FLSA commences "at the time the employer

24  breaches his duties under the Act . . . ." *Huss v. City of Huntington Beach*, 317 F. Supp. 2d 1151,

25  1161 (C.D. Cal. 2000), citing *Unexcelled Chem. Corp. v. United States*, 73 S.Ct. 580, 584 (1953).

26  The statute of limitations for an overtime compensation claim accrues at each regular payday

27  immediately following the work period during which the services for which overtime compensation

28  is claimed. *Mitchell v. Lancaster Milk Co.*, 185 F. Supp 66, 70 (D.C. PA 1960). ("It is well settled

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
50 West San Fernando Street
15th Floor
San Jose, CA 95113 2303
408 998 4150

(NO. CV 08 2907 MHP)                    11.        DEFENDANT'S MOTION FOR SANCTIONS
                                                   UNDER FRCP RULE 11

1  that '[a] separate cause of action for overtime compensation accrues at each regular payday

2  immediately following the work period during which the services were rendered and for which

3  overtime compensation is claimed.'").

4         In this case, Plaintiff and his counsel knew or should have known that any FLSA

5  claim Plaintiff may have had against Defendant expired prior to the filing time of the Fourth

6  Complaint. This is so, because Plaintiff has admitted he last worked for AC Square, Inc. more than

7  three years prior to filing the Fourth Complaint. Specifically, Plaintiff admitted in his Original

8  Complaint that he worked for Defendant from approximately January 30, 2005 to May 2, 2005.

9  (Peters Decl., Exh. A, ¶ 5); See *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th

10  Cir. 1988). ("[U]nder federal law, stipulations and admissions in the pleadings are generally binding

11  on the parties and the Court."). Moreover, in both his first and second deposition, Plaintiff expressly

12  testified that he absolutely did not work for AC Square, Inc. past the end of May 2005. (Peters

13  Decl., Exh. K, pp. 24:24-25; 25:1-2; 175:11-25; 176:5-8, 20-25; 177:1-4 and Exh. L pp. 18:12-25;

14  19:1-22). He also specifically testified that he was "fired" in May 2005. (Peters Decl., Exh. L, p.

15  18:21-23).

16         Although AC Square, Inc. has no record of Plaintiff working for it past May 3, 2008,

17  if Plaintiff is to be believed, he testified at most that he only worked for AC Square, Inc. for one day

18  after May 3, 2005. More importantly, Plaintiff admitted in a document he personally prepared and

19  stated was accurate, that he did not work any overtime for AC Square, Inc. after April 23, 2005.

20  (Peters Decl., Exh. L pp. 78:10-12, 21-24; 79:13-22; 80:7-8, 25; 81:1-6. Exh. M). Thus, any claim

21  for overtime compensation accrued AC Square, Inc.'s next regular payday following April 23, 2005.

22         Given that AC Square, Inc. paid its employees, including Plaintiff, on the first and

23  third Saturday of each month for the employees' work in preceding two weeks and Plaintiff last

24  worked overtime on April 23, 2005, any potential FLSA cause of action expired by May 7, 2008, the

25  regular payday immediately following the work period during which the services were rendered and

26  for which overtime compensation is claimed. *Mitchell v. Lancaster Milk Co.*, 185 F. Supp 66, 70

27  (D.C. PA 1960). Because Plaintiff did not file this action until June 11, 2008, his cause of action for

28  an alleged violation of the FLSA is barred by the statute of limitations.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
50 West San Fernando Street
15th Floor
San Jose, CA 95113 2303
408 998 4150

(NO. CV 08 2907 MHP)                    12.         DEFENDANT'S MOTION FOR SANCTIONS
                                                    UNDER FRCP RULE 11

1    Moreover, even if Plaintiff attempts to recant his sworn testimony and now claim that

2    he worked overtime sometime May, 2005, any claim for overtime compensation would have to had

3    been brought within three years of his last date of employment.    The latest date this could be

4    according to Plaintiff's testimony is June 1, 2008, assuming he worked the last day in May, 2005.

5    *See* Cal. Labor Code § 201 (stating, in pertinent part, "If an employer discharges an employee, the

6    wages earned and unpaid at the time of the discharge are due and payable immediately."); *Huss v.*

7    *City of Huntington Beach*, 317 F. Supp. 2d 1151, 1161 (C.D. Cal. 2000) (stating the running of the

8    statute under the FLSA commences "at the time the employer breaches his duties under the Act . . .).

9    Thus, even if Plaintiff now claims he was fired on the last day of May, 2005, his FLSA cause of

10    action is clearly barred by the statute of limitations because this Third Complaint was not filed until

11    June 10, 2008, after the statute of limitations had expired.

12    In addition, Plaintiff and Plaintiff's counsel cannot plead ignorance of this fact as

13    each admission was made by Plaintiff himself.    Thus, this is not a situation where facts showing an

14    action is barred by the statute of limitations are only discovered after a complaint is filed.    In this

15    action, Plaintiff and his counsel knew when Plaintiff last worked for Defendant, when Plaintiff was

16    terminated from Defendant's employment and therefore must have known when the statute of

17    limitations on a FLSA cause of action would run.    Therefore, this Court should impose sanctions on

18    Plaintiff and Plaintiff's counsel for filing the Fourth Complaint knowing full well that it is barred by

19    the applicable statute of limitations.

20    **b.    Plaintiff's Second Cause Of Action For Conspiracy To Violate The**
      **FLSA Is Barred By The Applicable Statutes Of Limitations**

21

22    In light of the matters discussed above, Plaintiff and his counsel knew or should have

23    known that Plaintiff's second cause of action for conspiracy to violate the Fair Labor Standards Act

      is also time-barred. See *Maheu v. CBS, Inc.*, 201 Cal. App. 3rd 662, 673 (1988). ("In an action

24    based on civil conspiracy, the applicable statute of limitations is determined by the nature of the

25    action in which the conspiracy is alleged.").    Therefore, this Court should impose sanctions on

26    Plaintiff and Plaintiff's counsel for filing and pursuing this claim knowing it was barred as a matter

27    of law.

28

LITTLER MENDELSON
A Professional Corporation
50 West San Fernando Street
15th Floor
San Jose, CA 95113 2303
408 998 4150

(NO. CV 08 2907 MHP)                13.        DEFENDANT'S MOTION FOR SANCTIONS
                                               UNDER FRCP RULE 11

1    Conspiracy is not an independent cause of action "but a legal doctrine that imposes

2    liability on persons who, although not actually committing a tort themselves, share with the

3    immediate tortfeasor a common plan or design." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7

4    Cal. 4th 503-511 (1994). As such, it has the same statute of limitations as the claim on which it is

5    based. *Maheu v. CBS, Inc.*, 201 Cal. App. 3rd 662, 673 (1988). To state a claim for conspiracy, "the

6    complaint must allege (1) the formation and operation of a conspiracy; (2) the wrongful act or acts

7    done pursuant thereto; and (3) the damage resulting from such act or acts." *General American Life*

8    *Ins. Co. v. Rana*, 769 F. Supp. 1121, 1125 (N.D. Cal. 1991). "To establish the 'wrongful act'

9    element of a civil conspiracy, defendant must satisfy all of the elements of a cause of action for some

10    other tort or wrong." *Id.* "[A] simple failure to comply with statutory overtime requirements...does

11    not qualify" to support a claim for conspiracy. *Reynolds v. Bement*, 36 Cal. 4th 1075, 1090 (2005).

12    Moreover, a conspiracy necessarily involves two or more people or entities. *Black v. Bank of*

13    *America*, 30 Cal. App. 4th 1, 6 (1995). "Agents and employees of a corporation cannot conspire with

14    their corporate principal or employer where they act in their official capacities on behalf of the

15    corporation and not as individuals for their individual advantage." *Reynolds v. Bement*, 36 Cal. 4th

16    1075, 1090 (2005).

17    **C.    Sanctions Are Warranted For Counsel's Misconduct**

18        **1.    Rule 11 Sanctions Are Appropriate**

19            **a.    Monetary Sanctions Should Be Imposed**

20    Rule 11(c)(2) authorizes the court to impose as sanctions reasonable attorneys' fees

21    and expenses incurred as a direct result of a violation of Rule 11. Fed. R. Civ. P. 11(c)(2). Federal

22    courts commonly award monetary sanctions to moving parties when the sanctioned party pursues a

23    frivolous lawsuit or where its complaint is factually misleading. See, e.g., *Truesdell v. Southern*

24    *California Permanente Medical Group*, 293 F.3d 1146, 1153 (9th Cir. 2002), remanded to 209

25    F.R.D. 169 (C.D. CA 2002). (Plaintiff and his attorney misrepresented material facts); *Walker v.*

26    *Norwest Corp.*, 108 F.3d 158, 162 (8th Cir. 1997). (Plaintiff filed a diversity suit without alleging

27    facts of diversity); *Johnson v. A.W. Chesterton*, 18 F.3d 1362 (7th Cir. 1993). (Attorney filed claim

28

LITTLER MENDELSON
A Professional Corporation
50 West San Fernando Street
15th Floor
San Jose, CA 95113 2303
408 998 4150

(NO. CV 08 2907 MHP)                    14.             DEFENDANT'S MOTION FOR SANCTIONS
                                                        UNDER FRCP RULE 11

1    that was not well grounded in law and fact); *Plante v. Fleet National Bank*, 978 F. Supp. 59, 69

2    (D.R.I. 1997). (Attorney failed to investigate viability of claims prior to filing lawsuit).

3        Plaintiff's actions warrant the imposition of similar sanctions in this case. As a result

4    of Plaintiff and his counsel's conduct, Defendant has incurred unnecessary attorneys' fees and costs

5    defending frivolous claims filed for improper purposes. See Fed. R. Civ. Pro. 11(c)(2); see, also,

6    *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 406 (1990).  Therefore, Defendant seeks the

7    reimbursement of the fees and costs incurred in litigating this case.  The total fees incurred to date by

8    Defendant in the defense of Plaintiff's three complaints are $_____.  (Peters Decl., ¶¶ 10-15.)

9    As a result of preparing this Motion and the Motion to Dismiss filed concurrently herewith,

10   Defendant has incurred $ _____.  In addition, Defendant estimates that it will incur future

11   fees responding to Plaintiff's oppositions and attending hearings on these motions in an amount of

12   $_____. (Peters Decl., ¶¶ 13-14.)  Thus, Plaintiff and his counsel should be ordered to pay

13   $_____ as a monetary sanction.

14            **2.    Terminating Sanctions Are Appropriate.**

15        A court has broad discretion in the choice of sanctions.  See *Cooter & Gell v.*

16   *Hartman Corp.*, 496 U.S. 384, 400 (1990). Such sanctions include orders that "may have collateral

17   financial consequences upon a party, such as dismissal of a claim." Fed. R. Civ. P. 11, Advisory

18   Committee Notes to 1993 amendment, at ¶ 16.  "A district court has the power to dismiss a

19   complaint if it is frivolous or brought for some ulterior purpose." *Rhinehart v. Stauffer*, 638 F.2d

20   1169, 1171 (9th Cir. 1979). (Dismissal based on Rule 11 upheld where attorney failed to investigate

21   merit of claim and reasonableness of damages prior to filing complaint and plaintiff failed to take

22   affirmative steps to advise attorney of same); *Combs v. Rockwell International Corp.*, 927 F.2d 486,

23   488 (9th Cir. 1991). (Dismissal appropriate where plaintiff falsified deposition transcript);

24   *Carman v. Treat*, 7 F.3d 1379, 1382 (8th. Cir. 1993). (Dismissal based on Rule 11 upheld *where pro*

25   *se* plaintiff filed a motion that was not well grounded in fact).

26        In this case, Plaintiff's challenged claims conspicuously lack merit.  It is apparent that

27   Plaintiff's counsel failed to conduct reasonable investigation as to the facts or legal merits of

28   Plaintiff's claims prior to filing the Fourth Complaint.  It is also clear that this Fourth Complaint was

LITTLER MENDELSON
A Professional Corporation
50 West San Fernando Street
15th Floor
San Jose, CA 95113 2303
408 998 4150

(NO. CV 08 2907 MHP)                    15.          DEFENDANT'S MOTION FOR SANCTIONS
                                                      UNDER FRCP RULE 11

filed for improper purposes. Accordingly, terminating sanctions are appropriate. *Rhinehart*, *supra*, 638 F.2d 1169.

## IV.   CONCLUSION

For the foregoing reasons, Defendant AC Square, Inc. respectfully requests that the Court grant its motion for sanctions and award it all attorneys' fees and costs expended in litigating Plaintiff's Fourth Complaint. In addition, Defendant respectfully requests that the Court dismiss, with prejudice, Plaintiff's Fourth Complaint against Defendant.

Dated: July _____, 2008

RONALD A. PETERS
BENJAMIN A. EMMERT
MARYAM S. KARSON
LITTLER MENDELSON
A Professional Corporation
Attorneys for Defendant
AC SQUARE, INC.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
50 West San Fernando Street
15th Floor
San Jose, CA 95113 2303
408 998 4150

(NO. CV 08 2907 MHP)                16.          DEFENDANT'S MOTION FOR SANCTIONS
                                                 UNDER FRCP RULE 11



## CONSENT OF PLAINTIFF DANIEL KEATING-TRAYNOR

I, DANIEL KEATING-TRAYNOR, hereby consent to be an individual plaintiff and class plaintiff in the actions currently pending before the United States District Court for the Northern District of California, Case Nos. 3:08-cv-02907-MHP and 3:08-cv-03035-MHP.

I specifically consent to all causes of action in the original federal complaint (08-cv-02907), the consolidated removed complaints, and all amended complaints brought by my attorney on my individual behalf and on behalf of the class members.

DATED: August 12, 2008

daniel keating-traynor   Digitally signed by daniel keating-traynor
DN: cn=daniel keating-traynor, o, ou,
email=danjkeating@gmail.com, c=US
Date: 2008.08.12 16:34:30 -07'00'



EXHIBIT I

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

DANIEL KEATING-TRAYNOR, on behalf of
himself and others similarly situated,

        Plaintiff,

    v.

AC SQUARE INC.; COMCAST INC.;
AFSHIN GHANEH; ANDREW
BAHMANYAR; AND DOES 1-60
INCLUSIVE,

        Defendants.
_____/

No. C 08-02907 MHP
No. C 08-03035 MHP

**MEMORANDUM & ORDER**

**Re: Defendants' Motion to Dismiss**

## BACKGROUND

The following background facts are derived from the various requests for judicial notice filed by defendants. The courts takes judicial notice of plaintiff's prior filings in state court pursuant to Federal Rule of Evidence 201.

Plaintiff was employed by some or all of the defendants in the past. He was last employed as a technician that installed, disconnected and upgraded television, computer and other electronic services to cable provider Comcast's customers. He now claims that defendants failed to adequately compensate him the hours he worked.

Plaintiff filed a complaint, case number 456118, in the San Mateo County Superior Court on July 7, 2006 alleging various state law causes of action. Plaintiff voluntarily dismissed many of his causes of action and his cause of action for wrongful termination was dismissed by the court.

United States District Court
For the Northern District of California

1  Judgment was entered on June 28, 2007. The next day, plaintiff filed another action in the same

2  forum, case number 464144, alleging violations of various state law causes of action (hereinafter

3  "second action"). Approximately one year later, on June 10, 208, plaintiff filed a new complaint in

4  the same forum, case number 473571, adding defendants and federal causes of action (hereinafter

5  "third action"). Specifically, plaintiff claimed defendants had violated the Fair Labor Standards Act

6  ("FLSA") and had conspired to do the same. The state court consolidated the second action and the

7  third action, which was thereafter removed to this court (hereinafter "removed action" or "case

8  number 08-3035"). Meanwhile, plaintiff filed an action in this court claiming violations of the

9  FLSA and a conspiracy to violate the FLSA (hereinafter "original federal action" or "case number

10  08-2907"). The original federal action and the removed action were related by this court.

11

12  LEGAL STANDARD

13      A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal

14  sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). Because Rule

15  12(b)(6) focuses on the "sufficiency" of a claim—and not the claim's substantive merits—"a court

16  may [typically] look only at the face of the complaint to decide a motion to dismiss." Van Buskirk

17  v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir. 2002). Although the court is generally

18  confined to consideration of the allegations in the pleadings, when the complaint is accompanied by

19  attached documents, such documents are deemed part of the complaint and may be considered in

20  evaluating the merits of a Rule 12(b)(6) motion. Durning v. First Boston Corp., 815 F.2d 1265,

21  1267 (9th Cir. 1987).

22      A motion to dismiss should be granted if plaintiff fails to proffer "enough facts to state a

23  claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974

24  (2007). Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient

25  facts alleged under a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699

26  (9th Cir. 1990). Allegations of material fact are taken as true and construed in the light most

27  favorable to the nonmoving party. Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337–38 (9th Cir.

28  1996). The court need not, however, accept as true allegations that are conclusory, legal

2

**United States District Court**
For the Northern District of California

1  conclusions, unwarranted deductions of fact or unreasonable inferences. See Sprewell v. Golden

2  State Warriors, 266 F.3d 979, 988 (9th Cir. 2001); Clegg v. Cult Awareness Network, 18 F.3d 752,

3  754–55 (9th Cir. 1994).

4

5  DISCUSSION

6  I.      Original Federal Action, Case No. 08-2907

7          Plaintiff claims that all defendants: 1) violated the FLSA; and 2) conspired to violate the

8  FLSA. Both claims are barred by the applicable statute of limitations.

9

10         A.      FLSA Violation

11         Under the FLSA, an action to recover unpaid overtime compensation is barred unless

12  commenced within two years after the cause of action accrues, except where the violation was

13  "willful," in which case the action may be commenced within three years. 29 U.S.C. § 255. A cause

14  of action for unpaid wages accrues each payday on which the wages due to an employee were not

15  paid. Biggs v. Wilson, 1 F.3d 1537, 1540 (9th Cir. 1993). The Biggs court, when interpreting 29

16  U.S.C. section 255, declined to distinguish between non-payment and late payment. Specifically,

17  the court stated:

18         Statutes of limitation have to start running from some point, and the most logical
           point a cause of action for unpaid minimum wages or liquidated damages (which are
19         merely double the amount unpaid) accrues is the day the employee's paycheck is
           normally issued, but isn't.

20  Id. Thus, the section 255 statute of limitations began running when plaintiff's last paycheck would

21  have normally issued.

22         In his amended complaint for case number 08-3035, plaintiff claims that he last worked for

23  pay on May 3, 2005 and considered himself employed by defendants until June 15, 2005. Further,

24  plaintiff claims to have received his last paycheck on October 26, 2006. Plaintiff did not file the

25  instant lawsuit until June 11, 2008, over three years after his termination. The consent form for the

26  opt-in FLSA class was not filed until August 12, 2008, after certain defendants pointed out this

27  deficiency. See 29 U.S.C. § 256.

28

3

**United States District Court**
For the Northern District of California

1   Plaintiff's self-characterization about when he considered himself employed is irrelevant. He

2   admits that he last worked for pay on May 3, 2005. Further, plaintiff's receipt of a paycheck in

3   October 2006, which he claims underpaid him, is also irrelevant. The cause of action here accrued

4   at some point in May 2005. Partial payment of wages at any point after that date does not reset the

5   statute of limitations clock. Indeed, the <u>Biggs</u> court found it impossible to determine "when or how

6   'late payment' metamorphoses into 'nonpayment' such that the Act is violated" and consequently,

7   neglected to adopt the "late payment" standard, opting instead, for the bright line rule set forth

8   above. <u>Id.</u> at 1541. Consequently, the statute of limitations here began running in May 2005.

9   Plaintiff's arguments regarding relation back and equitable tolling are also to no avail.

10   Relation back of amendments only apples to pleadings already filed and does not apply across

11   actions. Fed. R. Civ. P. 15(c). Here, the federal claims were all pled on or after June 10, 2008.

12   These causes of action were pled in newly filed complaints, not amended complaints. Consequently,

13   relation back does not apply here. Even if the federal claims were made in an amended complaint,

14   they would not necessarily relate back because plaintiff could have initially alleged only state law

15   causes of action as a strategic move to preclude removability of the action.

16   Second, equitable tolling does not apply here either. Defendants' knowledge of plaintiff's

17   overtime claims does not toll the statute of limitations. Plaintiff has shown no reason why he could

18   not have filed this action within the applicable statute of limitations.

19   Accordingly, plaintiff has not and can not plead facts sufficient to state a claim for an FLSA

20   violation because his claim is barred by the both the two-year and three-year statutes of limitations.

21   Therefore, plaintiff's claim for violation of the FLSA is DISMISSED.

22

23   B.   <u>Conspiracy to Violate the FLSA</u>

24   To state a claim for conspiracy, "the complaint must allege (1) the formation and operation

25   of a conspiracy; (2) the wrongful act or acts done pursuant thereto; and (3) the damage resulting

26   from such act or acts." <u>Gen. Am. Life Ins. Co. v. Rana</u>, 769 F. Supp. 1121, 1125 (N.D. Cal. 1991)

27   (Weigel, J.). "To establish the 'wrongful act' element of a civil conspiracy, defendant must satisfy

28   all of the elements of a cause of action for some other tort or wrong." <u>Id.</u> Here, the underlying

wrong is a violation of the FLSA.  However, as discussed above, plaintiff cannot make out a cause

of action for a violation of the FLSA.  Thus, a claim for civil conspiracy cannot be made.  See

Harrell v. 20th Century Ins. Co., 934 F.2d 203, 208 (9th Cir. 1991) ("Under California law, it is well

settled that there is no separate tort of civil conspiracy, and there is no civil action for conspiracy to

commit a recognized tort unless the wrongful act itself is committed and damage results therefrom."

(quotations omitted)).  Thus, plaintiff's conspiracy claim must be DISMISSED.

Although the above discussion is determinative, the court nevertheless discusses plaintiff's

overt act argument.  The applicable statute of limitations for a civil conspiracy claim is the statute of

limitations for the underlying claim.  Risk v. Kingdom of Norway, 707 F. Supp. 1159, 1170, n.13

(N.D. Cal. 1989) (Schwarzer, J.) ("Under California law, a civil conspiracy is not itself a tort.

Liability is based on the underlying tort committed in furtherance of the conspiracy. The applicable

statute of limitations is the statute of limitations for the underlying tort." (citations omitted)).

Accordingly, the statute of limitations for plaintiff's claims for conspiracy is the same as the

maximum three-year statute of limitations for his claim of an FLSA violation.  The relevant question

then, is when the statute began running.

Even though plaintiff provides no legal authority to this effect, he is correct in asserting that

the statute of limitations for a conspiracy claim does not start to run until the last overt act of the

conspiracy has occurred.  Id. at 1169–70.  This, of course, presumes that the underlying wrong is

actionable.  In any event, "[f]or an act to be an overt act delaying the commencement of the

limitations period, it must be performed in furtherance of the conspiracy."  Id. at 1170.  Here, the

only possible overt act within the last three years is the October 2006 payment.  This payment,

however, was not in furtherance of the conspiracy—it *reduced* the amount plaintiff was underpaid

and therefore could not have furthered an alleged conspiracy based on underpayment.

Therefore, plaintiff's conspiracy claim is DISMISSED.  In sum, this action, case number 08-

2907, is DISMISSED in its entirety.

II.    Removed Action, Case No. 08-3505

The removed action stems from the same facts as the action originally filed in this court. Consequently, any causes of action for violations of the FLSA or conspiracy to violate the FLSA are also DISMISSED. The removed action, which was removed solely on federal question grounds, the notice of removal not having alleged diversity jurisdiction, now consists only of state law claims. The action being in its incipiency, the court exercises its discretion to remand the action to the Superior Court for the State of California.

CONCLUSION

For the foregoing reasons, case number 08-2907 MHP is DISMISSED in its entirety and case number 08-3505 is REMANDED to the Superior Court for the State of California, County of San Mateo. The Clerk of Court is ordered to transmit a certified copy of this order to the Clerk of the San Mateo County Superior Court..

IT IS SO ORDERED.

Dated: August 22, 2008

_____
MARILYN HALL PATEL
United States District Court Judge
Northern District of California

United States District Court
For the Northern District of California

6



DANIEL JOSEPH KEATING-TRAYNOR November 21, 2006

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN MATEO

--oOo--

COPY

DANIEL JOSEPH KEATING-TRAYNOR, )
)
        Plaintiff,              )
                               )
    vs.                        )   No. CIV 456118
                               )
AC SQUARE, a California        )
corporation, DOES 1 - 20,      )
                               )
        Defendants.            )
                               )

DEPOSITION OF

DANIEL JOSEPH KEATING-TRAYNOR

TUESDAY, NOVEMBER 21, 2006

REPORTED BY: DIANE M. WINTER, CSR NO. 3186 (1-387774)

Merrill Legal Solutions (800) 869-9132

### DANIEL JOSEPH KEATING-TRAYNOR  November 21, 2006

**14**

1 you review something specifically for the purposes of
2 refreshing your recollection?
3    A  No.
4        MR. PETERS: I am going to go ahead and mark
5 as, I already gave you a copy of it, as Defendant's 1,
6 which is a copy of a Notice of Deposition, your Notice
7 of Deposition for the deposition here today, includes
8 document requests.
9        I apologize, I noticed as I went through this
10 there is some numbering problems that accord with some
11 of these.
12        (Whereupon, Exhibit 1 was
13        marked for identification.)
14    Q  (BY MR. PETERS) Have you reviewed -- have you
15 seen this before?
16    A  Yes.
17    Q  And did you review this in preparation for
18 producing documents today?
19    A  Yeah.
20    Q  And I'm not going to go through this right now
21 because I know that -- I note and let the record reflect
22 that you brought a bunch of documents here today which
23 are in a pile in the middle of the table and I'm going
24 to try to take a look at those in our lunch break and
25 we'll go through and figure out what has been produced

**15**

1 in response to what.
2        But let me ask preliminarily, did you produce
3 everything that you feel that you have in your
4 possession that is responsive to the requests in this
5 document request --
6    A  Yes.
7    Q  -- which is Exhibit 1? Okay. Now I know from
8 your previous testimony regarding the action against
9 San Francisco Unified School District that it looks like
10 you graduated in December of 2004 from the
11 San Francisco -- which high school did you graduate
12 from?
13    A  School of the Arts.
14    Q  School of the Arts. And did you get a diploma?
15    A  Yeah.
16    Q  Just regular high school diploma?
17    A  No. Actually it was School of the Arts
18 diploma.
19    Q  Okay. Is that different than a regular high
20 school? I just don't know.
21    A  It is.
22    Q  In what way is it different?
23    A  Well, it specialized in visual arts.
24    Q  Okay. And have you attended any other schools
25 after graduating from the School of the Arts in

**16**

1 San Francisco?
2    A  Briefly.
3    Q  Okay. And where did you attend, what
4 institution did you attend?
5    A  San Francisco City College.
6    Q  And did you attend the campus that's here in
7 San Francisco?
8    A  Yeah.
9    Q  The ones up on Ocean, I believe, up in that
10 area someplace?
11    A  That one, and the campus on Evans Street.
12    Q  And how long did you attend San Francisco City
13 College?
14    A  About a couple weeks.
15    Q  Okay. What caused you to drop -- to stop
16 going?
17    A  The first time I went there after I graduated
18 high school I decided to take the job with AC Square
19 instead of going to college. Big mistake. And I again
20 went a couple weeks ago to take some automotive classes
21 and plumbing classes just to learn a thing or two. And
22 that lasted about two weeks. I knew most of the stuff
23 they were teaching. It was a weekend class. It was
24 just an attempt to try to learn something new as I'm
25 still looking for work.

**17**

1    Q  Was AC Square your first job?
2    A  It was.
3    Q  So you hadn't been employed before that?
4    A  No.
5    Q  How did you hear about the job at AC Square?
6    A  Through my girlfriend's father.
7    Q  What's your girlfriend's name?
8    A  Veronica Tufo.
9    Q  Would you hazard a spelling of that last name?
10    A  T-U-F-O.
11    Q  Do you still have a relationship with Veronica?
12    A  I do.
13    Q  What is Veronica's father's name?
14    A  Biaggio Tufo.
15    Q  Can you hazard a spelling of his first name?
16    A  I don't know.
17    Q  Is it Italian?
18    A  It is Italian.
19    Q  So maybe B-I-A-G-G-I-O, maybe, Biaggio?
20    A  I don't know if there is two Gs. I can't -- I
21 call him Bill.
22    Q  Okay. Do you know if --
23    A  Others call him William. I don't know.
24    Q  And when did you first discuss with Mr. Tufo,
25 Veronica's father, the possibility of working at

5 (Pages 14 to 17)

DANIEL JOSEPH KEATING-TRAYNOR  November 21, 2006

**22**

1  Walkie-Talkie?
2      A  Yeah.
3      Q  And could you hear, could you hear what Max was
4  saying on the Walkie-Talkie?
5      A  Yeah.
6      Q  And what did Max say?
7      A  I could not give you an exact quote.
8      Q  Okay. You mentioned before he said something
9  about getting equipment and stuff like that. Is that a
10  general --
11      A  Yeah, exactly.
12      Q  And was this a normal working day for Bill, if
13  you know?
14      A  Besides the fact that he was training me.
15      Q  Besides the fact that you were there it was his
16  normal working day?
17      A  (Nodding head).
18      Q  Is that a yes?
19      A  Yeah.
20      Q  Did you have any other conversations with Max
21  regarding this training period, other than the one you
22  just talked about?
23      A  Not that I can recall.
24      Q  Did Max ever tell you you would get paid for
25  this training period?

**23**

1      A  Max did not tell me.
2      Q  Did Bill ever tell you you would get paid for
3  this training period?
4      A  Yeah.
5      Q  So Bill told you that?
6      A  Yeah.
7      Q  What is Bill's position, if you know?
8      A  I have no idea.
9      Q  Is he a technician like you?
10      A  Yeah.
11      Q  Did you ask Bill if you would be paid for the
12  training that you were doing with him?
13      A  Yeah.
14      Q  And what did he say?
15      A  He said he had talked to Max.
16      Q  Do you know if he ever talked to Max?
17      A  Yeah.
18      Q  And what, were you present when he spoke with
19  Max?
20      A  Not all the time.
21      Q  Okay. Were you present when he spoke with Max
22  about you being paid for the training period?
23      A  No.
24      Q  Did he tell you what Max had said regarding his
25  requests that you be paid during the training period?

**24**

1      A  Not that I can recall.
2      Q  Other than the allegations you have in this
3  lawsuit regarding -- which you mentioned this training
4  period, did you ever make a specific request for
5  AC Square that you be paid for the training period?
6      A  A specific request then?
7      Q  To somebody, then, at that time.
8      A  Not that I can remember.
9      Q  Other than Bill, did you train with anybody
10  else during this training period?
11      A  Yeah.
12      Q  Who else did you train with?
13      A  Max and another technician. I can't remember
14  his name off the top of my head. His first name was
15  Matt.
16      Q  Okay. How long after you started training did
17  you first train with Max?
18      A  I trained with Max a couple times after I had
19  been training with Bill. Max wanted to make sure that I
20  had been trained properly. He wanted to go out and put
21  me on a, I guess he called it a test to see if I knew
22  everything, to show me the things that I still didn't
23  know before he officially hired me.
24      Q  Okay. How long -- how my records indicate your
25  first day of work was February 8th, 2005. Does that

**25**

1  sound right?
2      A  Yeah.
3      Q  And we'll look at records that will confirm
4  that or not so I'm not holding you to that. But that's
5  approximately when, relative to that date, how long
6  before did you first meet and train with Max
7  specifically?
8      A  A week before I was hired. Within the week
9  before I was hired.
10      Q  Okay. You said a couple times. Where both of
11  those times in that week, in that week time frame before
12  you were hired?
13      A  Uh-huh.
14      Q  And how long were these training sessions that
15  you went through?
16      A  Well, depended on how long Bill, Bill's day
17  was. Sometimes he would take a light schedule and would
18  work until two in the afternoon. There were days where
19  he had a heavy schedule and we were working until seven
20  at night.
21      Q  Okay. I understand that. We'll talk about the
22  training with Bill specifically. But what actually I'm
23  talking about, is that in that one week time frame
24  before you first started being hired you mentioned you
25  trained with Max twice. In those two times how long

7 (Pages 22 to 25)

DANIEL JOSEPH KEATING-TRAYNOR   November 21, 2006

**90**

1   were --
2      A  Yeah.
3      Q  -- piecemeal and far apart?
4      A  Yeah.
5      Q  And the decision for who got what was made by
6   the leads generally?
7      A  Yeah.
8      Q  So Eduardo on some occasions, and some of the
9   other leads on other occasions?
10     A  Yeah.
11     Q  Max wasn't generally making these assignments,
12  was he?
13     A  It depended on where he was working.
14     Q  Okay.
15     A  Sometimes he did.
16     Q  So sometimes he made choices.  Was that true,
17  was that true of -- was that true generally with you?
18  Did he make your choices for your routes, or was that --
19     A  The times he handed out the routes.
20     Q  How many times in the course of your employment
21  from February 7th of 2005 to May 4th of 2005 did he
22  assign you a route?
23     A  I would have to estimate approximately seven
24  times.
25     Q  Do you have any way of estimating when those

**91**

1   seven times occurred?
2      A  Throughout my employment.
3      Q  So from the very beginning through to the very
4   end?
5      A  I can't give you exact dates.  There was a day
6   I worked with him.  I don't know if he even paid me for
7   those.  There was time -- there was my first day he gave
8   me a route.  I don't know if he paid me for those
9   either.  And there was times in the middle.
10     Q  You say you don't know whether he paid you for
11  those.  Would you -- would there be, would there be
12  documentation showing that you did the work?
13     A  There would be the invoice.  And he told me
14  that he would write my name on the invoice and turn them
15  in and they would show up on my paycheck.  But every
16  time I received the paycheck, the list of jobs that I
17  had done were vague and they did not have the dates they
18  were done.  I was not aware of the dates that each job
19  was done.
20        And I believe every time I received a paycheck
21  that I was missing jobs.  There was no way for me to
22  verify it.  I complained, but there was no way for me to
23  prove that I had done more jobs without the actual
24  Comcast receipts, which I was not able to access and did
25  not come with my paycheck.  I complained, but it didn't

**92**

1   change.
2      Q  But you did get a transaction detail for each
3   of your -- with each of your paychecks, did you not?
4      A  A transaction what?
5      Q  You got documentations of jobs you did, you
6   just couldn't tell what date they were, right?  You got
7   a transaction deal document with each paycheck?
8      A  Yeah, and they were always inaccurate and
9   missing.
10     Q  How did you know if they were inaccurate if you
11  had no way of verifying?
12     A  Because I kept a tally of how many of these I
13  did and how many of those I did.
14     Q  And where did you keep that tally?
15     A  I would keep it in my van until I received my
16  paycheck.
17     Q  Then what did you do with it?
18     A  Then I would use it to see if it added up.  And
19  if I was approximately a couple $100 short or if I got
20  all my money or not.  I don't have them now.  I don't
21  know what happened to them.
22     Q  So you don't have these tallies now?
23     A  I wish I would have kept them.  They were just
24  notes I made.
25     Q  And did you make specific requests for more

**93**

1   money after each paycheck where you found something that
2   was wrong?
3      A  I did.  I complained usually to Max.  Max is
4   the one that usually gave me my paycheck.  Sometimes he
5   would come in the morning and give them to the lead and
6   leave before I got there.  And I would get it from the
7   lead, which was Eduardo.  And --
8      Q  How many -- okay.
9      A  I would complain to Eduardo.  But I didn't, I
10  didn't, I don't think I got any more money than my
11  paycheck was written for.
12     Q  How many times would you say you found
13  discrepancies in the course of your employment from
14  February 7th, 2008, through May 4th, 2008 -- getting
15  ahead of myself, February 7th of 2005 to May 4th of
16  2005, how many times?
17     A  How many times what?
18     Q  Did you find some discrepancy, do you think?
19     A  Every time.  Every time I received a paycheck.
20     Q  And you had documentation of these
21  discrepancies, correct, in your van?
22     A  Sometimes.
23     Q  Sometimes.
24        What was, what form was this documentation?
25  Was it in a spiral?

24 (Pages 90 to 93)

DANIEL JOSEPH KEATING-TRAYNOR  November 21, 2006

**94**

1     A  Notes.
2     Q  Notes.  And was it in a spiral notebook, was it
3  just pieces of paper?
4     A  On pieces of paper.
5     Q  What kind of paper was it, Post-Its, notebook
6  paper?
7     A  Sheets of, sheets of usually 11 by 8, whatever
8  it is, the standard size paper that they would give out
9  with the daily, a daily log that I'd fill out every day.
10    Q  Okay.
11    A  And I'd take a couple extra blank ones just to
12  use for notes.
13    Q  Now you kept track of — you kept track and
14  were required to keep track of your jobs that you did,
15  correct?
16    A  That's correct.
17    Q  And you recorded the billing numbers and item
18  numbers, correct?
19    A  That's correct.
20    MR. PETERS:  Let me show you a document which
21  we will mark as Defendant's next in order.
22    (Whereupon, Exhibit 3 was
23    marked for identification.)
24    Q  (BY MR. PETERS)  For the record, Defendant's 3
25  is a multiple page document Bates stamped variously

**95**

1  because some documents were taken out to pull these out
2  specifically.  And they are a document with several
3  columns, says "AC Square" at the top.  First page of
4  Exhibit 3 has a date, handwritten date 2-8-05,
5  typewritten date, and then tech name it says, "Danny
6  Keating, Tech Number 8669."  Is that your handwriting?
7     A  Yeah.
8     Q  And is the — well, the items listed below, is
9  that all your handwriting?
10    A  Yeah.
11    Q  And did you, when you went and did jobs and
12  filled out this form, did you fill it out completely?
13    A  For the most part.
14    Q  Well, for the most part.  Was it your practice
15  to fill out everything completely?
16    A  Yeah.
17    Q  And you understood that this was part of how
18  you got paid, correct?
19    A  That's right.
20    Q  And do you have any reason to believe that you
21  left out anything on any of these sheets, several pages
22  here on Exhibit 3?  You can look through quickly to see
23  if they are all your handwriting.
24    A  There is one, first one does not have a
25  signature.

**96**

1     Q  Okay.
2     A  I might have missed a signature.
3     Q  Okay.  And the second one I would note on page
4  two, which is document number D00136, that doesn't have
5  a signature either, correct?
6     A  That's correct.
7     Q  But is this all your handwriting on page two?
8     A  Yes, it is.
9     Q  Or on the second document.  And, you know, you
10  can take a quick look through there and see if there is
11  any of these documents in this exhibit that bears — I
12  notice the handwriting changes a little bit.  But if any
13  of this, if all of this is your handwriting.
14    A  Here is one, 4-1-05.
15    Q  Okay.  4-1-05, and it says tech number is 8646.
16  Do you know whose tech number that is.  That's not your
17  tech number?
18    A  I don't, I don't know whose tech number that
19  is.
20    Q  Okay.  Could this be one of the ones that Max
21  Alverado filled out and gave to you?
22    A  Him or one of the leads filled it out for me.
23    Q  Okay.
24    A  Except for the part on the right.  The billing
25  item number when I completed a job, that's my

**97**

1  handwriting there, and my signature on the bottom as
2  well.
3     Q  Okay.  Are there any other documents in here,
4  and look through carefully, each one page, where the
5  handwriting on the document is not yours?
6     A  Yes.  There is another one here, 4 — 4-8?  I
7  don't know what that says, 4, 4-0, it looks like a 0.
8     Q  I don't know what it is.
9     A  4-2?
10    Q  But it looks like it's — let's see if I can —
11  it's document Bates stamp number D00387.  And it looks
12  like somebody maybe didn't know how to spell your name,
13  because you are referred to as Danny.
14    A  Looks that way.
15    Q  Is any of the handwriting on this document
16  yours?
17    A  Yeah.
18    Q  Is it the billing item numbers?
19    A  The billing item number and the signature.
20    Q  Okay.  So this would be another example of
21  where somebody might have filled it out for you?
22    A  Uh-huh.
23    Q  Would this be a circumstance like you discussed
24  with Max Alverado, where you guys were working together?
25    A  No, this would be.

25  (Pages 94 to 97)

DANIEL JOSEPH KEATING-TRAYNOR  November 21, 2006

**174**

1 the original. There is also several references, and
2 there is a reference of phone calls to home, it looks
3 like, under April 27th. Do you know what that refers
4 to?
5 A No.
6 O Okay.
7 A Well, it refers to a phone call, but I don't
8 know.
9 Q You don't know what phone call or who made the
10 phone calls?
11 A Not from this.
12 Q Okay. And again all of the handwriting on this
13 document is your mother's?
14 A Yeah.
15 Q Okay. Explain to me again the process that you
16 guys were going through to create this. Did you sit
17 down next to her and try to do this with her, or did you
18 just give her the documents and let her look through it?
19 A She asked me questions. She — I explained the
20 paperwork to her, the forms and everything. And I
21 explained to her, you know, all the, pretty much
22 basically all the different forms that we received, what
23 do they call them, the invoices. She used the invoices
24 that we received from AC Square to determine which jobs
25 I did and from what hour to what hour and how much that

**175**

1 job was worth. And she used those to calculate.
2 Q Do you know if she included in the dollar
3 figures, do you know if she included payment for
4 overtime?
5 A No, she did not. I don't believe. It doesn't
6 look like it.
7 Q And how did you come up with the time frames.
8 How did you figure out what time you worked?
9 A From the documents we received from AC Square,
10 or Comcast.
11 Q Okay. And just before we move on to the next
12 document, the next, the last page of Exhibit 19
13 indicates work on Sunday, Monday and Tuesday, May 1st,
14 2nd and 3rd. Does this comport with your understanding
15 of when the last day you worked at AC Square was?
16 A No. I believe I worked more days in May. I
17 believe I worked in later May.
18 Q And when you say later May, what days in later
19 May?
20 A In the last two weeks of May.
21 Q You think you worked sometime in the last two
22 weeks in May?
23 A I do. And this was made before we received the
24 last check. We never received the last check and
25 documents supporting it, so —

**176**

1 Q Okay. Do you remember where you were working
2 in those last days, the last days you worked at
3 AC Square?
4 A These three days in particular here?
5 Q No, no. You've indicated that you believe you
6 worked after May 3rd.
7 A There was a day I worked with Max.
8 Q Okay.
9 A And that was — I don't know which day that was
10 exactly, because I don't have the paperwork. He had the
11 paperwork. And I never received the paperwork.
12 Q Do you recall whether — where you were
13 working?
14 A Yeah, I do.
15 Q And where were you working?
16 A I was working in Palo Alto. Although I worked
17 in Redwood City as well. I remember one specific job
18 with him in Palo Alto. I remember the house, but I
19 can't remember the address.
20 Q So do you recall more than one day working with
21 Max after May 3rd, or do you just remember one?
22 A I remember one day.
23 Q Just one day. And you think it was sometime
24 after the 3rd. Can you give me any estimate of how long
25 after, a week after, two weeks after?

**177**

1 A No, I don't know.
2 Q So it could have been the fourth?
3 A Could have been the fourth, could have been the
4 20th, could have been the 25th.
5 MR. BERNSTEIN: Do you know if it was after
6 when you were owed your last paycheck?
7 THE WITNESS: When was I owed the date for my
8 last paycheck? I know they were offset by two weeks, so
9 the whole process that they had set up is so confusing.
10 MR. BERNSTEIN: I'm going to say May 6th, or
11 the first Saturday in May.
12 THE WITNESS: Yeah, I think I worked after that
13 paycheck.
14 MR. BERNSTEIN: Why?
15 THE WITNESS: Because I think I — okay.
16 Well —
17 MR. BERNSTEIN: I mean why, at that time were
18 you complaining about your paycheck?
19 THE WITNESS: Uhm, I don't know what day I
20 worked with Max. It could have been, it could have been
21 any time. I don't know when. It could have even been
22 before the 3rd. I'm not sure. But I did work with Max.
23 I know I fixed the brakes on the 6th, right, or was it
24 the 7th? I have to look at the receipt.
25 Q (BY MR. PETERS) I believe you said you fixed

45 (Pages 174 to 177)

DANIEL JOSEPH KEATING-TRAYNOR  November 21, 2006

194

1   Q  (BY MR. PETERS) So you are at the office every
2   day at 7:00 a.m.  And so who would be at the office when
3   you got there at 7:00 a.m.?
4   A  The other technicians, a lead, and a couple
5   Comcast employees.
6   Q  So was it your practice to just every day get
7   up in the morning, sometime before 7:00 a.m., and then
8   just hop in the car and get to work at 7:00 a.m.?
9   A  No.
10  Q  Okay.  So when wouldn't you get up at 7:00
11  a.m.?  When wouldn't you arrive at work at 7:00 a.m.?
12  A  If I wasn't going to work that day.
13  Q  So I'm just trying to be clear.  Any day in
14  which you actually worked, regardless of the number of
15  hours, regardless of the first job, you were at the
16  office at 7:00 a.m.?
17  A  The first thing I did in the morning was use
18  the Nextel radio and try to contact somebody.
19  Q  Okay.
20  A  And if I was going to go into the office, I
21  would leave depending on what time I got ahold of them,
22  depending on how early they wanted me to show up.  If
23  they were real busy and they had a lot of 8:00 to 12 or
24  8:00 to 10 really early jobs, then they would try to get
25  me there as fast as possible.  Sometimes I wouldn't show

195

1   up until 8:00 if they said all our jobs are in the
2   afternoon, you can take a little bit longer to get here
3   if you want.  Maybe I would go to breakfast first.
4   Q  So if I look at these work orders, which we've
5   attached as an exhibit, one of which was Exhibit 20, and
6   I look at them and I see a job that starts, say, at
7   12:30 in the afternoon, the first job you did was at
8   12:30 in the afternoon, would that be a day you arrived
9   at 7:00 a.m.?
10  A  Yeah.
11  Q  Why?  What would you do from 7:00 a.m. to
12  12:30?
13  A  There were times where I'd — I didn't have
14  anything to do until 12:30.
15  Q  Okay.  So you said you called, you would find
16  out, you know, when you had to come in.  Sometimes they
17  wouldn't have you come in right away, correct?
18  A  Yeah, sometimes they'd have me come in as late
19  as eight or maybe nine at the latest.  There might have
20  been one or two occasions where I showed up at the
21  latest 9:00.
22  Q  One or two occasions?
23  A  (Nodding head.)
24  Q  So the rest of the occasions, other than one or
25  two, you showed up at 7:00 a.m.?

196

1   A  Approximately.
2   Q  And who would I go and talk to and ask if I
3   wanted to verify that you were there every day at 7:00
4   a.m. other than one or two times?
5   A  Me.  Other than me, I don't know.
6   Q  Other than you no witnesses, nobody at the
7   office?
8   A  There is other people at the office.
9   Q  Okay.  So if I talk to co-workers and I said
10  Daniel Keating was here every day at 7:00 a.m. other
11  than once or twice, they would say, oh, yeah?
12  A  I don't know what they'll say.
13  Q  Okay.  If your first job didn't start until,
14  you know, late morning or early afternoon, you arrived
15  at 7:30, what would you do?
16  A  I would first get my route, then when I got my
17  route and rewrote it onto the daily log, I would see
18  what my first job is at 9:00 or 12:00.  And would then
19  make, you know, make my list and my route of which ones
20  first and the order of which I'm going to do it.
21     I then see what equipment is needed, and I'd
22  get it in line.  And the line could have taken from 15
23  minutes up to an hour sometimes waiting in line to get
24  my equipment.
25     And once I got my equipment I would, depending

197

1   on the job, if I had to leave right away, I would leave
2   right away.  If I didn't, there was always a group of
3   technicians who didn't have a job until 10 to 12 in the
4   afternoon, and they would all go get breakfast or
5   something, talk.
6   Q  So once you got your schedule, if it didn't
7   start right away, then you were free to go, I guess,
8   whatever you wanted to do until it was time to go?
9   A  I couldn't do whatever I wanted to do.
10  Q  You could go have breakfast, something like
11  that?
12  A  I could do — there was some of the offices had
13  little corner store or little corner café around the
14  corner, some of them didn't.  Sometimes I'd help other
15  technicians with their jobs whenever I had a gap
16  in-between jobs.  And I would go and I would help the
17  other technicians with their jobs.
18  Q  I was just gonna say, when you sat down with,
19  your mom and you came up with an estimate of the
20  number of hours you worked over time?
21  A  Yeah.
22  Q  And we're talking about any hours above, above
23  eight in a day?
24  A  Uh-huh.
25  Q  Perfect so I'm clear, we can determine at

50  (Pages 194 to 197)

DANIEL JOSEPH KEATING-TRAYNOR    November 21, 2006

**198**

1  least, I know it's not everything, but we can determine
2  at least when you last left a customer's house, we can
3  determine that from these documents?
4      A  Yeah.
5      Q  You would agree that the last date, the last
6  time in the day of the last work order would reflect the
7  time you left that customer's house?
8      A  Except for certain jobs that involved actually
9  meeting with the customers, if there was a disconnect,
10 and those were eight to eight. The time frame was eight
11 in the morning to 8:00 at night.
12     Q  Well, I understand that. But the documents
13 would still reflect when you left, correct?
14     A  Unless I did -- well, yeah, they would.
15     Q  I understand there may be stuff you did
16 afterwards by going back to the office and turning in
17 the equipment, all that kind of stuff?
18     A  There was also --
19     Q  I'm trying to figure out what I can figure out
20 from the documents.
21     A  Yeah.
22     Q  The documents reflect the last time out, it
23 says, "stop time." So no matter whose house you are at,
24 the last stop of the day, that's going to be your stop
25 time for that customer. And then we have to figure out

**199**

1  if there was time after that you spent?
2      A  Yeah.
3      Q  That's the part we don't know. And is that the
4  part you tried to estimate in your -- in the work that
5  you did with your mother on this issue?
6      A  What's that?
7      Q  Is that the time frames that you were trying to
8  work with your mother?
9      A  Yeah, for the calendar.
10     Q  Okay. Not for that, but you said there was
11 another document where you determined overtime.
12     A  Yeah. That --
13     Q  You said you've established that it's not here
14 today.
15     A  That was determined through a bunch of stuff.
16 The documents there, also assuming I started every day
17 at 7:00.
18     Q  Okay. What I'm trying to figure out, because I
19 want to ask for it because I'm entitled to get it. Is
20 there a document that you and your mother prepared,
21 besides this calendar, that shows in your mind the
22 amount of overtime you worked?
23     A  Yeah.
24     Q  Okay. And as far as you know, that's either
25 back at home or with your mom?

**200**

1      A  It was here this morning.
2      Q  Do you have any sense of what the estimate of
3  the number of overtime hours was on that document? That
4  question --
5      A  Okay. There was -- we had estimated that out
6  of the how many days was it I worked, I think it was 38,
7  something like that, that I worked 34 days, 34 of the 38
8  I had done -- worked overtime.
9      Q  Okay. And did you determine the number of
10 hours of overtime in those 34 days?
11     A  My mom calculated that. And she filled out a
12 table. And she came out with a total dollar amount of
13 how much I should be owed in overtime.
14     Q  Okay. And how did you figure out the dollar
15 amount?
16     A  I'm not sure. My mom figured that out. She
17 figured it out.
18     Q  You don't know whether she figured it out
19 whether it was overtime or time-and-a-half?
20     A  Okay. I do know. She explained it to me. She
21 said anything over eight hours is time-and-a-half. So
22 she said that if you did a 208, which is five something,
23 I think, it's now 750, which is time-and-a-half, that
24 the piece work has to be paid time-and-a-half, whatever
25 the piece rate is. So if a job is $20 and it's done

**201**

1  after eight hours worth of work, that job has to be paid
2  at $30.
3      Q  Did she tell you -- and so did she figure --
4  did she times the number of hours times the
5  time-and-a-half figure?
6      A  She did it by the piece work. Because I was
7  not paid on an hourly, I was paid by piece work. So the
8  first --
9      Q  They still use piece -- well, never mind.
10     A  Do they still use hourly?
11     Q  They still use hourly. But what I'm wondering
12 is, is that did you -- you know what the overall figure
13 was so I have some sense of what we're dealing with
14 here.
15     A  She gave -- we gave you a paper this morning
16 that had that, that had all that on it. It had the
17 summary of the gas receipts, it had the summary of the
18 expenses, it had the -- it's over here somewhere. Maybe
19 we can take a minute and find it.
20     MR. PETERS:  Sure. Go off the record.
21     (Off the record from 4:12 to 4:14.)
22     Q  (BY MR. PETERS)  So you don't remember, you
23 believe there is a document that estimates the number of
24 overtime hours?
25     A  There is.

51  (Pages 198 to 201)



EXHIBIT K

DANIEL KEATING-TRAYNOR    May 23, 2008

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN MATEO

DANIEL KEATING-TRAYNOR,                )
individually and on behalf of          )
all others similarly                   )
situated,                              ) Case No. CIV 464114
                                       )
              Plaintiffs,              )
                                       )
vs.                                    )
                                       )
AC SQUARE INC. and DOES ONE            )
through and including DOE SIX          )
HUNDRED,                               )
                                       )
              Defendants.              )
                                       )
                                       )
_____    )



DEPOSITION OF DANIEL KEATING-TRAYNOR

San Luis Obispo, California

Friday, May 23, 2008

10:05 a.m. - 3:29 p.m.

Reported by:  Lora L. Shoffstall, RPR, CSR 9271

1

DANIEL KEATING-TRAYNOR   May 23, 2008

**2**

```
1         THE DEPOSITION OF DANIEL KEATING-TRAYNOR
2   was taken at Merit Reporting & Video, 1151 Leff Street,
3   San Luis Obispo, California, before Lora L. Shoffstall,
4   CSR No. 9271 and Registered Professional Reporter, on
5   Friday, May 23, 2008, commencing at 10:05 a.m.
6
7   APPEARANCES OF COUNSEL:
8
9   For Plaintiffs:
10      LAW OFFICE OF DANIEL BERKO
        BY: DANIEL BERKO
11      819 Eddy Street
        San Francisco, California 94109
12      (415) 771-6174
13
14  For Defendant AC Square, Inc.:
15      LITTLER MENDELSON
        Attorneys at Law
16      BY: RONALD A. PETERS
        50 West San Fernando Street, 14th Floor
17      San Jose, California 95113-2431
        (408) 795-3433
18
19
20
21
22
23
24
25
```

**3**

```
1              I N D E X
2   WITNESS        EXAMINED BY          PAGE
3   DANIEL
    KEATING-TRAYNOR   MR. PETERS          6
4
5
6
7        INFORMATION REQUESTED
           (None)
8
9
10       WITNESS INSTRUCTED NOT TO ANSWER
11       PAGE   LINE
12         9    17
          15    17
13        163   15
14
15
16
17       EXHIBITS FOR IDENTIFICATION
18  DEFENDANTS':              MARKED
19  1 - Untitled document re Date, Last Job, and    78
        Overtime
20
21  2 - 2/8/05 Comcast work orders     81
22  3 - 2/9/05 Comcast work orders     99
23  4 - 2/10/05 Comcast work orders    106
24  5 - 2/11/05 Comcast work orders    108
25  6 - 2/14/05 Comcast work orders    109
```

**4**

```
1            I N D E X (Continued)
2     EXHIBITS FOR IDENTIFICATION (Continued)
3   DEFENDANTS':                   MARKED
4   7 - 2/15/05 Comcast work orders      109
5   8 - 2/16/05 Comcast work orders      110
6   9 - 2/17/05 Comcast work orders      110
7   10 - 2/18/05 Comcast work orders     115
8   11 - 2/19/05 Comcast work orders     122
9   12 - 2/20/05 Comcast work orders     122
10  13 - 2/23/05 Comcast work orders     123
11  14 - 2/24/05 Comcast work orders     123
12  15 - 2/25/05 Comcast work orders     124
13  16 - 2/26/05 Comcast work orders     125
14  17 - 2/27/05 Comcast work orders     126
15  18 - 3/3/05 Comcast work orders      126
16  19 - 3/4/05 Comcast work orders      127
17  20 - 3/8/05 Comcast work orders      127
18  21 - 3/9/05 Comcast work orders      129
19  22 - 3/15/05 Comcast work orders     130
20  23 - 3/16/05 Comcast work orders     131
21  24 - 3/19/05 Comcast work orders     133
22  25 - 3/26/05 Comcast work orders     134
23  26 - 3/28/05 Comcast work orders     135
24  27 - 4/1/05 Comcast work orders      136
25
```

**5**

```
1            I N D E X (Continued)
2     EXHIBITS FOR IDENTIFICATION (Continued)
3   DEFENDANTS':                   MARKED
4   28 - 4/2/05 Comcast work orders      138
5   29 - 4/4/05 Comcast work orders      138
6   30 - 4/5/05 Comcast work orders      139
7   31 - 4/6/05 Comcast work orders      139
8   32 - 4/8/05 Comcast work orders      139
9   33 - 4/14/05 Comcast work orders     140
10  34 - 4/15/05 Comcast work orders     141
11  35 - 4/16/05 Comcast work orders     142
12  36 - 4/19/05 Comcast work orders     144
13  37 - 4/20/05 Comcast work orders     145
14  38 - 4/23/05 Comcast work orders     145
15  39 - 4/30/05 Comcast work orders     146
16  40 - 5/1/05 Comcast work orders      146
17  41 - 5/2/05 Comcast work orders      146
18  42 - 5/3/05 Comcast work orders      147
19  43 - Plaintiff Daniel Keating-Traynor Answers   149
        to Request for Admissions Set One
20      Related to Class Certification Issues
21  44 - Plaintiff Daniel Keating-Traynor            151
        Responses to Form Interrogatories as
22      Supplemented Set One
23
24
25
```

2 (Pages 2 to 5)

DANIEL KEATING-TRAYNOR    May 23, 2008

18

1  BY MR. PETERS:
2    Q.  And I'm going to ask you, that if you are
3  having trouble focusing, that you let me know, and I'll
4  repeat a question. Don't assume that you remembered it.
5  If you have any trouble, let me know. I want to make
6  sure you understand every one of my questions and give
7  me the appropriate answer.
8    A.  Absolutely.
9    Q.  All right. Thank you very much.
10    Are you currently working?
11    A.  No.
12    Q.  When was the last time you worked?
13    A.  At AC Square.
14    Q.  So May -- last time you actually did any
15  work --
16    A.  The end of May.
17    Q.  Well, my question is -- I'll ask a different
18  question. I understand that you are alleging that you
19  were employed until the end of May. When was the last
20  time you actually did any physical work for AC Square?
21    A.  Um, sometime in the same month that I was
22  fired. Can't remember off the top of my head what day
23  that was.
24    Q.  And the work orders that I have reflect the
25  last work orders that you had were on May 3rd. Is that

19

1  approximately right? Within a week?
2    A.  From what I recall, it was -- I worked later in
3  the month, physically.
4    Q.  How much later?
5    A.  The end of May.
6    Q.  So your recollection and your testimony is that
7  you worked, actually worked at AC Square doing cable
8  installation and things at the end of May. Is that
9  right?
10    A.  Yeah.
11    Q.  Are you sure about that?
12    A.  My -- my answer to your question is that I
13  worked, physically worked after May 3rd.
14    Q.  Okay.
15    A.  In the month of May.
16    Q.  Okay. Is your testimony, if I can recall it
17  here, is that you actually worked sometime at the end of
18  May, meaning you did some cable installations; you went
19  to somebody's house --
20    A.  Yeah.
21    Q.  -- at the end of May?
22    A.  Yeah.
23    Q.  Okay. And there will be work orders, I assume,
24  that reflect that you did work at somebody's house at
25  the end of May?

20

1    MR. BERKO:  Well, that calls for speculation.
2  BY MR. PETERS:
3    Q.  Do you know if there would be work orders that
4  reflect that you worked at the end of May?
5    A.  I can't say that from here, but there's --
6  there should be.
7    Q.  As I understand it, Mr. Keating-Traynor, you're
8  alleging that you worked overtime during the period of
9  time in which you worked at AC Square. Correct?
10    A.  Yeah.
11    Q.  And before we get started on that line of
12  questioning, my records reflect that you began working
13  as a regular employee in February of 2005. Now, I know
14  that you are alleging that you had a training period
15  before that. Okay? With -- where you trained with
16  Mr. Tufo; correct?
17    A.  Correct.
18    Q.  But for the purposes of my questions here, I
19  want to talk about the period after you became a regular
20  employee, which I understand was February 8th of 2005.
21  Does that sound about right?
22    A.  Um, yeah. Sounds about right.
23    Q.  Right. I'm not going to hold you to a
24  particular date, but does that sound right?
25    A.  Yeah.

21

1    Q.  When you started working in February of 2005 or
2  around February of 2005, after your training period that
3  you're alleging, what time -- what location did you
4  typically report to?
5    MR. BERKO:  Assumes there is a typical, but go
6  ahead.
7    THE WITNESS:  On a typical day, I would report
8  to any number of Comcast offices on the peninsula.
9  BY MR. PETERS:
10    Q.  Okay.
11    A.  Usually the lunchroom of the Comcast office.
12    Q.  Now, during the period of time that you worked
13  for AC Square, were you also reporting to a Comcast
14  office?
15    A.  Yeah.
16    Q.  So you weren't reporting to AC Square
17  headquarters or any location that you understood
18  belonged to AC Square?
19    A.  Correct.
20    Q.  Okay. Do you know if that's still the case or
21  not?
22    A.  I don't know.
23    Q.  You don't know one way or the other?
24    A.  I've heard that people report to AC Square's
25  office.

6  (Pages 18 to 21)

DANIEL KEATING-TRAYNOR    May 23, 2008

---

**22**

1   Q. And how have you heard that?

2   A. Mr. Berko mentioned it, I believe.

3      MR. BERKO: All right. Don't talk about our

4   conversations.

5      THE WITNESS: Okay.

6   BY MR. PETERS:

7   Q. You should assume my questions don't request

8   that you provide information that was provided to you by

9   your attorney. Okay?

10  A. Okay.

11  Q. So other than -- other than what you just

12  mentioned, you haven't heard that from anybody else?

13  A. No.

14  Q. And you don't know when that changed?

15  A. No. I don't know anything about that. I don't

16  know if it's true. When I was working there, we

17  reported to Comcast lunchroom.

18  Q. And you said any one of a number of locations.

19  What locations did you report to during the time that

20  you were there?

21  A. They had an office in San Mateo. They had an

22  office in Redwood City. They had an office in Palo

23  Alto. And they had an office in San Francisco. On any

24  given day, I could have been told to drive to either

25  of -- either one of those offices.

---

**23**

1   Q. And was there one of these offices that you

2   reported to more than others?

3   A. The Redwood City and Palo Alto offices I

4   reported to more than the San Francisco and San Mateo

5   offices, but not -- not by a long shot. It was pretty

6   even.

7   Q. What about San Francisco? How often did you

8   report to San Francisco?

9   A. Um, I'd say maybe seven, seven times at the

10  most.

11  Q. So that was somewhat less than --

12  A. That was a little bit less. Same with the San

13  Mateo office. For daily work purposes.

14  Q. And just to remind you. One instruction I

15  didn't give you. You do have to make sure I finish my

16  question before you answer. You're doing fine, but just

17  so we're not talking over each other and she gets

18  behind. Okay?

19  A. Yep.

20  Q. So Redwood City and Palo Alto were probably the

21  most. San Mateo and San Francisco were somewhat less?

22  A. Yeah. I also reported to the San Mateo office

23  for meetings and paperwork, if they wanted me to sign

24  paperwork or had anything to give me.

25  Q. And --

---

**24**

1   A. Paychecks.

2   Q. Okay. Sorry. That was my fault.

3      And how often did these meetings occur?

4   A. Um, I'd say either between weekly and biweekly.

5   Q. So once a week to twice a week or once a week

6   or every other week?

7   A. I can't remember if we did -- how often our

8   meetings were, but we did a -- we did meetings several

9   times a month. And every other week I went to pick up

10  my paycheck. Sometimes a technician would have the

11  paycheck, be handing them out.

12  Q. And you were paid every two weeks?

13  A. Yeah.

14  Q. Is it Friday?

15  A. Saturday.

16  Q. Saturday. So every other Saturday you would

17  pick up your paycheck?

18  A. Yeah. Sometimes the paychecks would be given

19  to another technician. They would give them to Eduardo

20  or something like that, and I would go to the office in

21  Redwood City where I was working that day, and he'd have

22  the paychecks for the employees at that office.

23  Q. And meetings, were they usually held at

24  San Mateo?

25  A. Yeah.

---

**25**

1   Q. Okay. And was that the San Mateo Comcast

2   office?

3   A. The AC Square office.

4   Q. Okay. So it was in the -- it was at the

5   AC Square office that the meetings took place.

6   A. Yeah.

7   Q. Correct?

8      And was there a San Mateo Comcast office?

9   A. Yeah.

10  Q. And so you reported to the San Mateo Comcast

11  office for work and you reported to the San Mateo

12  AC Square office to pick up the checks and have the

13  meetings. Correct?

14  A. Yeah.

15  Q. And the meetings occurred once a week to every

16  other week or once a week to twice a week?

17  A. The meetings --

18     MR. BERKO: Asked and answered.

19     THE WITNESS: Maybe once a week.

20  BY MR. PETERS:

21  Q. Okay. And what kinds of things would you --

22  would these -- what subject matters would be discussed

23  at these meetings?

24  A. Anything from -- from chargebacks. I remember

25  a meeting about chargebacks. How to do a certain job in

---

7 (Pages 22 to 25)

DANIEL KEATING-TRAYNOR    May 23, 2008

**78**

BY MR. PETERS:
2  Q.  So when you're estimating in your mind the
3  overtime that you work, are you taking out of that
4  estimate times in which you took meal or rest breaks?
5  A.  Yes, if I took a meal and rest break.
6  Q.  And when you're estimating your overtime in
7  this case, are you -- the estimate you've given me, are
8  you assuming a start time of 7:00?
9  A.  I was assuming start time 7:30.
10  Q.  7:30.  Okay.  Do you recall preparing an
11  estimate of your overtime in your previous action?
12  A.  Um, I believe so.
13  (Defendants' Exhibit 1 was marked for
14  identification.)
15  BY MR. PETERS:
16  Q.  I'll show you a document we'll mark as
17  Defendants' Number 1.  Actually, let her mark that and
18  you can look at that one, and --
19  MR. BERKO:  She's going to give you one.
20  BY MR. PETERS:
21  Q.  Defendants' Number 1 is a one-page document,
22  contains a chart with three columns, and I'll represent
23  to you that was produced by your former counsel at your
24  previous deposition.
25  A.  Look at that.  7:30 a.m.

**79**

1  MR. BERKO:  Just answer his questions.
2  THE WITNESS:  Did you ask a question?  I didn't
3  think so.
4  MR. PETERS:  That's why you shouldn't just pipe
5  up and talk.
6  MR. BERKO:  It's okay.  Just wait for a
7  question.
8  MR. PETERS:  That's what he was telling you not
9  to do.
10  MR. BERKO:  It's fine.  Whatever.
11  THE WITNESS:  Oh, well.
12  BY MR. PETERS:
13  Q.  So my first question about this document is:
14  Do you recognize it?
15  A.  Yeah.
16  Q.  You've seen this document before?
17  A.  Uh-huh.
18  Q.  Is that a yes?
19  A.  Yes.
20  Q.  And what is this document, if you know?
21  A.  Um, it's my start -- it's the days I worked,
22  the time of my last job, and how much overtime.
23  Q.  So you calculated your overtime based upon the
24  start date or start time -- sorry -- of 7:30.  Correct?
25  A.  That's correct.

**80**

1  Q.  And that's referenced at the bottom of this
2  document in parentheses where it says paren, asterisk,
3  assumes start at 7:30 a.m., comma, one-half-hour lunch
4  and one-half-hour return time.  Correct?
5  A.  Correct.
6  Q.  Okay.  So if I'm to interpret this document --
7  and did you prepare this document?
8  A.  Correct.
9  Q.  And if I'm to interpret this document
10  correctly, contained in the middle column under last
11  job, you include a one-half-hour return time.  Correct?
12  A.  Correct.
13  Q.  And return time is what, return to the office or
14  Return to home?
15  A.  Return to job, the house, job site.
16  Q.  Well, okay.  So interpret for me the bottom
17  information there.  It says assumes start at 7:30,
18  one-half-hour lunch.  So you took out one-half-hour
19  lunch for each of these days.  Correct?
20  A.  Uh-huh.
21  Q.  And then it says one-half-hour return time.
22  A.  Getting here.
23  Q.  What does that mean?
24  A.  Half hour home.
25  Q.  Okay.  So do you believe this is accurate?

**81**

1  A.  Um --
2  Q.  You prepared -- this document you prepared?
3  A.  Yeah.
4  Q.  So it's an accurate reflection of the hours you
5  worked and the overtime you worked on these days?
6  A.  To the best of my knowledge at the time.
7  (Defendants' Exhibit 2 was marked for
8  identification.)
9  BY MR. PETERS:
10  Q.  Okay.  Let me make sure she gets this back
11  because it's gotta go with the deposition.
12  Okay.  I'm going to show you another document,
13  which is -- we will mark as Defendants' next in order.
14  And I'm doing these in -- these documents I'm showing
15  you now are actually work orders, which I'm sure you can
16  see in front of you, so you know what they are.  And I'm
17  going to be showing them to you in groups.  The groups
18  generally reflect the days -- the dates on the documents
19  of the days you worked.  So Defendants' Exhibit 2 is
20  four documents.  Each one appears to be a work order.
21  Each one is dated February 8th of 2005.  And tell me if
22  you have seen these documents before.
23  MR. BERKO:  Wait just a second.  Why don't you
24  take the court reporter's so I can have one.
25  //

21 (Pages 78 to 81)

DANIEL KEATING-TRAYNOR    May 23, 2008

94

1    A.  That's correct.
2    Q.  Okay.  On exhibit -- or page 3 of Exhibit 2, it
3  says that the start time is 3:30.  Is that correct?
4    A.  That's correct.
5    Q.  You don't have any reason to believe that's not
6  accurate?
7    MR. BERKO:  I'm sorry.  The start time on the
8  next one was what time?
9    MR. PETERS:  3:30.
10    THE WITNESS:  No.
11    MR. PETERS:  Do you want to go ahead and break?
12  We're at five after now.
13    THE WITNESS:  Yeah, let's take lunch.
14    (Recess.)
15    MR. PETERS:  Back on the record.
16    MR. BERKO:  He wanted to say something actually
17  about this exhibit, I think, so I just wanted to give
18  him a chance to do that.
19  BY MR. PETERS:
20    Q.  And just so we know, exhibit -- you're talking
21  about Exhibit 1, which was the chart which you indicated
22  you prepared in connection with your claims for overtime
23  in the previous action.
24    A.  Yeah.  I just -- I want to say that we were
25  looking at the figures over the lunch, and it is a

95

1  little confusing.  And now when we and Bruce prepared
2  this, I don't remember what -- what we were -- what kind
3  of math we were doing to come up with these figures, but
4  they don't really seem to be accurate in this case with
5  overtime.  I don't know -- I don't know.  I don't know
6  how we figured out these numbers or what these numbers
7  are supposed to mean.  I don't remember.
8    MR. BERKO:  I think he's talking about the
9  third column.
10    THE WITNESS:  In the last case.  But anyways --
11  anyways, it should be pretty easy to figure out the
12  actual overtime.
13  BY MR. PETERS:
14    Q.  Well, my question is is you previously
15  testified that you had prepared this and that you
16  believed it was accurate.  So just so I understand your
17  testimony, you're recanting that testimony and
18  indicating that you don't believe it's accurate.
19    A.  Accurate, what --
20    Q.  Accurate --
21    A.  I believe that it is accurate.  I just don't
22  recall what -- what exactly the purpose of this was at
23  the time --
24    Q.  Okay.
25    A.  -- and how we figured out --

96

1    MR. BERKO:  I'll give you an example.  See like
2  half hours, it doesn't match.
3    THE WITNESS:  Start at 6:00.  How do you get
4  two hours?  I mean, I don't know.  I don't remember what
5  we did.
6  BY MR. PETERS:
7    Q.  Well, let me ask this question:  Let's just go
8  down this -- take this step by step.  First column says
9  date.
10    MR. BERKO:  Can I just give you one example?
11  If you look, it says 7:30 start time.  Half hour lunch
12  and half hour return.  But then if you look on
13  April 4th, it says 1.17.  So it's hard to know what that
14  meant there, because what's 1.17?  It doesn't make
15  any -- and he doesn't remember exactly what they did.
16  You know, he did it with his attorney.  2.33 on
17  March 8th.  Well, I guess, yeah, how could it be a third
18  of an hour?
19    THE WITNESS:  It's supposed to be 2.33 --
20    MR. PETERS:  Off the record.
21    (Discussion off the record.)
22  BY MR. PETERS:
23    Q.  Let me just ask some questions about what we
24  might be able to figure out from Exhibit 1, Defendants'
25  Exhibit 1.  The column to the far left, which is

97

1  indicated as date, that -- those reflect days that you
2  worked.  Correct?  That column?
3    A.  Correct.
4    Q.  Just so we know.  And then the middle column,
5  which indicates last job, that indicates a time in which
6  the last job occurred or finished.  Correct?
7    A.  Correct.
8    Q.  Okay.  And then the third column -- and I
9  understand that there may be questions about what's
10  there, but is supposed to indicate an amount of
11  overtime.  Correct?
12    A.  Correct.
13    Q.  Okay.  And what you're saying is that you're
14  not quite sure how you came -- how you derived that
15  number in the third column beyond what's indicated on
16  the sheet.
17    A.  Correct.
18    Q.  Correct?
19    A.  Correct.
20    Q.  But you believe this document to be accurate?
21    A.  I do believe that.
22    Q.  Okay.  Daniel, as you -- when you were working
23  for AC Square, did you over time get better at your job?
24    MR. BERKO:  Vague and ambiguous.
25    THE WITNESS:  What do you mean by better?

25 (Pages 94 to 97)

**EXHIBIT L**

| DATE | LAST JOB | OVERTIME |
|---|---|---|
| 2/8 | 6:00 | 2.00 |
| 2/9 | 7:15 | 3.25 |
| 2/17 | 7:00 | 3.00 |
| 2/18 | 6:10 | 2.17 |
| 2/25 | 6:15 | 2.25 |
| 2/27 | 6:00 | 2.00 |
| 3/3 | 6:00 | 2.00 |
| 3/4 | 5:00 | 1.00 |
| 3/8 | 6:20 | 2.33 |
| 3/9 | 6:40 | 2.67 |
| 3/15 | 6:00 | 2.00 |
| 3/16 | 6:00 | 2.00 |
| 3/19 | 5:00 | 1.00 |
| 3/26 | 5:15 | 1.25 |
| 4/4 | 5:10 | 1.17 |
| 4/5 | 4:15 | 0.25 |
| 4/6 | 6:30 | 2.50 |
| 4/8 | 5:15 | 1.25 |
| 4/14 | 5:35 | 1.56 |
| 4/15 | 6:30 | 2.50 |
| 4/16 | 7:10 | 3.17 |
| 4/19 | 4:40 | 0.67 |
| 4/20 | 5:30 | 1.50 |
| 4/23 | 4:30 | 0.50 |
| | TOTAL HOURS | 43.99 |
| | | x$18.75 |
| | | $824.81 |

(*assumes start at 7:30 a.m., ½ hour lunch and ½ hour return time)



(1 pg.)

Δπ EXHIBIT 1
Deponent _Traynor_
Date _5/23/08_ Rptr. _JS_
WWW.DEPOBOOK.COM

EXHIBIT M



**Littler**

Employment & Labor Law Solutions Worldwide

Littler Mendelson, P.C.
50 West San Fernando Street
15th Floor
San Jose, CA  95113.2303

August 26, 2008

Ronald A. Peters
408.795.3433 direct
408.998.4150 main
408.288.5686 fax
rpeters@littler.com

**VIA E-MAIL BERKOLAW@SBCGLOBAL.NET**

Daniel Berko, Esq.
Law Office of Daniel Berko
819 Eddy Street
San Francisco, CA  94109

Re:    Daniel Keating-Traynor v. AC Square, Inc. et al.
       San Mateo Superior Court Case No. 464114
       USDC Case Nos. CV-08-02907 MHP; CV-08-03035 MHP

Dear Mr. Berko:

As I am sure you are aware, on August 22, 2008, Judge Patel issued a Memorandum and Order dismissing your 2907 Complaint and dismissing the Fair Labor Standards Act ("FLSA") causes of action from your 3035 Complaint. The Judge ruled on the merits of Defendants' 12(b)(6) motions pertaining to the FLSA actions, and ordered their dismissal.

I am writing to request that you (1) dismiss all causes of action in the 3035 and/or the Amended Consolidated Complaint that are barred by the statute of limitations, in accordance with the Judge's findings; (2) dismiss Comcast as a party Defendant; (3) dismiss Afshin Ghaneh and Andrew Bahmanyar as individual defendants; and (4) that we discuss you paying my client's attorneys' fees and costs as the prevailing party in the 2907 action and avoid any additional costs my client will incur in bringing a motion for these fees and costs.

**Dismissal of Causes of Action Barred by the Statute of Limitations**

It cannot be disputed that Judge Patel dismissed the FLSA causes of action in both your 2907 and 3035 Complaints in her Memorandum and Order. Specifically, Judge Patel stated:

- Accordingly, plaintiff has not and can not plead facts sufficient to state a claim for an FLSA violation because his claim is barred by ... both the two-year and three-year statutes of limitations. Therefore, plaintiff's claim for violation of the FLSA is DISMISSED;

- Therefore, plaintiff's conspiracy claims are DISMISSED. In sum, this action, case number 08-2907, is DISMISSED in its entirety;

Daniel Berko, Esq.
August 26, 2008
Page 2

- The removed action stems from the same facts as the action originally filed in this court. Consequently, any causes of action for violations of the FLSA or conspiracy to violate the FLSA are also DISMISSED.

(Memorandum and Order, pp. 4:19-21; 5:24-25; 6:2-7).

Judge Patel's decision was based on her explicit finding that Plaintiff's claim for unpaid wages accrued for the purposes of the statute of limitations on May 3, 2005, (Memorandum and Order, pp. 3:22-23; 4:8 stating "Consequently, the statute of limitations here began running in May 2005."). This finding is now entitled to res judicata effect for all similar issues.

First, Judge Patel rejected your claims that the statute of limitations accrued on a different date or was somehow extended. Specifically, Judge Patel rejected your contention that the statute of limitations accrued later because Plaintiff "considered himself employed by defendants until June 15, 2005", (Memorandum and Order, p. 4:1-2 stating "Plaintiff's self-characterization about when he considered himself employed is irrelevant. He admits that he last worked for pay on May 3, 2005.").

Second, Judge Patel rejected your claim that the statute of limitations accrued later because "plaintiff claims to have received his last paycheck on October 26, 2006. (Memorandum and Order, p. 4:2-8 stating, "Further, plaintiff's receipt of a paycheck in October 2006, which he claims underpaid him, is also irrelevant. This cause of action here accrued at some point in May 2005. Partial payment of wages at any point after that date does not reset the statute of limitations clock.).

Third, Judge Patel rejected your claim that the statute of limitations was somehow tolled by the relation back doctrine. (Memorandum and Order, p. 4:10-11 stating the "Relation back of amendments only apples to pleadings already filed and does not apply across actions. Fed. R. Civ. P. 15(c)."). Your newly filed causes of action could not in any event relate back to the original complaint, since such causes of action are based on different factual allegations.

Fourth, Judge Patel rejected your claim that the statute of limitations was tolled by the equitable tolling doctrine. (Memorandum and Order, p. 4:16-17 stating "Second, equitable tolling does not apply here either. Defendant's knowledge of plaintiff's overtime claims does not toll the statute of limitations.").

Finally, Judge Patel rejected your claim that the statute of limitations was extended for the purposes of your conspiracy claims. (Memorandum and Order, pp. 4:28; 5:1-6, 21-23 stating "Here, the underlying wrong is a violation of the FLSA. However, as discussed above, plaintiff cannot make out a cause of action for violation of the FLSA. Thus, a claim for civil conspiracy cannot be made" and "[t]his payment however, was not in furtherance of the conspiracy – it

Daniel Berko, Esq.
August 26, 2008
Page 3

*reduced* the amount plaintiff was underpaid and therefore could not have furthered an alleged conspiracy based on underpayment.").

Each of the above findings are conclusive and has res judicata effect in this action.  See *Angel v. Bullington*, 330 U.S. 183, 190 (1947) (holding the dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is a "judgment on the merits.").  "A final judgment on the merits [such as a dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)] **precludes** the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981); *Commissioner v. Sunnen*, 333 U.S. 591, 597 (1948).

Thus, it is clear that each of your causes of actions that have a one, two, or three year statute of limitations are barred as they accrued at the latest on May 3, 2005.

AC Square, Inc., Afshin Ghaneh and Andrew Bahmanyar therefore demand that you dismiss the fourth cause of action for "Failure to Pay Monies Due at Termination of Employment" and the fifth cause of action for "Conspiracy to Violate Labor Code section 558 from your Complaint for Restitution, Damages and Injunctive Relief filed on June 10, 2008.

Moreover, assuming that you will claim that the complaint filed in San Mateo County Superior Court on June 10, 2008 is no longer the operative pleading, but has been supplanted by your self-created "Amended Consolidated Complaint for Restitution, Damages and Injunctive Relief", AC Square, Inc., Afshin Ghaneh and Andrew Bahmanyar demand that that you dismiss the following causes of action: (1) the third cause of action for "Failure to Pay Monies Due at Termination of Employment – Labor Code 201-203"; (2) the fourth cause of action for "Conspiracy Consisting of Failure to Pay Monies Due at Termination of Employment – Labor Code 201-203"; (3) the fifth cause of action for "Violation of Labor Code section 558"; (4) the sixth cause of action for "Conspiracy to Violate Labor Code section 558"; (5) the seventh cause of action for "Violation of Labor Code 1194"; (6) the eighth cause of action for "Conspiracy to Violate Labor Code 1194"; (7) the ninth cause of action for "Violation of San Francisco Administrative Code 12R – San Francisco Minimum Wage Ordinance"; and (8) the tenth cause of action for "Conspiracy to Violate San Francisco Administrative Code 12R – San Francisco Minimum Wage Ordinance".

Please be advised that if you do not voluntarily dismiss these causes of action, AC Square, Inc., Afshin Ghaneh and Andrew Bahmanyar will file the appropriate motion to dismiss once this action is remanded to State Court.  If you require such a motion to be filed, AC Square, Inc., Afshin Ghaneh and Andrew Bahmanyar will also file a motion for sanctions under California Code of Civil Procedure 128.7 and/or any other appropriate code section.

Daniel Berko, Esq.
August 26, 2008
Page 4

**Dismissal of Comcast**

Your primary basis for suing Comcast appears to be as a means of either extorting monies from AC Square, by suing one of their principle clients and/or to attempt to get at a deeper pocket, notwithstanding the absence of any basis for suing Comcast. Your primary legal theory for suing Comcast appears to be that they "conspired" with AC Square, Inc. to violate various and sundry wage and hour laws. Predictably, as set forth above, your erstwhile conspiracy theory has been determined by the court to be legally invalid. To avoid the inevitable granting of either a demurrer or motion for summary adjudication/judgment on this issue, and the inevitable claim of costs, fees and sanctions that will follow, demand is made upon you to immediately dismiss Comcast, with prejudice.

**Dismissal of Afshin Ghaneh and Andrew Bahmanyar**

It is also without dispute that Afshin Ghaneh and Andrew Bahmanyar are not proper defendants. You yourself acknowledge in your papers opposing Defendants' Motions To Dismiss, that they are not proper defendants based on definitions of "employer" under California law, acknowledging that the FLSA definition is much broader. In the absence of any FLSA claim, it is clear that both Mr. Afshin Ghaneh and Andrew Bahmanyar could not be "employers" and must be dismissed.

As noted in our motions to dismiss, you claim that Mr. Bahmanyar and Mr. Ghaneh's involvement in the alleged conspiracy is based on their alleged positions as a managerial employees, officers and/or directors and their nonexclusive responsibility for AC Square, Inc.'s payroll and business practices. You do not, and cannot allege that Mr. Bahmanyar or Mr. Ghaneh acted outside their official capacities on behalf of the corporation in doing any alleged improper act. See *Black v. Bank of America*, 30 Cal. App. 4th 1, 4 (1994).

At most, your client claims that Mr. Bahmanyar and Mr. Ghaneh failed to pay Plaintiff all wages due and owing while serving as agents of the corporation. Thus, Plaintiff's claims against Mr. Bahmanyar and Mr. Ghaneh are specifically limited to acts allegedly committed within the scope of their agency because Plaintiff is claiming Mr. Bahmanyar and Mr. Ghaneh were partially responsible for AC [Square, Inc.'s] payroll and business practices and AC Square, Inc. "deprive[d] Plaintiff and all class members of their rights to overtime pay as provided by the FLSA." As Mr. Bahmanyar and Mr. Ghaneh could not possibly "deprive" Plaintiff of any overtime pay to which he is allegedly entitled under any statute, state or federal, but for their alleged responsibility for AC Square, Inc.'s payroll and business practices, both Mr. Ghaneh and Mr. Bahmanyar necessarily must have been acting in their capacity as agents of AC Square, Inc. in doing the alleged improper acts. It necessarily follows that, because "directors and officers of a corporation do not incur personal liability for torts of the corporation merely by reason of their official position" and corporate agents, such as Mr. Bahmanyar and Mr. Ghaneh, are "not personally liable for the corporate employer's failure to

Daniel Berko, Esq.
August 26, 2008
Page 5

pay its employee's wages". *Reynolds v. Bement*, 36 Cal. 4th 1075, 1087. Plaintiff therefore has no legal basis for any action against either Mr. Ghaneh or Mr. Bahmanyar as individual defendants. A dismissal of Mr. Ghaneh and Mr. Bahmanyar will avoid the inevitable motion for costs, fees and/or sanctions which will inevitably follow a successful motion resulting in their dismissal. Demand is hereby made that you dismiss Afshin Ghaneh and Andrew Bahmanyar from this action with prejudice.

**Defendants, AC Square, Inc., Afshin Ghaneh and Andrew Bahmanyar's Attorneys' Fees and Costs**

As stated above, defendants AC Square, Inc., Afshin Ghaneh and Andrew Bahmanyar and Comcast Inc. are, at a minimum, the prevailing party on the 2907 action. As held in *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, a prevailing defendant in a FLSA claim is allowed to recover its attorneys' fees and costs in certain instances, such as when such the claim lacks foundation. *Id.* at 420 (stating "Congress intended 'to deter the bringing of lawsuits without foundation' by providing that the 'prevailing party' – be it plaintiff or defendant – could obtain legal fees."). In addition, 28 U.S.C. section 1927 states:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

As the 2907 complaint, and the majority of the causes of action in the 3035 Complaint, were judicially determined to be without merit, your conduct in filing these complaints is clearly unreasonably and vexatiously multiplied the proceedings. Thus, you will be required to pay Defendants' attorneys fees and costs in defending against those claims that have been dismissed if Defendants are required to bring a motion requesting the same.

In support of Defendants' position, I invite you to review *Berkel v. Fox Farm and Road Machinery*, 581 F. Supp. 1248 (D. Minn. 1984). In *Berkel*, the plaintiff filed an action that was barred by the statute of limitations. Despite being presented with evidence showing the action was barred, plaintiff's counsel refused defendant's request for a dismissal. The defendant therefore filed a motion for summary judgment on the statute of limitations grounds, which was granted. The court also granted defendant's request for attorney's fees they incurred in defending the action based on plaintiff counsel's refusal to file a dismissal.

Like the plaintiff's counsel in *Berkel*, you filed the 2907 action and the FLSA claims in the 3035 action at a time when you knew they were barred by the statute of limitations. You must have known this fact because your client admitted he was terminated in May 2005 in his

Daniel Berko, Esq.
August 26, 2008
Page 6

original complaint and testified consistently with this fact in his deposition.  Thus, it is clear
you either filed these actions with the express knowledge that these claims were barred by the
statute of limitations, or you completely failed to make the required reasonable investigation of
the facts prior to the complaints being filed.  Moreover, you compounded your error by
pursuing these cases despite being presented with evidence that the claims were barred.  In
fact, rather than dismissing the complaints after defendants' motions to dismiss were filed, you
filed oppositions and defective amended complaints that did absolutely nothing to remedy the
glaring deficiencies, but only increased Defendants' costs by making them respond to these
additional pleadings. See also, *Murray v. Playmaker Services, LLC*, 548 F. Supp. 2d 1378
(S.D. Fla. 2008).

Any claim that you might raise that the actions had a good faith basis because you believed the
statute of limitations was tolled and or extended would be completely without merit.  You cited
absolutely no evidence or legal authority supporting your claim and these arguments were
summarily rejected by Judge Patel.

I am currently working on compiling the attorneys' fees and costs Defendants have incurred in
successfully obtaining judgments on your FLSA claims.  I am happy to discuss resolving this
issue with you.  However, if you will not agree that you are responsible for at least some of the
costs Defendants have unnecessarily incurred, I do not see the benefit in engaging in any such
discussions.  Should you disclaim any responsibility for Defendants' attorney's fees and costs,
Defendants will have no choice but to file a motion with the court and request the additional
amount for having to prepare and file such motion.

Very truly yours,

Ronald A. Peters

RAP/prl

Firmwide:86382955.1 047098.1008

**EXHIBIT N**

**Peters, Ronald A.**

| | |
|---|---|
| **From:** | Daniel Berko [Berkolaw@sbcglobal.net] |
| **Sent:** | Wednesday, August 27, 2008 8:10 PM |
| **To:** | Peters, Ronald A.; 'Daryl S. Landy' |
| **Cc:** | Emmet, Benjamin A.; Ravishankar, Lilanthi P. |
| **Subject:** | RE: Keating Traynor v. AC Square, Inc. et al RESPONSE TO THREATENING LETTER OF AUGUST 27, 2008 |

August 27, 2008

Dear Mr. Landyl and Peters,

This is in response to the letter I received earlier today.

I write to both of you because although the letter is signed by Mr. Peters, I assume it is written and endorsed by both of you and your clients.

I see your letter as just another in a series (by AC Square and its counsel, now joined by Comcast) of thuggish threats and bad faith tactics by an attorney who knowingly aids and abets his client in violating state and federal employment wage law in virtually very particular.    I again invite you, in a timely response to this email, to state the basis for any defense to a 17200 claim that Ac Square owes anyone whose claim is less than four years old from the filing of the June 29, 2007 complaint for all damages, based on the 17200  unlawful prong, every technician (1) overtime after 8 hours day (2) overtime for work more than 40 hours in a work week (3) reimbursement for expenses incurred at least when there was no pay scale differential between techs who used company owned vehicles as opposed to their own (4) at least minimum wage for every hour worked starting at least when they reported to the warehouse to get assignments (5) pay at least at minimum wage for time spent when a tech went to a job site and through no fault of the tech the customer was not available.   Those are not at all exclusive, there are several more as you know, but these have no factual or legal basis whatever as far as I can tell. In other words, AC'S defense of the claims are frivolous. Similarly, AC'S claim that these claims are not subject to class certification is also frivolous. In virtually every situation I specifically list above- and please point to any exception-, the issues involve company- wide policies that have been consistent since the start.  For example, the company takes the position that it has no duty to pay overtime over 8 hours in a day or 40 hours in a week, it never has paid overtime, and technicians are not entitled to it because they are exempt. I have asked Mr. Peters the basis for the exemption claim previously and he has stated only he will tell me at some point.  If the company does not take the position that techs are exempt, let me know. I again, as I have before I believe twice, ask you to assert any authority or facts that support the legal defenses to claims (1) through (5) above.  The SOL on all these claims is clearly four years and everyone of them is preserved from the start of the company until today.  And let's not play games or make frivolous arguments, although every lawyer of any skill knows that the SOL on all the claims in this suit relate back to June 29, 2007 when the first of the two consolidated actions were filed.  Four years

1

before that date, brings us to before the company even started. I predict that Mr. Peters and Comcast will continue to be coy and reply, if at all, with such gibberish as you will respond some time later in due course. But, if you really have defenses to the claims, you are most assuredly vexatiously increasing litigation expenses by failing to advise what they are.  The clock is ticking on your clients' refusal to comply with the law and failure to properly compensate its workers.

I do, of course, recognize that all three of the other defendants and Littler have arguable defenses which Ac does not have i.e. they are not the "employer" or cant' commit the tort.  As to Comcast, you simply caricature the situation with a claim of victimhood for AC.  There is a strong argument that I believe have a high likelihood of success that Comcast's position in this situation subjects it to paying the damages sought. Any claim that the claim that Comcast has liability is frivolous, it itself highly frivolous.

Only lawyers who are ignorant of the law or misleading their reader could possibly assert that it is clear that under California law a person such as President Ghanesh and Mr. Bahnmayar cannot be liable for wages for workers underpaid as well as penalties. I can't believe experts like you are guilty of the former so I must assume the only alternative is the latter. The claims are asserted on behalf of a putative class and there is no question that some class members' claims against them are as hot as yesterday's paycheck.

The conspiracy claim is not just based on Ac, Ghanmayar and Ghaneh engaging in a willful course of action in underpaying their employees, but also the involvement of Comcast and Littler Mendelson and others. And I know of no authority that an aidder and abettor claim, in which the statute of limitations reaches before the business was formed goes back four years in any event under 17200. It goes back at least three years every other time "damages" as opposed to a penalty are awarded pursuant to statute.

Your statement about why Comcast was used is so specious and tendentious that I will not respond.  Indeed, Comcast's out sourcing its obligations to see that its products are installed by workers paid the minimum required by law was one of the initial motivating factors behind the passage of the FLSA.

Your recitation of the law is often very flawed.  First, the judge did no more than rule against our position, something that happens every day many times a day.  In fact, she rejected, implicitly if not explictly, your key position which was that one could not conspire to violate the FLSA.  I respect, but disagree strongly with the main elements of her opinion, and any lawyer acting at the minimally competent level you have to be to make your threats should know that the case is not res judicata until all appeals are complete or the time periods for all appeals to be taken are complete.
Further, res judicata is not the proper doctrine in any event, which is collateral estoppel.  The case, if it becomes final, is res judicata on the FLSA claims of Danny. It probably is not, even if final, collateral estoppel on any of the state claims or any material issue in the state claims.  In any event, the most important claims in the case are all covered by the 17200 umbrella and are not barred or even affected by Judge

2

Patel's ruling.

We intend to proceed vigorously to establish our claims.  I will not be intimated, although you will try and try. You are correct there is no basis for negotiations on your so-called fees.  I also put you and Comcast on notice- because it is clear your letter is sent on behalf of Comcast and its counsel and you, that I will seek sanctions for this frivolous, bad faith, intimidation tactic which has no basis in law and for all motions that follow up on these baseless claims.

I hereby demand that you withdraw your frivolous letter and baseless, bad faith threats which attempt to interfere with my duty to the class and to my client.

Dan Berko




-----Original Message-----
From: Peters, Ronald A. [mailto:RPeters@littler.com]
Sent: Wednesday, August 27, 2008 4:16 PM
To: Daniel Berko; Daryl S. Landy
Cc: Emmert, Benjamin A.; Ravishankar, Lilanthi P.
Subject: Keating Traynor v. AC Square, Inc. et al


See attached letter.  Hard copy to follow by mail.


Ron A. Peters/ Littler Mendelson, P.C.
The National Employment & Labor Law Firm(r)
_____
408.795-3433-dir/ 408.288.5686-fax/415.860.4546-cell
50 W. San Fernando, Suite 1500/ San Jose, CA 95113 rpeters@litter.com/
www.littler.com

----

To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this document (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

This email may contain confidential and privileged material for the sole use of the intended recipient(s).  Any review, use, distribution or disclosure by others is strictly prohibited.  If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message.

To reply to our email administrator directly, send an email to postmaster@littler.com

Littler Mendelson, P.C.
http://www.littler.com